UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MICHAEL S. SCHIELE,

      Plaintiff,

v.                                    CASE NO.: 8:16-CV-2308-T30MAP

SOUTHEAST SHOWCLUBS, LLC,
EMPEROR'S TAMPA II, INC., and
MICHAEL TOMKOVICH,

      Defendants.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

      Pursuant to Fed.R.Civ.P. 56, Plaintiff, Michael S. Schiele, respectfully files this response in opposition to Defendant's Motion for Summary Judgment (Doc. 25) ("Defendant's Motion"). Rather than relying upon Plaintiff's testimony and on undisputed facts, Defendant's Motion improperly relies on contradictory deposition testimony, ignoring Plaintiff's, and on equally disputed issues of fact from its own witnesses and version of events.  Simply put, the Motion lacks the evidentiary predicate needed to establish the baseline set of undisputed facts required for summary judgment to be entered against Plaintiff.  For this reason, Plaintiff respectfully asks that this Honorable Court deny Defendant's Motion and let this case be tried on the merits.  The EEOC already found case, and while that is certainly not binding, it also adds strength to Plaintiff's claims. He is telling the truth.  He refused to fire or otherwise treat differently because of the color of their skin black dancers.  Then, he got fired.  Defendant's Motion should be denied as a result.

### *Overview of Motion*

Plaintiff is a 34-year White-American male who refused to charge black dancers an upfront stage free -- a not charge to white female dancers -- and then was fired a few weeks later under the classical pretextual reason given by the majority of employers: "performance".    By charging the "upfront" fee to the black dancers, Defendants kept many very poor dancers from dancing at all. After all, dancing is how they make their money.  If they cannot get on the stage, they cannot dance, and they cannot earn a living. Defendants know this.

Many, many shifting reasons were provided by Defendants only two witnesses as to why he was fired.  One was that he drank on the job.  Another was that he allegedly took whiskey. Another was that he asked the dancers to sleep with him.  And still another, and the reason Defendants' lawyers finally decided to go with, was due to poor performance."  These pretextual reasons and led Plaintiff to the EEOC where, in only 3.8% of all Charges filed, is a "reasonable "cause finding" provided, further validating Plaintiff's claims.[1]

However, the only performance issue was that he let everyone "perform" without first paying a stage fee.  Plaintiff worked as manager at strip clubs, Gold Club and Emperor's II, owned by Defendants.    He refused to fire black dancers who at the club, and in general slang, are sometimes referred to as "Canadians."  To Plaintiff's knowledge no "Canadians" worked at either club. Simply put, "Canadians" meant black dancers.  In late November of 2013 Plaintiff was told to thin the herd (another derogatory term) by changing the "Canadians"[2] stage fees to dance up front.  In the strip club industry this is usually not done until ***after*** the dancers have dance, so they can use their tips to pay the dance fee.  But, because Defendant Michael Tomkovich did not like

---

[1] https://www.eeoc.gov/eeoc/statistics/enforcement/all.cfm
[2]2 https://www.huffingtonpost.com/2008/01/26/is-canadian-a-racist-term_n_83392.html

black dancers, he gave his head manager strict instructions to pass down lower level managers to (*see* Exhibit A):

Lets start thinning the heard make sure you collect house up front from the Canadians.

Defendants have no evidence to support their ludicrous claims that Plaintiff was somehow a bad employee, other than the testimony of a single-company man witness, Rob Rice, who has, in fact, gone back to work for Defendant according to Plaintiff.  On the other hand, Plaintiff has and will produce that not only did liquor sales increase while he was there, he stopped what is known in the bar business as "shrinkage" (free drinks) by 60%.  Plaintiff was the best manager that Defendants had.  The only problem he did have was he refused to break the law and discriminate against black dancers.  When he complained about the policy in late November to Rob Rice, his superior, he was fired in early January.  Moreover, when Defendant attempted to implement the policy in late October, Plaintiff refused to do it.  This opposition is more than enough to satisfy the protected activity components need for a solid retaliation case.  And, obviously his termination constitutes and adverse employment action, leaving only causation and pretext.  The short window of time between when he both opposed the discriminatory practice. mid-October and when he actually complained about in, late November, ***both*** easily fit with within the Eleventh Circuit's temporal proximity needed to establish causation.  Those elements, couple with Defendant complete lack of evidence, direct evidence of discriminatory intent ***plus*** their

3

shifting reasons for her termination easily survive summary judgment as to all counts pled, including under 1981, FCRA, and the FCRA.

**RESPONSE TO EACH OF DEFENDANT'S ALLEGED UNDISPUTED FACTS**

1.      Plaintiff Schiele worked for Defendant Emperors during the relevant times of this alleged action. (Doc. 37-1-Rice Depo. Page 26, Lines 1-3); (Doc. 39-1- Schiele Depo. Page 20, Lines 11-19).

[*PARTIALLY UNDISPUTED*]

        <u>**Plaintiff's Additional Facts**</u>: Plaintiff also worked at Gold Club and did marketing work. (Schiele, p. 11, lines 16-25).

2.      Plaintiff began working for Defendant Emperors on or about March 21, 2013, as a manager. (Doc. 39-1-Schiele Depo. Page 20, Lines 17-19).

[*UNDISPUTED*]

3.      Plaintiff was a manager for Defendant Emperors and his job duties included, the overall safety of the establishment, opening and closing the establishment, accounting for the money in the registers, scheduling employees, and the independent contractors. (Doc. 38-1-Tomkovich Depo. Page 30, Lines 15-25).

[*UNDISPUTED*]

4.      Defendant Tomkovich is an individual, along with being the titled Director for Defendant Emperors and the Manager for Defendant Southeast Showclubs, (Exhibit "A"-[3]Florida Corporate Registration Documents for both Defendants).

        [*PARTIALLY UNDISPUTED*]

        <u>**Plaintiff's Additional Facts**</u>:  Mr. Tomkovich also met with Plaintiff <u>almost every day</u>

---

[3] The exhibits in the fact section, unless noted otherwise, are Defendants.

(Schiele, p. 35, lines 3-18); Mr. Tomkovich <u>set Plaintiff's rate of pay</u> (Schiele, p. 86, lines 23, 24); <u>instructed Plaintiff on what his job duties were</u> ((Schiele, p. 86, lines 25; p. 87, lines 1-5); and <u>set all company policies Plaintiff enforced</u> (Schiele, p. 87, lines 6-7)

5.      Plaintiff was not employed by Defendant Southeast Showclubs, LLC, as it did not own any business, or have any employees. The entity was created as a business concept but never engaged in business. (Exhibit "A"); (Exhibit "B"- Declaration of Jenny Adams); (Tomkovich Depo. Page 7, Lines 2-7; Page 24, Lines 22-25; Page 25, Lines 1-15; Page 31, Lines 15-21).

6.      The name Southeast Showclubs (without the "LLC") was simply an overarching term used to encompass a group of nightclubs that advertised jointly, but is not the same as the named Defendant Southeast Showclubs, LLC. (Doc. 37-1-Rice Depo. Page 21, Lines 1-3); (Exhibit "C"- Copy of an advertising card for South east Showclubs); (Doc. 39-1-Tomkovich Depo. Page 21, Lines 4-10).

[*DISPUTED*]

**Plaintiff's Additional Facts**

- Plaintiff's single write-up for not clocking in was issued on "SES" letter, meaning Southeast Show Clubs, LLC issued discipline documentation to it employees.  *See* Exhibit C.

- Southeast Showclubs, LLC is Liable as a Single Integrated Enterprise, as further evidenced by filing with the Securities Exchange Commission (*See* Composite Exhibit B).  In fact, the EEOC won a huge judgement against Southeast for nearly identical accusations which, remarkably, Mr. Tomkovich claims to know nothing about it.  (*See* Tomkovich, 38-1, pp. 8-9).

- According to Defendant's own witness, Rob rice (*see* Rice, p. 24, lines 1-4):

Q. So who set the rates of pay for management for South East Show Clubs' employees?

A. Mike set the rate of pay. You keep referring to the South East Show Clubs' employees. There was no employees of South East Show Clubs other than myself, but it was paid out of the Gold club.

Q. How did that work? What do you mean?

A. Because there was never -- like, you couldn't go to South East Show Club. It wasn't a club. That just encompassed everything. Rather than me saying I'm operations manager of Tampa Emperor's, Tampa Gold Club, Bliss, Pasco Emperor's, I would just say the South East Show Clubs. I was paid out of the Tampa Gold Club.

7.     At all times relevant to this cause of action in 2013, Defendant Emperors had, at the most, 13 employees. (Exhibit "B"). [*DISPUTED*]

**Plaintiff's Additional Facts -** Emperors Tampa, II, Inc., always had at least 15 employees during my employment. Beginning with the General Manager, then there was a shift manager, swing shift manager, night time and day time DJ, at least five or six guys working the floor and as porters, two day time bartenders, three night time bartenders, two door girls (one night and one day girl), please waitress, and the bathroom attendant, additionally, there was an employee who worked the parking lot putting the total number of employees (not counting dancers) well above 15. These people worked exclusively at Emperors Tampa, II, Inc., the front club, and does not count the back club. **(Plaintiff Schiele Declaration, ¶4).**

8.     Plaintiff was required to fill out the employee leasing application from Convergence Employee Leasing, Inc., as Plaintiff was employed through that employee leasing company and subject to the terms and conditions of that employment. (Exhibit "D"-A copy of the Employee Leasing Application).

[*DISPUTED*]

**Plaintiff's Additional Facts** – the eight page "Convergence" document is nothing more than an employee leasing application. Plaintiff had absolutely no contact with Convergence, they did not set his pay, hours, give him his job responsibilities, nothing. **(Schiele Declaration, ¶5).** This is a throw-away fact. Everyone knew that Mike, and even Rob, worked for Southeast through the different clubs. Notably, this argument isn't even raised as an affirmative defense. Other than a poorly drafted 2013 agreement which, is, arguably, illegal due to forced waiver of any worker's compensation injuries, "I hereby waive and forever release an rights I might have to make to the extent permit, against any customer or cel [*sic*] for damages which are covered under the workers' compensation status." **(Defendant's Exhibits, p. 10).**

9.    A portion of Plaintiff's signed application contained "General Safety Rules" which included the following contractual provision: "Employees under the influence of drugs or alcohol on-the-job will be subject to immediate discharge." Plaintiff signed his name and acknowledged the form, which stated that, "I have read these rules (or I had them read to me), and understand them and will obey them for my benefit." (Id.) Therefore, Plaintiff was on notice that being under the influence of drugs and alcohol on the job would result in "immediate discharge." (Id.).

[*UNDISPUTED* as to the language in the contract, but *DISPUTED* that Defendant knew Plaintiff was smoking pot in his car on break. **(Schiele, p. 68, lines 16-18).**

**Plaintiff's Additional Facts**:

At best this is an after-acquired evidence as that that was ***not*** why Defendant fired Plaintiff. In fact, Mr. Tomkovich testified that he did not ***fire*** Plaintiff for smoking pot, or even for drinking on the job. (Tomkovich, p. 61, lines 12-19). Then, Mr. Rice testified opposite of Mr. Tomkovich: he said he fired her for poor performance, his paperwork was never correct; the money was never

correct; and he drank on the job and tried to sleep with the dancers. **(Rice. 18, p. 1-5).** The two, meaning Tomkovich and Rice, couldn't get their stories straight.

10.    Plaintiff was also given a "Notice of Drug & Alcohol Testing," which stated: "The illegal use of drugs and the abuse of alcohol are problems that invade the workplace, endangering the health and safety of the abusers and those who work around them, this company is committed to creating and maintaining a workplace free of substance abuse without jeopardizing valued employees' job security…Our policy formally and clearly states that the illegal use of drugs or abuse of alcohol or prescription drugs will not be tolerated." (Id.)

[*UNDISPUTED*]

11.    Defendants also employed a policy that "stealing" was grounds for termination. (Doc. 38-1-Tomkovich Depo. Page 37, Lines 11-20).

[*UNDISPUTED*]

12.    Rob Rice was the general manager of Defendant Emperors and supervisor of the Plaintiff. (Doc. 38-1-Tomkovich Depo. Page 20, Line 18-22).

[*UNDISPUTED*]

13.    On several occasions during Plaintiff's employment, he was verbally reprimanded and presented with written write-ups from the manager, Rob Rice, for several reasons, including: his poor performance; his paperwork was never correct; the money (accounting) was never correct; he abused his "power of authority" to threaten girls if they didn't "party" with him or meet him "after hours," and he admitted, under oath, to rampant illicit marijuana drug use during working hours. (Doc. 37-1-Rice Depo. Page 18, Lines 1-5; Page 31, Lines 18-25; Page 32, Lines 1-6); (Doc. 38-1-Tomkovich Depo. Page 16, Lines 23-25; Page 17, Lines 1-10; Page 19, Lines 9-17).

[*DISPUTED*]

**Plaintiff's Additional Facts**. When deposed Mr. Rice did say those things, but he never mentioned once confronting Mr. Schiele about any of them, much less writing him or firing him.  This is simply after acquired evidenced.   It is also completed contradicted by the Declaration of Bruze Stoelzel, a former employee who said he heard Mr. Tomkovich refer to another employee as a nigger.  (Declaration of Bruze Stoelzel)  Mr. Stoelzel also said Plaintiff was an excellent manager who was against the discriminatory practices instituted by Mr. Tomkovich.

14.    Plaintiff admits to "smoking pot" on his breaks while on shifts employed with Defendant Emperors. (Doc. 39-1-Schiele Depo. Page 68, Lines 5-18).

[*UNDISPUTED*]

15.    Plaintiff admits to drinking "quite a few drinks" while on shifts employed with Defendant Emperors. (Doc. 39-1-Schiele Depo. Page 52, Line 6-25).

[*UNDISPUTED*]

16.    Plaintiff stole and drank Jameson Irish Whiskey while on duty at shifts employed at Defendant Emperors. (Doc. 37-1-Rice Depo. Page 18, Lines 12-13; Page 19, Lines 1-6 and 19-21); (Exhibit "E"-Defendant Emperors internal emails dated July 23, 2013, and September 23, 2013, which show a bottle of Jameson missing during each inventory accounting).  [*DISPUTED*]

**Plaintiff's Additional Fact - (Plaintiff successfully reduced the "shrinkage" at Emperor's by nearly 60% within a few months.  Defendant has <u>zero</u> proof Plaintiff stole anything.**

17.    Due to his poor performance and violations of the Defendants' policies, Plaintiff was changed from manager to "disc jockey" by Rob Rice, the General Manager, on or about December 31, 2013. (Doc. 37-1-Rice Depo. Page 16, Lines 5-20); (Doc. 38-1-Tomkovich Depo. Page 38, Line 1-18). [*DISPUTED*]  **- (Schiele, p. 66, 16-18, Schiele was fired and then offered the disc jockey job to ensure he didn't become to upset because he knew "too much").**

18.     Plaintiff refused to accept what he viewed as a demotion and therefore "quit" his employment at Defendant Emperors. (Doc. 37-1-Rice Depo. Page 16, Lines 5-20); Doc. 38-1-Tomkovich Depo. Page 38, Line 1-18). [*DISPUTED*]  **(Schiele, p. 61, p. lines 12-18).**

19.     Plaintiff believed that the reason he was subjected to an "adverse action" by Defendants was because they thought he was a "sh*tty manager". (Exhibit "F"- Text messages between Plaintiff and a colleague).  [*DISPUTED*]   **(Schiele, p. 61, p. lines 12-18Plaintiff's adverse action in this case was his termination.**

20.     Plaintiff never complained of any of Defendants' policies in place. (Doc. 38-1-Tomkovich Depo. Page 36, Lines 9-12).  [*DISPUTED*]  **(Schiele, p. 42, p. line 25; p. 43, lines 6-9 (report discrimination).**

## MEMORANDUM OF LAW

Summary judgment is only appropriate if the pleadings, discovery, disclosure materials on file, and any affidavits demonstrate there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The plain language of Rule 56(c) allows for the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).   The appropriate substantive law will guide the determination of which facts are material and which facts are irrelevant.  *Anderson v. Liberty Lobby. Inc*., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences must be resolved in favor of the non-movant.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  Plaintiff respectfully submits that Defendant has failed to carry its burden establishing that no genuine issue as to any material fact exists.  The material facts remain

in dispute.  Thus, each of Plaintiff's claims should be decided by a jury.

## ARGUMENT

**I.    Plaintiff Established a Prima Facie Case for Retaliation**

Plaintiff seeks recovery pursuant to the Florida Civil Rights "FCRA" and section 1981 for retaliation.  In this Circuit, FCRA and Section 1981 claims have the same legal elements when the claims are based on the same set of facts. *See, e.g., Rioux v. City of Atlanta, Ga*., 520 F.3d 1269, 1275 n.5 (11th Cir. 2008); *see also Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805-806 (11th Cir. 1995).  Here, all claims turn on the same set of facts.

**II.    Plaintiff's Retaliation Claims**.

**A.    Plaintiff Established a Prima Facie Case of Retaliation.**

In order to establish a prima facie case of retaliation under either FCRA or 1981, Plaintiff must show (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. *Alford vs. State of Florida, Office of the Auditor General*, 390 F. Supp. 2d 1236, 1252 (S.D. Fla. 2005) (citing *Raney v. Vinson*, 120 F.3d 1192, 1196 (11th Cir. 1997)).  Defendant's Motion concedes that Plaintiff's termination is an adverse employment action that satisfies the second element, and fails to address causation (thus, any arguments related thereto have been waived).  Nonetheless, below Plaintiff addresses both elements one and three.

**1.    Plaintiff Engaged in a Protected Activity.**

To satisfy this first element of a prima facie case of retaliation, it is sufficient that an employee merely have a good faith, objectively reasonable belief that his activity is protected. *See, e.g., Clover v. Total Sys. Servs., Inc*., 157 F.3d 824, 827 (11th Cir. 1998).  In fact, in *Crawford v. Metropolitan Government of Nashville & Davidson County, Tennessee*, 555 U.S. 271, 276 (Jan. 26, 2009), a unanimous Supreme Court held that "oppose" in terms of retaliation is undefined by

FCRA, and further held there is no requirement that the employee actually initiate or voice a complaint to trigger the opposition clause. Instead, words or conduct which communicate an "ostensibly disapproving" stance toward a discriminatory act or practice is protected activity. *See Id.*

Plaintiff engaged in a statutorily protected activity in October, again in late November, and again in December, approximately one month prior to his pretextual termination (*see* Doc. 39-1, 42, lines 17-25; lines 1-9):

> 17    Q.  All right.  So what, if any, knowledge do you
> 18  have about Mr. Tomkovich being aware of any issue
> 19  related to this discipline form?
> 20    A.  To this specific discipline form?
> 21    Q.  Correct.
> 22    A.  I mean, I couldn't tell you, but -- I mean, I
> 23  don't know if he's -- if he even does know about it.  I
> 24  mean, you'd have to ask him that.
> 25    Q.  So this is December 18th, and I think you told
>
> Page 43
> 1  me that -- and again, we're working on getting the phone
> 2  records, this text that talked about thinning the herds
> 3  and the reference to Canadians was sometime in October.
> 4  So that's probably --
> 5    A.  November, probably.
> 6    Q.  So somewhere eight to ten or -- you know,
> 7  some -- several weeks, at least?
> 8    A.  It was probably very late November.  So you're
> 9  probably talking, yeah, two, three weeks tops.

Thus, Plaintiff has easily met the first element of his retaliation claims.

### 2.    **Plaintiff Established Causation.**

Although the third element of "causation" is not raised in Defendant's Motion, the close temporal proximity between Plaintiff's protected activity on April 23, 2014, and his termination six days later on April 29, 2014, easily satisfies the causation element. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). Indeed, a showing that the protected activity and the adverse employment action occurred in "close temporal proximity" and that the employer was

aware of the protected activity is often sufficient to establish the causal connection. *Hairston v. Gainesville Sun Publishing Co*., 9 F.3d 913, 920 (11th Cir. 1993) (prima facie showing of causal connection at summary judgment stage does not require proof by a preponderance of the evidence standard, but merely that the employee's activity and the employer's action were not wholly unrelated). In fact, this circuit has long adhered to the rule that temporal proximity can, by itself, create an inference of causation. *See Brungart v. BellSouth Telecommunications, Inc*., 231 F.3d 791, 799 (11th Cir. 2000), *cert. denied*, 532 U.S. 1037, 121 (2001); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). Here, we had three protected activities, one in October, one described as late November, and a third in December. This is more than close enough causation.

### 3.    Defendant's Reasons for Plaintiff's Termination Were Pretextual.

To prevail on summary judgment, therefore, Defendant must present a legitimate, non-retaliatory reason for terminating Plaintiff: "a reason that no reasonable jury could conclude was pretextual." *Martin v. Brevard County Pub. Sch*., 543 F.3d 1261, 1268 (11th Cir. 2008). Defendant has not met this high standard. Namely, Plaintiff has established pretext through Defendant's "shifting reasons" for Plaintiff's termination. One was that he drank on the job. Another was that he allegedly took whiskey. Another was that he asked the dancers to sleep with him. And still another, and the reason Defendants' lawyers finally decided to go with, was due to poor performance." These pretextual reasons and led Plaintiff to the EEOC where, in only 3.8% of all Charges filed, is a "reasonable "cause finding" provided, further validating Plaintiff's claims.[4]

## IV.    Both Emperors and Southeast Meet the Definition of Employer Under Both the FCRA and 1981.

---

[4] https://www.eeoc.gov/eeoc/statistics/enforcement/all.cfm

Emperors belongs to a chain of clubs organized under the entity ―Southeast Showclubs, LLC. SES existed and operated as a single, integrated enterprise with Emperors, and as a result, is also liable for the FCRA and 1981 violations against Plaintiff. They shared the same offices, many of the same employees, and even the same logo on company paperwork. **(Schiele Declaration, ¶8).** *Perrin v. Florida Power & Light Co.*, No. 83-2990-CIV-JLK, 1984 WL 987, at *1 (S.D. Fla. Apr. 24, 1984) (stating that ―overtly distinct entities can be exposed to liability as a single, integrated enterprise‖ for violations of Title VII).

In determining whether an entity is a single, integrated enterprise with other entities, and therefore liable for FCRA or 1981 violations, courts consider the following factors: ―(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *McKenzie v. DavenportHarris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987); *see also Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999);

All four factors weigh in favor of holding SES liable as a single, integrated enterprise with Emperors. First, ownership and financial control of SES and Emperors by a single individual—Tomkovich. Emperors had common management, Rob Rice, with Tomkovich as the ultimate decision-maker. **(Schiele Declaration, ¶7).**    Additionally, the entities' operations were interrelated in several aspects: text messages were exchanges club managers for promotional ideas; club manager, including Plaintiff worked at times as different SES clubs at the direction of Tomkovich and other SES management personnel; payroll among SES clubs was interrelated and managed by Tomkovich either through

Convergence or Tomkovich's Jacksonville office, as did disciplinary matters demonstrated by the single write-up SES gave Plaintiff. **(Schiele Declaration, ¶8).**

Most telling, —SES written policies governed day-to-day operations of all SES clubs, including but not limited to, employee relations and book-keeping came out of the Jacksonville headquarters for SES. **(Schiele Declaration, ¶8).** Finally, Tomkovich made final decisions related to labor relations at all SES decisions, acting through SES regional managers, at times. SES was essentially one in the same as Emperors and should be held jointly and severally liable for the violations of the FCRA and 1981 set forth therein. **(Schiele Declaration, ¶8.**

## V. Both Emperors and Southeast Meet the Definition of Employer Under Both the FCRA and 1981.

As to Plaintiff's FCRA claim, which requires 15 or more employees, Contrary to Defendant's Motion Plaintiff has proffered sufficient information that, at a minimum creates an issue of fact as to how many employees  Southeast Show Clubs, LLC actually employees, particularly, if considered a joint enterprise with Emp.  Such a question is better left for a jury to decide.  For example, as explained in Plaintiff's declaration, Emperors Tampa, II, Inc., always had at least 15 employees during my employment.  Beginning with the General Manager, then there was a shift manager, swing shift manager, night time and day time DJ, at least five or six guys working the floor and as porters, two day time bartenders, three night time bartenders, two door girls (one night and one day girl), please waitress, and the bathroom attendant, additionally, there was an employee who worked the parking lot putting the total number of employees (not counting dancers) well above These people worked exclusively at Emperors Tampa, II, Inc., the front club, and does not count the back club.

§1981 has no similar "15 person" requirement.  Individuals can be sued under 1981.

Thus this argument fails as a matter of law.  *See* 42 U.S.C. 1981.

**VI.    Plaintiff has put on sufficient testimony as to his engagement in a protected activity and as to Defendant's knowledge of the same.**

As set forth above, Plaintiff testified as follows (*see* Doc. 39-1, 42, lines 17-25; lines 1-9)::

> 17    **Q.  All right.  So what, if any, knowledge do you**
> 18    **have about Mr. Tomkovich being aware of any issue**
> 19    **related to this discipline form?**
> 20    A.  To this specific discipline form?
> 21    **Q.  Correct.**
> 22    A.  I mean, I couldn't tell you, but -- I mean, I
> 23    don't know if he's -- if he even does know about it.  I
> 24    mean, you'd have to ask him that.
> 25    **Q.  So this is December 18th, and I think you told**
>
> Page 43
>
> 1    **me that -- and again, we're working on getting the phone**
> 2    **records, this text that talked about thinning the herds**
> 3    **and the reference to Canadians was sometime in October.**
> 4    **So that's probably --**
> 5    A.  November, probably.
> 6    **Q.  So somewhere eight to ten or -- you know,**
> 7    **some -- several weeks, at least?**
> 8    A.  It was probably very late November.  So you're
> 9    probably talking, yeah, two, three weeks tops.

The Supreme Court has long held that protected activity not be in writing and, thus, by complaining to Tomkovich and Rich Plaintiff has also satisfied this element.

**VII.    <u>Tomkovich is personally liable to Plaintiff under §1981.</u>**

Section 1981 provides as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other

16

Simply put, per *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975) Mr. Tomkovich is personally liable to Plaintiff under Section 1981, because "the propriety of such an award in a Section 1981 action is well recognized in this circuit. *E.g., Sanders v. Dobbs Houses, supra; Mizell v. North Broward Hospital Dist*., 427 F.2d 468 (5th Cir. 1970). *See also Sullivan v. Little Hunting Park, Inc., supra*, 396 U.S. at 239, 90 S.Ct. at 405, in which the Supreme Court stated, 'the existence of a statutory right implies the existence of all necessary and appropriate remedies;' and *Waters v. Wisconsin Steel Works of Internat'l Harvester Co., supra*, 427 F.2d at 488, in which the Seventh Circuit stated that a plaintiff's relief under Section 1981 'is potentially as broad as that available in (an) action . . . under Title VII.'

Just as in FLSA cases when an individual is named, Courts look to the amount of control the induvial in question had over the Plaintiff.  Here, Plaintiff testified that he had more than sufficient control to establish liability under 1981 (*see* Schiele, pp. 86-87):

5    Q.   Okay.  And is this the type of documentation
6  you saw other people get whenever they would get
7  disciplined?
8    A.   Yes.  I would -- I had to actually issue a few
9  of these in my day.
10    Q.   And it came from South East Show Clubs?
11    A.   And they were identical to these.  You'd just
12  get a blank one of these, and normally, the process
13  would be if I wanted to write up an employee, I would
14  have to write them up, and then, I would have to find
15  somebody who worked for the parent company to back it
16  up.
17        So if you see here, there's usually two
18  different managers or two different witnesses.  They
19  would always get somebody from the parent company to be
20  around for that.
21    Q.   And by the parent company, what do you mean?
22    A.   South East Show Clubs.
23    Q.   And who set your rate of pay?
24    A.   Mike Tomkovich.
25    Q.   Who set your hours?

Page 87

1    A.   Mike Tomkovich, South East Show Clubs.  Mike
2  Tomkovich.
3    Q.   Who told you what your job duties were?
4    A.   The company, the parent company, Mike
5  Tomkovich, directly from him.
6    Q.   Who set the company policies that you
7  enforced?
8    A.   The owner, Mike Tomkovich.

18

**VIII.  Plaintiff can easily establish pretext through the shifting reasons provided by Defendant and its employees as to Plaintiff's termination**.

Pretext in a retaliation case can also be demonstrated where the defendant changes or shifts reasoning for a personnel action. *See, e.g., Cleveland*, 369 F.3d at 1194 (finding that "shifting reasons" given by the decision maker supported a jury finding that the employer's explanation was "unworthy of credence" and the real reason was the plaintiff's disability). *Bechtel Constr. Co. v. Secretary of Labor*, 50 F.3d 926, 935 (11th Cir. 1995)("The perpetual nature of Bechtel's terminating Nichols is further demonstrated by Bechtel's shifting explanations for its actions"); *Combs v. Plantation Patterns, Inc*., 106 F. 3d 1519 (11th Cir. 1997)(Inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its employment action support a jury finding of pretext); *Howard v. BP Oil Co. Inc*., 32 F.3d 520, 526 (11th Cir. 1994)("identification of inconsistencies in the defendant's testimony is evidence of  pretext."); *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993); *Brooks v. Monroe Systems  for Business, Inc*., 873 F.2d 202, 204 (8th Cir. 1989); *Schmitz v. St. Regis Paper Co*., 811 F.2d  131, 132 (2d Cir. 1987)(*per curiam*).

In this case Defendant's reasons for terminating Plaintiff have shifted multiple times and clearly demonstrate pretext.  First, Defendant claimed it fired him for poor performance, than for smoking pot in his car, then for stealing, then Tomkovich said he was not fired at all, he quit because he didn't want to be a DJ.  These "shifting reasons" given by the decision maker, Tomkovich (with support from Rice) support a denial of Defendant's Motion.

Dated this 27th day of October, 2017.

Respectfully Submitted,

*/s/Brandon J. Hill*

**BRANDON J. HILL**
Florida Bar Number: 37061
Direct No.: 813-337-7992
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Main No.: 813-224-0431
Facsimile: 813-229-8712
Email: lcabassa@wfclaw.com
Email: bhill@wfclaw.com
Email: mkimbrou@wfclaw.com
Email: jriley@wfclaw.com
**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 27th day of October, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notice of all counsel of record.

*/s/Brandon J. Hill*

**BRANDON J. HILL**