Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

2..5

```
                                          Page 2                                              Page 4
 1    A P P E A R A N C E S:                        1           S T I P U L A T I O N S
 2    BRANDON J. HILL, ESQUIRE                      2       It is hereby stipulated and agreed by and between
      OF:  WENZEL FENTON CABASSA, P.A.
 3         1110 NORTH FLORIDA AVENUE                3   the counsel for the respective parties and the deponent
           SUITE 300
 4         TAMPA, FLORIDA 33602                     4   that the reading and signing of the deposition
           (813)224-0431, FAX(813)229-8712
 5         Bhill@wfclaw.com                         5   transcript be reserved.
              APPEARING ON BEHALF OF THE PLAINTIFF
 6                                                  6
      LUKE CHARLES LIROT, ESQUIRE                   7
 7    OF:  LAW OFFICES OF LUKE LIROT, P.A.          8
           2240 BELLEAIRE ROAD
 8         SUITE 190                                9
           CLEARWATER, FLORIDA 33764
 9         (727)536-2100, FAX(727)536-2100         10
           Luke2@lirotlaw.com
10            APPEARING ON BEHALF OF THE DEFENDANTS 11
11    CANDICE A. ROJAS, ESQUIRE                    12
      OF:  LAW OFFICES OF LUKE LIROT, P.A.         13
12         2240 BELLEAIR ROAD
           SUITE 190                               14
13         CLEARWATER, FLORIDA 33764               15
           (727)536-2100, FAX(727)536-2100
14         Candice@lirotlaw.com                    16
              APPEARING ON BEHALF OF THE DEFENDANTS
15                                                 17
16    ALSO PRESENT:                                18
           MICHAEL S. SCHIELE
17                                                 19
18                                                 20
19                                                 21
20                                                 22
21
22                                                 23
23                                                 24
24
25                                                 25
```

```
                                          Page 3                                              Page 5
 1              I N D E X                           1        PROCEEDINGS
 2    TESTIMONY OF MICHAEL TOMKOVICH                2       THE COURT REPORTER:  Would you raise your
 3       DIRECT EXAMINATION BY MR. HILL.........5   3   right hand, please?
 4       CROSS-EXAMINATION BY MR. LIROT.........57  4       Do you solemnly swear or affirm that the
 5       REDIRECT EXAMINATION BY MR. HILL.......63  5   testimony you're about to give in this cause is the
 6    CERTIFICATE OF OATH........................69 6   truth, the whole truth and nothing but the truth?
 7    CERTIFICATE OF REPORTER....................70 7       THE WITNESS:  Yes.
 8    ERRATA SHEET...............................71 8           MICHAEL TOMKOVICH
 9    NOTIFICATION LETTER........................72 9   was called as a witness and, having first been duly
10                                                 10   sworn, testified as follows:
11           INDEX OF EXHIBITS                     11           DIRECT EXAMINATION
12    PLAINTIFF'S EXHIBITS                         12   BY MR. HILL:
13    EXHIBIT 6...FINAL JUDGMENT..................8 13      Q.  Mr. Tomkovich, good morning.  My name is
14    EXHIBIT 7...EMPEROR'S REPORTS..............17 14   Brandon Hill.  We have three depositions that you're
15    EXHIBIT 8...PLAINTIFF'S AMENDED NOTICE OF TAKING 15  going to be a party to today.
                  CORPORATE REPRESENTATIVE'S DEPOSITION....30  16       The first, we're going to start with you
16                                                 17   individually, and that means that you'll be testifying
      EXHIBIT 9...PLAINTIFF'S NOTICE OF TAKING     18   as Michael Tomkovich, not as South East Show Clubs or as
17                CORPORATE REPRESENTATIVE DEPOSITION......32  19   Emperor's but as yourself.  That deposition is a little
18    EXHIBIT 10..DEFENDANTS' RULE 26 INITIAL DISCLOSURES..40  20   different in that it's more free and wide open, whereas
19    EXHIBIT 11..DEFENDANTS' ANSWER AND AFFIRMATIVE 21   the corporate representative depositions that you take
                  DEFENSES...............................42  22   will be more limited to the topics that I've provided.
20                                                 23   Do you understand?
      EXHIBIT 12..DEFENDANTS' SOUTH EAST SHOW CLUBS LLC'S 24      A.  Yeah.
21                ANSWERS TO INTERROGATORIES..............47  25      Q.  And I'm not here to trick you.  I'm not here
22    EXHIBIT 13..VIP CARD.......................51
23
24
25
```



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH
6..9

Page 6

1 to argue with you. I'm just here to know what you know,
2 hear your side of things. Can you state your full name
3 for the record, please?
4   A. Michael Tomkovich.
5   Q. And, Mr. Tomkovich, you're the owner of many
6 clubs; is that true?
7   A. Yes.
8   Q. Okay. And here in Tampa Bay, what clubs do
9 you own?
10   A. Gold Club and Emperor's.
11   Q. And there used to be other clubs that you
12 owned; is that right?
13   A. Yes.
14   Q. Which other clubs did you own in the last five
15 years in Tampa, do you know?
16   A. Level III, Full Moon Saloon. That changed to
17 Club Ice.
18   Q. Any others?
19   A. Bliss Cabaret.
20   Q. Okay.
21   A. Emperor's in Pasco and Diamonds in Pasco.
22   Q. Did you own AJ3860, LLC, d/b/a The Executive
23 Gentlemen's Club?
24   A. Yes.
25   Q. And --

Page 7

1   A. Which was Bliss Cabaret.
2   Q. Got you. And South East Show Clubs, LLC, what
3 is that?
4   A. That is nothing.
5   Q. What does that mean, it's nothing?
6   A. It's nothing. It didn't do any business, it
7 doesn't have a business license, it doesn't do anything.
8   Q. Okay. You still operate it though, right?
9   A. It's still an active corporation, but it never
10 had any operations. So just management, overseeing, any
11 kind of managerial type thing, nothing of that nature.
12   Q. So, for example, Mr. Rice just testified that
13 he was an employee of South East.
14   A. That would be incorrect. All the paychecks --
15 each club I own is owned and operated individually with
16 their own FIN numbers, their own sales tax, their own
17 liquor licenses, their own business tax. South East
18 Show Clubs never had a business license in any capacity.
19   Q. And, obviously, you've been dealing with some
20 lawsuits. The EEOC suit, South East Show Clubs; is that
21 right?
22   A. Yes, I think so.
23   Q. Okay. There's a final judgment here I'm going
24 to hand you with -- part of it includes an injunction.
25     MR. HILL: I'll mark that as Plaintiff's

Page 8

1 Exhibit 6.
2     (Plaintiff's Exhibit Number 6 was marked for
3     identification.)
4 BY MR. HILL:
5   Q. If you could turn to Page 2, please, sir.
6 Would you read the permanent injunction and out -- I
7 mean, to yourself and let me know when you're ready to
8 talk about it.
9   A. Where are we looking at?
10   Q. It's Page 2 where it says permanent
11 injunction.
12   A. Uh-huh.
13   Q. Just read those first two paragraphs and let
14 me know when you're ready to discuss them.
15   A. All right.
16   Q. Okay. And so were you aware that there was an
17 permanent injunction that's been entered by the United
18 States District Court, Notice of Florida, Tampa Division
19 against South East Show Clubs?
20   A. I know now.
21   Q. You didn't know before today?
22   A. No.
23   Q. And were you aware, sir, that as part of that
24 injunction, Page 3, spells out the specific things that
25 South East Show Clubs is supposed to do to comply with

Page 9

1 this injunction? Have you ever seen these before?
2   A. No.
3   Q. Could you read through Pages 3 through 5 and
4 tell me if you've ever complied with any of the court's
5 order?
6   A. I never did anything wrong. This whole thing
7 is bunk.
8   Q. My question is a little bit different. So,
9 for example, Judge Covington ordered you --
10   A. Ordered South East.
11   Q. -- ordered South East to create and
12 disseminate a written policy preventing discrimination
13 based on race and color. Did South East do that?
14   A. No.
15   Q. Why not?
16   A. Because it doesn't do any business.
17   Q. Okay. Did South East ever provide the EEOC
18 with a copy of the policy within 60 calendar days of the
19 judgment as ordered by the Court?
20   A. No.
21   Q. Did -- Page 4, Judge Covington ordered South
22 East to post notice of the final entry of default in a
23 conspicuous location easily and commonly frequented by
24 its employees? Did that ever happen?
25   A. Don't have any employees, so no. It doesn't



ORANGELEGAL

Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

10..13

Page 10

1  operate a business, so no.
2     Q.  Okay. Has South East Club -- Show Clubs sold
3  anything recently?
4     A.  Nope. It doesn't own anything. There's no
5  corporate assets.
6     Q.  What about quarterly reporting, Paragraph C,
7  Page 4, Docket 47, Judge Covington ordered South East
8  within 30 calendar days to provide EEOC with a work
9  force roster which identifies each member of its work
10 force by name, race, color, position, date of hire, date
11 of separation, anything? Did you do anything of that?
12    A.  Nope. Does -- it does not have any employees.
13    Q.  Did you report that to the EEOC report?
14    A.  Never seen this order.
15    Q.  You've never seen this injunction?
16    A.  Nope.
17    Q.  So you haven't complied with -- South East
18 hasn't complied with any of it, right?
19    A.  No.
20    Q.  Do you have any intention to comply with the
21 Court's order?
22    A.  South East Show Clubs?
23    Q.  Right.
24    A.  It doesn't own or operate any kind of
25 business. I could probably put a sign outside saying

Page 11

1  don't discriminate on it at a park bench. It's the same
2  thing as putting it in this office. Where am I going to
3  put it?
4     Q.  Paragraph 6 required South East Show Clubs to
5  retain all documents or data made or kept required by
6  this judgement. And so this -- none of this got done,
7  right?
8     A.  Right.
9     Q.  Did you ever see this injunction when it was
10 entered against you?
11    A.  No.
12    Q.  You know it was sent to you as a registered
13 agent?
14    A.  To where?
15    Q.  To 320 General Dolittle Drive, Jacksonville,
16 Florida?
17    A.  The place burned down.
18    Q.  Did you get your mail forwarded when it got
19 burned down?
20    A.  Nope. Nope. So I never got it.
21    Q.  Well, what about the address at 5718 East
22 Adamo Drive in Tampa, Florida?
23    A.  I didn't get it.
24    Q.  What address is that?
25    A.  That's Emperor's address.

Page 12

1     Q.  You said that one's open, though, right?
2     A.  I didn't say anything like that.
3     Q.  Is it open? Is that address open for
4  business?
5     A.  The front address, yes.
6     Q.  So there's no reason that you shouldn't have
7  gotten this piece of mail, right?
8     A.  I can't answer that.
9     Q.  Does the Court know that you haven't done any
10 of this?
11    A.  I can't answer that.
12    Q.  What do you mean?
13    A.  I don't know what the Court knows.
14    Q.  Have you -- let me ask you, I'm -- last
15 question, is it your testimony that you've never
16 received a copy of this injunction and you're completely
17 unaware of it?
18    A.  That one there, yes.
19    Q.  And now that you're aware of it, do you plan
20 on complying with it?
21    A.  South East Show Clubs can't comply with that.
22 It has -- it doesn't do any of those things.
23    Q.  What happened in this case, do you know? And
24 I'm talking about the -- this is the EEOC case that they
25 bought against South East and the Executive Gentlemen's.

Page 13

1  What happened in that case?
2     A.  Tony Hernandez, which was the regional
3  manager, told Pat Franke to fire a bartender. The
4  original Complaint was against A&J associated with
5  our -- 3860, whatever the other corporate entity was.
6        The original Complaint was owner, Tony
7  Hernandez, said to fire the black girl. That was the
8  original thing, that Franke thought Tony Hernandez was
9  the owner.
10       Then it changed that Mike Tomkovich said to
11 fire the girl. Mike Tomkovich never said anything of
12 the like.
13       I've been in business since 1991. I never had
14 an EEOC complaint ever since then until Tony Hernandez
15 and this Pat Frankly had a problem. The problem was
16 that Tony Hernandez got a picture of Pat Franke in drag
17 and disseminated it to everybody in a text message form.
18       Pat Franke was then let go by me due to the
19 fact that he wasn't even supposed to be hired as the
20 manager because I had a general manager, which was an
21 Adam Goodman (ph) in line for the job. Pat Franke said,
22 Does this have to do with the picture that's been
23 circulated?
24       I said, No, it has to do with your poor job
25 performance and drinking on the job.



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

14..17

Page 14

1   I read this little debunk thing. He brought
2   up sales from a year ago. The problem was with that, I
3   only purchased that property in October of that year.
4   So this statement is a lie.
5       Q. Are you talking about the EEOC declaration he
6   provided?
7       A. That what Pat Franke said that he bought up
8   sales from a year ago. The problem is with that, I
9   didn't own the place a year before that. So there was
10  nothing to compare it to. So his lie about bringing up
11  sails was bunk.
12      Q. Okay.
13      A. And I never told Pat -- Tony Hernandez to fire
14  anyone. He did that on his own.
15          Then, he also dealt with the EEOC behind my
16  back with this case and I never even knew this case
17  existed until I fired Tony Hernandez, and then all these
18  papers started coming my way. So that's where we're at
19  with this EEOC.
20          And at the time, I had many -- I have nothing
21  else. I'm going to have to go --
22          MR. HILL: Do you want to take a break?
23          THE WITNESS: No.
24          MR. HILL: You sure?
25          THE WITNESS: I'm a little ticked off about

Page 15

1   the whole case with Tony Hernandez.
2   BY MR. HILL:
3       Q. All right? And so I understand. That's --
4   we'll let it go. That's enough about that, unless you
5   have anything else you want to add.
6       A. No. I think that's a fair Reader's Digest
7   version of what happened.
8       MR. HILL: Well, I want to take a few minute
9       break. So let's gather our thoughts and we'll come
10      back.
11          (Brief recess was taken from 11:20 a.m. to
12      11:25 a.m.)
13  BY MR. HILL:
14      Q. Mr. Tomkovich, I'm going to ask you a few more
15  personal -- not personal, but questions about just kind
16  of the organization, and then we're going -- we're going
17  to cover the topics in the 30(b)(6) so we don't -- we're
18  not sitting here all day. That way, it'll be much
19  shorter, okay?
20          And let's talk about Mr. Schiele for a minute
21  while we -- before we get the topics out. When did you
22  first meet plaintiff Michael Schiele, do you remember?
23      A. I don't remember exactly. He came to the Gold
24  Club. One of those guys from Orlando I hired brought
25  him over. He said he was an excellent DJ. He used to

Page 16

1   use him as a DJ in Orlando, and then a very limited
2   management capacity in Orlando. I had a couple of those
3   clubs over there.
4       Q. Now, and what role do you play at the clubs in
5   terms of decision making? You do some of the hiring; is
6   that right?
7       A. Limited on hiring. I don't hire dancers, I
8   don't hire bartenders. I hire the more -- the upper and
9   middle management, and then let the people hire people
10  after that. So then they're responsible for hiring
11  managers and things. I don't live here. I'm not close
12  to here.
13      Q. Which of the clubs do you spend most of your
14  time at, do you know, if any?
15      A. I really don't spend all my time in a club.
16      Q. And so what was your first impression of
17  Mr. Schiele?
18      A. He sounded good as a DJ.
19      Q. Good DJ voice?
20      A. Uh-huh.
21      Q. And how was his job performance as a manager?
22      A. As a manager, it was not good.
23      Q. Tell me why.
24      A. Sales were down. There was an abundance of
25  drinking at the Emperor's, what we're talking about now.

Page 17

1   We're not talking about when he worked at the Gold Club
2   for a very short time. At Emperor's, there was a bottle
3   of Jameson missing just about every day. The -- the
4   Bevco reports were showing that liquor was being
5   missing.
6       Q. The -- are they Bev -- is it Bevintel; is that
7   what you mean?
8       A. Yes.
9       Q. All right. Is that called shrinkage?
10      A. Shrinkers or loss.
11      Q. Shrinkers or loss. So let me show you a
12  couple of those.
13          MR. HILL: Mark this 7. I believe you all have
14      them from, I think, this morning, but --
15          MR. LIROT: Thank you, sir.
16          (Plaintiff's Exhibit Number 7 was marked for
17      identification.)
18          THE WITNESS: What is this?
19  BY MR. HILL:
20      Q. Take a look at -- this is a what I understand
21  to be a Bevintel on shrinkage.
22      A. The first page reflects --
23      Q. Let me -- no, no, no.
24          And so, it talks about the shrinkage
25  percentages right, up at the top? Does that mean loss



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

18..21

Page 18

1  of liquor or what does that mean, if you know?
2      A.  Are you talking about the first part?
3      Q.  Yes, sir.
4      A.  Shrinkage rate is at 63 percent.
5      Q.  Right. And that was in July of 2013; is that
6  correct?
7      A.  That's what it looks like.
8      Q.  And was Mr. Schiele the manager at that
9  point --
10     A.  I don't remember.
11     Q.  -- of Emperor's?
12     A.  I don't remember.
13     Q.  You wouldn't dispute that he is, though, if
14 that was what the time records show, would you?
15     A.  If that's what the time records show, I don't
16 know.
17     Q.  And then if we turn to the next page, we've
18 got one from, I think, September of 14, 2013. It looks
19 like the shrinkage rate went down by 40 percent to
20 20.06 -- 20.6. Do you see that?
21     A.  Yeah.
22     Q.  And that was just a couple of months before
23 Mr. Schiele was fired, wasn't it?
24     A.  Mr. Schiele wasn't fired.
25     Q.  Okay. What -- how did his employment end

Page 19

1  according to you?
2      A.  He was relieved of being a manager, and then
3  he was offered a DJ position. He mentioned to Rob Rice
4  that -- this is my recollection of what happened because
5  I told Rob not to fire him. He was a good DJ. He
6  wasn't a good manager, but he was a good DJ. He said he
7  didn't want to take a DJ position and he left and went
8  to Déjà Vu right across the street as a DJ.
9      Q.  So you were -- who -- okay. Back up.
10        Rob Rice approached you to ask you if he could
11 fire Mr. Schiele; is that correct?
12     A.  He called me on the phone and said that was
13 his decision was to fire Mike Schiele due to the fact of
14 inconsistencies, drug use on the place and just -- just
15 not running the club correctly, and it wasn't
16 profitable. The place wasn't making any money to pay
17 the bills.
18     Q.  And what did you say?
19     A.  I said, Well, he makes a really good DJ. See
20 if he'll take the DJ job.
21     Q.  So you told him not to fire him, right?
22     A.  Told him not to fire him from -- not -- not to
23 get rid of him, but relieve him of being a manager.
24     Q.  So that decision was left to you; is that
25 correct?

Page 20

1      A.  No, not --
2      Q.  I'm sorry?
3      A.  It's convoluted. He'd already made the
4  decision. I was going to stick by the manager's
5  decision, but I didn't want to see him gone completely.
6  Does that make any sense?
7      Q.  Yes.
8      A.  I mean, in a management capacity, yes, I'll
9  stick by the manager's position to let him go because I
10 just had hired Rob Rice to be the general manager. So
11 he had, you know, when -- like any general manager, they
12 start looking around and put the people that they know
13 and trust in supervisory positions. Every company does
14 it.
15        They bring in a new man, they look at the fat,
16 and they go this is a problem here, here and here. They
17 address it. That's why Rob Rice was brought in.
18     Q.  And so what was Rob Rice the general manager
19 of?
20     A.  He was -- became the general manger of
21 Emperor's and became the general manager of Gold Club,
22 the Pasco County Emperor's, and the Bliss Cabaret.
23     Q.  Okay. And Rob Rice describes South East Show
24 Clubs as the umbrella under which those Tampa Bay area
25 clubs fell; is that inaccurate?

Page 21

1      A.  That's inaccurate.
2      Q.  Why is that?
3      A.  Each club is owned and operated individually.
4      Q.  Okay.
5      A.  South East Show Clubs was just moniker, you
6  know, to -- instead of saying my clubs in Tampa and in
7  Clearwater and in Pasco County, it just became an
8  umbrella. It did not do any kind of business. It did
9  not -- there was not a hierarchy of management in South
10 East Show Clubs to dictate policy to anyone.
11     Q.  Okay. Will you look at Plaintiff's Exhibit 2.
12        MR. HILL: I don't know if you all have it
13     over there.
14 BY MR. HILL:
15     Q.  This was a -- just take a look at this and
16 let me know when you're ready to talk about it.
17     A.  Okay.
18     Q.  It's a document that plaintiff produced, a
19 business card Mr. Schiele was given that says he's the
20 manger of South East Show Clubs. Have you seen this
21 before?
22     A.  Not really, no. It should have said Emperor's
23 was where he was working at.
24     Q.  Well, if you look on the -- the next page,
25 this is the back of that business card, and it looks it



Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH
22..25

Page 22
1  says Tampa Emperor's, Tampa Gold Club, I think that's
2  Executive or Bliss, and then --
3     A.  It says Bliss.
4     Q.  -- Pasco Emperor's Gentlemen's Club. So --
5     A.  It says good for one free admission to the
6  following locations.
7     Q.  Right. Why would a South East Show Clubs
8  manager card have all of those locations if it had
9  nothing to do with them?
10    A.  I don't know. I didn't make this card.
11    Q.  Let's look at Plaintiff's Exhibit 3. Are you
12 familiar with a gentleman named Shawn Hopper?
13    A.  Very much intimately at this point.
14    Q.  Okay. Did you hire him to do some graphics
15 work for you?
16    A.  Yes, I did.
17    Q.  All right. Did he make your business cards?
18    A.  Yes, he did.
19    Q.  All right. So this is a business -- this is
20 an e-mail from Mr. Hopper to Mr. Schiele that attached
21 Plaintiff's Exhibit 2, and it says that, quote, We put
22 Tampa corporate address on the card and created an
23 e-mail, Mike@SouthEastShowClubs.com?
24    A.  Uh-huh.
25    Q.  And so --

Page 23
1        MR. LIROT: That would be a yes.
2        THE WITNESS: Yes.
3  BY MR. HILL:
4     Q.  There is a -- there was a website called SES,
5  which is SouthEastShowClubs.com; is that right, or at
6  least an e-mail address?
7     A.  That showing Hopper made for him?
8     Q.  Well, I'm --
9     A.  It looks like that's what happened.
10    Q.  No, I want to know if, for example, did
11 anybody besides Mr. Schiele have a
12 SouthEastShowClubs.com e-mail address?
13    A.  I don't know.
14    Q.  Okay.
15    A.  Shawn Hopper is notorious for plagiarizing and
16 using unlicensed material.
17    Q.  Well, didn't you hire him to create this card
18 for Mr. Schiele?
19    A.  No, I did not hire him to create that card for
20 Mr. Schiele.
21    Q.  Is it your testimony that Mr. Schiele did this
22 on his own?
23    A.  Yes, contacted Shawn Hopper is what it looks
24 like in this e-mail right here made his own business
25 cards.

Page 24
1     Q.  Okay. Did you move -- or did Mr. Schiele move
2  from club to club?
3     A.  Mr. Schiele started as a relief manager at the
4  Gold Club, stopped working there, was put on the payroll
5  at Emperor's Tampa II, and started there.
6     Q.  Okay. And at some point, did Emperor's Tampa
7  II cease to exist?
8     A.  Yes.
9     Q.  When was that, do you remember?
10    A.  I don't remember the exact date.
11    Q.  Wasn't that -- well, we'll come back to that.
12       And then you reactivated it, correct?
13    A.  Recently.
14    Q.  Why did you do that?
15    A.  Because I didn't realize I had let the -- the
16 registration go on it.
17    Q.  And do you still run that as an active
18 business?
19    A.  No.
20    Q.  So why did you reactivate it then?
21    A.  I just wanted to keep the corporation active.
22    Q.  So it's your testimony that Emperor's Tampa II
23 and South East Show Clubs have no assets, right?
24    A.  That's correct.
25    Q.  No employees?

Page 25
1     A.  That's correct.
2     Q.  You just keep them active because you want to
3  keep them active?
4     A.  That's correct.
5     Q.  Can you understand why that's confusing a
6  little bit? I mean, why have businesses active if
7  you're not using them?
8     A.  No, I don't understand why that's confusing.
9     Q.  So no money flows through either of those
10 entities for any --
11    A.  That's correct.
12    Q.  -- for any reason?
13    A.  That's correct.
14    Q.  Does one of them hold a liquor license?
15    A.  No.
16    Q.  And no employees, you -- and you think all of
17 your folks -- well, strike that.
18       Who employs your bartenders that work at
19 Emperor's?
20    A.  Right now?
21    Q.  Yes, sir.
22    A.  EMTB.
23    Q.  Is that an employee leasing company?
24    A.  No.
25    Q.  Is it a payroll company?



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

26..29

Page 26
1   A. There's a payroll company which is now
2 Kimberly Group.
3   Q. And did it used to be Convergence that you
4 used?
5   A. Yes.
6   Q. All right. Who at Emperor's sets -- let's
7 talk about the time when Mr. Schiele was there. Who set
8 the hours for the bartenders, do you know?
9   A. The managers.
10   Q. That worked at Emperor's?
11   A. That worked at Emperor's.
12   Q. And you set Mr. Schiele's rate of pay; is that
13 correct?
14   A. Yep, he made over $455 a week, and he had the
15 ability to hire and fire people.
16   Q. Okay. Did you hire Mr. Rice?
17   A. Yes.
18   Q. All right. And you said you fired Mr. Franke?
19   A. Yes, I did that because Tony Hernandez
20 degrading this guy and then he started drinking on the
21 job, and he was never actually supposed to be hired
22 because I had another person coming in besides Pat
23 Franke before he ever got started. Pat Franke started
24 in January.
25       I didn't even know Tony Hernandez was hiring

Page 27
1 another one -- man. I hired a guy, a friend of mine
2 from Maine, Adam Goodman, and he was coming to start in
3 March.
4   Q. Now, that was --
5   A. Pat Franke was not even supposed to have been
6 hired as the manager there because I had someone in
7 place for him.
8   Q. Okay. And so, obviously, you've read through
9 this, and, you know, there's some -- Mr. Franke accuses
10 you of calling Africans-Americans the N word. Did you
11 ever do anything like that?
12   A. Nope. I'm a little bit smarter than that.
13   Q. Did you, in fact, have an African-American
14 female working the door when Mr. Franke was employed, do
15 you remember?
16   A. At Bliss?
17   Q. Or a bartender rather? I'm sorry.
18   A. I have no idea. I bought that place in
19 October of '11. I walked in there five times until
20 March when I was putting Adam Goodman in there as a
21 manager.
22   Q. Did you set Mr. Goodman's hours?
23   A. He set his own hours.
24   Q. Okay. Who told Mr. Schiele when to come to
25 work and when to go home, do you know?

Page 28
1   A. It was the stated hours of the -- of the
2 business. He is the nighttime manager. He'd get there
3 just about 7 o'clock and stay there till just after
4 three to close.
5   Q. And those are hours created --
6   A. Those are hours of operation.
7   Q. Understood. Who decided those hours, do you
8 know?
9   A. Those are the bar business hours. That's what
10 we do.
11   Q. Did you decide those hours?
12   A. That was in place when I bought the place.
13 So --
14   Q. And you kept --
15   A. I just kept -- kept on going.
16   Q. Got you. So it was your decision to keep the
17 hours that were in place when you purchased the bar that
18 Mr. Schiele worked at, correct?
19   A. That's correct.
20   Q. All right. You could have changed them if you
21 wanted to, you owned the place, right?
22   A. I can lock the door, which I've also done
23 there, too.
24   Q. Fair enough.
25       Have you seen the maintenance request that's

Page 29
1 Plaintiff's Exhibit 5? This South East Show Clubs kind
2 of general maintenance request with the big South East
3 Show Clubs logo, do you see that?
4   A. Yeah. I don't know where this came from.
5   Q. Okay.
6   A. Where did it come from? We'll get to that.
7   Q. It's a one-way street unfortunately today.
8       I want to just walk through some -- I'm going
9 to walk -- well, actually, let's get the topics out.
10 Let's do that before I forget to do it.
11       So at this point in the deposition,
12 Mr. Tomkovich, I'm going to kind of switch gears on you
13 a little bit, and you've testified in your individual
14 capacity. I'm going to ask you some questions related
15 to the specific entities that are named as defendants,
16 okay?
17       And after these are over, we may come back to
18 you individually. I'm going to try to work through it,
19 okay?
20       MR. HILL: So I'm marking the transcript at
21 this point. We will be going forward as the corporate
22 representative deposition for South East Show Clubs,
23 LLC, okay, and I'll try to stick to these topics as
24 close as I can. That's Plaintiff's -- you guys probably
25 got it switched because of the stickers.



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

30..33

**Page 30**

1   MR. LIROT: I got the legit one.
2   (Plaintiff's Exhibit Number 8 was marked for
3   identification.)
4   BY MR. HILL:
5   Q. And so I'll try not to be too repetitive, and
6   what I'm going to do to save time is introduce -- well,
7   I can't do that.
8   I'm going to ask you questions about South
9   East Show Clubs, LLC, and then because the topics are
10  basically the same, I'm going to ask you the same
11  questions for Emperor's. It's going to get a little
12  repetitive. Just tell me if the answer is different or
13  not, okay?
14  A. Okay.
15  Q. In terms of -- and I know you've talked about
16  some of this, but just bear with me, Mr. -- plaintiff's
17  job duties, which is topic one, can you give us a brief
18  overall description of what he did while he was
19  employed?
20  A. Overall safety of the club, opening and
21  closing, locking the door, counting the money,
22  scheduling the bartenders, waitresses, DJ.
23  Q. Anything else?
24  A. General cleanliness of the facility to make
25  sure things are maintained.

**Page 31**

1   Q. And he was there from approximately March
2   of 2013 through December of 2013. Does that sound
3   right?
4   A. That sounds close.
5   Q. And would that answer change at all for
6   Emperor's Tampa II, Inc.? The same?
7   A. I thought that was for Emperor's Tampa II.
8   Q. I know it's confusing, and then I could do it
9   as South East, but right now, we're talking about South
10  East Show Clubs, LLC.
11  A. Okay. Then no, he did not work there. So --
12  Q. You're saying he didn't work for South East
13  Show Clubs?
14  A. Right.
15  Q. Or Emperor's Tampa II, Inc.?
16  A. For Emperor's Tampa II, he worked. He did not
17  work for South East Show Clubs. It does not have a
18  business license. It never owned a business license.
19  It's never had an alcohol license in its name. So it
20  cannot operate a bar or employ someone to operate a bar
21  if it does not have those items.
22  Q. Let's do it this way, so we don't get that
23  answer over and over. Let's go to Plaintiff's
24  Exhibit 9, and let's do the corporate representative
25  deposition for Tampa's -- Emperor's Tampa II, okay?

**Page 32**

1   A. You want a little sticker on there?
2   Q. Yeah. Made me hand it to Luke again.
3   MR. HILL: I have the sticker. I'll trade
4   you.
5   MR. LIROT: All right. There you go. There
6   you go.
7   (Plaintiff's Exhibit Number 9 was marked for
8   identification.)
9   BY MR. HILL:
10  Q. And so just so we're clear for the record, I
11  have handed Mr. Tomkovich, the corporate representative
12  deposition topic for Emperor's Tampa II, Inc., and
13  you're saying that this is the entity that Mr. Schiele
14  worked for; is that correct?
15  A. That is correct.
16  Q. Now, Mr. Rice said that Mr. Schiele worked for
17  Convergence.
18  A. That is the payroll company where the checks
19  were cut out of, but on the check stub itself, it says
20  Convergence, and then there's a slot that said Emperor's
21  Tampa II on the check stub for where it was coming from.
22  Convergence does payroll, employee leasing payroll
23  throughout the state of Florida and other states. I
24  don't know where their vast conglomerate of places are
25  but they do the state of Florida.

**Page 33**

1   Q. Okay. In terms of Number 3, plaintiff's job
2   performance, have we talked about that? Is there
3   anything else you want to add in terms of what you've
4   already testified to?
5   A. No.
6   Q. Now, I saw Mr. Schiele's personnel file, or at
7   least what we were given. We saw one write up. Do you
8   know of others?
9   A. Well, I know he had been talked to a bunch
10  over there. I don't know the extent of it because it
11  wasn't my job to oversee, micromanage managers when I've
12  hired a new general manager to put my facilities and put
13  procedures back into correct order.
14  Q. Okay. And the procedures, were the procedures
15  your own that you expected the managers to implement?
16  A. Under the federal guidelines of polygraph
17  notifications, also an arbitration agreement, also
18  corporate policy on handling of confidential material as
19  the manager, also like a noncompete, nondisclosure
20  agreement that was -- that was in place. That was in
21  Mr. Schiele's thing also, a corporate nondisclosure,
22  noncompete, which I never exercised.
23  Q. Those were all things that you created; is
24  that what you're saying?
25  A. Yeah, to do -- to deal with the new federal



Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

34..37

Page 34

1 guidelines of employment, yes.
2   Q. And in terms of topic 4, dates of employment,
3 we've talked about already, March of 2013 through
4 December of 2013.
5       His job title, I have some confusion here. So
6 he started as the manager of Emperor's Tampa II, Inc.?
7   A. He started and ended as the manager of
8 Emperor's Tampa II, Inc.
9   Q. And wasn't it after he was fired that he was
10 offered the DJ position out in Pasco?
11  A. Not in Pasco. For Emperor's.
12  Q. For Emperor's?
13  A. For where he was at.
14  Q. Okay.
15  A. Not in Pasco.
16  Q. Got you. So was he terminated and then
17 brought -- then you all offered him the job back?
18  A. I believe I, when Rob told me he had fired
19 him, said I didn't really want to lose him. He was a
20 really good DJ. Could you ask him to take the DJ job
21 there?
22      He'd make more money as a DJ there than the
23 manager, and that's -- that's a fact.
24  Q. So he was fired, and then you told Rob, Hey,
25 let's offer him the DJ position?

Page 35

1   A. Yes, because I didn't want to lose him. I
2 thought he was a good guy but he wasn't good at being a
3 manager.
4   Q. Number 5, Topic 5, did he ever receive any
5 type employee of the month or compliments or anything?
6   A. I don't do that.
7   Q. And you said that he was reprimanded a few
8 times. Who would have reprimanded him, do you know?
9   A. Rob Rice.
10  Q. Would you have signed off on the --
11  A. No.
12  Q. -- written disciplinary --
13  A. I wouldn't even -- I would never have even
14 seen it.
15  Q. Is there a corporate office in Jacksonville
16 for all your clubs?
17  A. For the ones in Jacksonville. It was located
18 at the time on Atlantic Boulevard.
19  Q. Okay. Did Mr. Schiele's personnel file
20 somehow wind up there?
21  A. There were some moved files, and I've been
22 trying to locate a lot of them and it's been a little
23 difficult. Then the fire happened at the Gold Club in
24 Jacksonville. So where I used to store a lot of
25 records, and it's been a little -- a little difficult,

Page 36

1 to say the least.
2   Q. Understood.
3   A. Every once in a while we come across an old
4 piece of paper. Not relevant to this case. We say, Oh,
5 we're looking for that. Why is this stuck over here?
6       Like when you move from house to house,
7 it's -- you found that old plate that you thought you
8 lost.
9   Q. All right. And so did Mr. Schiele ever voice
10 any concerns to you about any of the policies in place
11 at Emperor's for any reason?
12  A. No.
13  Q. Have you heard of this policy of making
14 African-American or dark-skinned entertainers at
15 Emperor's pay up front a stage fee?
16  A. I really don't know anything about that.
17  Q. And have you -- you know, I got to do my job
18 so I got to ask you these questions.
19      Have you yourself ever instructed any of your
20 employees to fire African-American employees for any
21 reason?
22  A. For any reason?
23  Q. Well, for discriminatory reasons, I would say,
24 because of their skin color?
25  A. No.

Page 37

1   Q. The answer's no?
2   A. No.
3   Q. You ever use the term thin the herd for any
4 reason?
5   A. Absolutely not.
6   Q. Ever refer to an African-Americans as
7 Canadians?
8   A. No.
9   Q. Ever heard that term?
10  A. No.
11  Q. Let me see. We've been through 7, 8.
12      So Topic 9 talks about policies and procedures
13 regarding employee discipline. There was sort of a
14 progressive disciplinary policy in place at Emperor's;
15 is that correct?
16  A. Yes and no. It all depends on the degree of
17 infractions. If you're stealing, you're caught
18 stealing, you're immediately let go.
19      You're using drugs on the premises, you're
20 immediately let go.
21      If you're late for work, you get a, you know,
22 write up for being late or a verbal warning, you know.
23      You didn't do your closing duties and left the
24 bar all sticky and there's bar gnats there, you don't
25 get fired for that unless you've done it numerous,

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

38..41

Page 38

1  numerous times.
2     Q. Okay. And in terms of Mr. Schiele, was he
3  caught doing any of the terminable offenses?
4     A. I sort of heard he was drinking a lot on the
5  job. I heard he was letting or using pot on the -- on
6  the premises, letting people smoke out in the parking
7  lot or himself doing it.
8     Q. And that was the reason that Mr. Rice told you
9  he wanted to fire Mr. Schiele; is that correct?
10    A. Yes.
11    Q. And then he actually -- and then you're saying
12 you told him not to fire him?
13    A. No, I told fire to him was fine, but see if he
14 would take the DJ job because he was good at that, and
15 then there was a manager -- a supervisory person over
16 him to stop this unacceptable behavior, and it never
17 went that far. He never came back and that was the end
18 of that, and that's the last I ever heard of him.
19    Q. In terms of Topic 10, is there any policy in
20 place with respect to, like, retaliation or anything, do
21 you know?
22    A. I have no retaliation against him. If I
23 wanted to actually do anything, I could have enforced
24 the noncompete clause in his contract, which I never
25 did.

Page 39

1     Q. In Topic 11 what were Emperor's policies
2  regarding discrimination?
3     A. We don't discriminate.
4     Q. And is there an employee handbook or anything
5  that covers discrimination?
6     A. There was a handbook. I don't know how in
7  depth at the time in 2013 it went into this. It has
8  evolved since, like everything else. If there's a new
9  congress, there's a new law. We have to add another
10 page.
11    Q. Topic 12 and 13 talk about kind of the racial
12 composition of the workforce at Emperor's. Do you
13 know -- can you describe for me what that was when
14 Mr. Schiele was there?
15    A. I don't know.
16    Q. Topic 15 talks about insurance coverage. Does
17 Emperors have insurance to cover Mr. Schiele's claims
18 against -- the lawsuit claims that have been brought?
19    A. I don't believe so.
20    Q. And besides yourself, did Rob Rice or anybody
21 else play a role in Mr. Schiele's termination?
22    A. I don't believe so. I don't know. I can't
23 say definitively. I don't know. I don't have an answer
24 for that, because I don't know who Rob would've maybe
25 talked to or not, but my answer is I don't know.

Page 40

1     Q. Topic 21. Did you ever hear about any
2  internal complaints of discrimination made by
3  Mr. Schiele or anyone while he worked there?
4     A. No.
5     Q. And who actually -- Topic 22 says, "All
6  statements made to plaintiff by defendant when plaintiff
7  was informed that his employment had been terminated."
8  Do you know who actually told him the situation that you
9  just described earlier as --
10    A. I believe it was Rob Rice that talked to him
11 about letting him go.
12    Q. And that was after he talked to you; is that
13 right?
14    A. He had let him go first, and then told me what
15 he had done, and that's when I said to him, "Offer him
16 the DJ job." I wasn't even in the area, or I would've
17 probably had been there, but I wasn't anywhere near
18 here. I don't live here.
19       MR. HILL: Let's take 5 minutes.
20       (Brief recess was taken from 11:58 a.m. to
21    12:15 p.m.)
22 BY MR. HILL:
23    Q. I'm handing you Plaintiff's Exhibit 10.
24       (Plaintiff's Exhibit Number 10 was marked for
25    identification.)

Page 41

1  BY MR. HILL:
2     Q. Continuing with the corporate representative
3  deposition of Emperor's, II, Inc. And I realize since
4  these disclosures were provided, there may be more
5  witnesses. I just want to figure out who they are?
6       So, Mr. Tomkovich, in addition to Rob Rice --
7  Robert Rice, who else, if you know without revealing
8  conversations with your attorney, would you be calling
9  as a fact witness in this case?
10    A. I don't know at this point.
11    Q. Okay. No idea?
12    A. Not at this point, I don't know.
13    Q. And you realize discovery closes in, like, six
14 days?
15    A. Okay.
16    Q. All right. Do you have any documents that
17 you're planning on relying upon to support your
18 claims -- I'm sorry -- your defenses, rather?
19    A. I don't know at this point.
20    Q. I'm going to ask you the same question. You
21 realize discovery closes in six days? So we're coming
22 down to the wire.
23    A. Okay.
24    Q. You haven't produced -- I mean, I've gotten
25 about ten documents so far from your counsel. Do you



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH                                                    42..45

Page 42

1  have anything else you plan on relying upon at trial or
2  in support of a motion for summary judgment --
3      A.  I don't know at this point.
4      Q.  Just real quick -- in support of a motion for
5  summary judgment that you plan on utilizing? And your
6  answer is?
7      A.  I don't know at this point.
8      Q.  Okay. That's 10. I'm going to go through the
9  affirmative defenses. I'm not going to ask you about
10 the legal stuff. I'm just going to ask you about facts.
11 If you don't know, you don't know. That's okay. All
12 right? I'm going to hand you Plaintiff's Exhibit 11.
13     MR. LIROT: Thank you, sir.
14     (Plaintiff's Exhibit Number 11 was marked for
15     identification.)
16 BY MR. HILL:
17     Q.  I'm not going to go through all of them,
18 because some of them are just straight legal questions.
19 But if you turn to page 5. These are what is known as
20 affirmative defenses. All I'm going to do is ask you
21 about any facts that you may be aware of that support
22 any of these, and I'll go through them and kind of list.
23 Like, I'm not going to ask you about 1, because that's a
24 legal question. I'm not going to ask you about 2,
25 because that's a legal question. Skipped 3.

Page 43

1      What facts are you aware of, if any, that
2  supports defendant's contention that there's no
3  vicarious liability for the two corporate entities or
4  for all the entities -- I'm sorry -- for all the
5  defendants named in this lawsuit? Do you know?
6      A.  I'm not sure how to answer that.
7      Q.  And are you aware of any facts that you can
8  share with us that on affirmative defense number 5 that
9  would support defendants' contention that it acted in
10 good faith and with reasonable grounds for believing it
11 did not violate Mr. Schiele's rights under the Florida
12 Civil Rights Act or Section 1981?
13     A.  The reason he was let go at being a manager.
14 He wasn't doing a good job. So...
15     Q.  Number 6. I know this sounds repetitive, but
16 I'm going to keep on going. Can you provide me with the
17 facts supporting defendants' contention in this
18 affirmative defense number 6 that any and all actions
19 taken by defendant with regard to plaintiff are taken
20 for legitimate nondiscriminatory and non-retaliatory
21 business reasons?
22     A.  Basically the same thing. Not doing a good
23 job as a manager.
24     Q.  Affirmative defense number 7, it reads
25 plaintiff would be barred from asserting a meritorious

Page 44

1  claim because any conduct exercised by any properly
2  identified employer as it relates to plaintiff was
3  lawful as a job-related requirement, which requirements
4  were valid indicators of the plaintiff's success or lack
5  thereof by performing the plaintiff's purported
6  responsibilities unrelated to any racial
7  characteristics.
8      Are you aware of any facts you can share with
9  us that support that affirmative defense?
10     A.  I'm not sure how to answer that one either.
11     Q.  Number 8 is a very similar defense. Do you
12 have any facts supporting affirmative defense number 8
13 that you can share with us?
14     A.  He wasn't asked to do anything that was
15 racial. So...
16     Q.  And I've got to ask you, if you're not -- if
17 you said you weren't around much, how do you know?
18     A.  It just -- it wouldn't have happened. At the
19 time I owned bunches of other places with numerous
20 different people of color, race, creed, sexual
21 orientation, I never discriminated against anyone.
22     Q.  Number 9. I'm just going to read the numbers
23 instead of reading the whole thing. Number 9, can you
24 provide us with any facts supporting that affirmative
25 defense?

Page 45

1      A.  There was no retaliation.
2      Q.  And does defendant deny that Mr. Schiele ever
3  complained about discrimination in any of the clubs?
4      A.  Yes, I deny that.
5      Q.  Number 10 is a legal question related to
6  mitigation I'm not going to ask you about.
7      Number 11, can you share with us any facts
8  supporting that affirmative defense, please?
9      A.  I don't know how to answer that one either.
10     Q.  Same for number 12, can you provide us with
11 any facts supporting that affirmative defense?
12     A.  Same -- same answer.
13     Q.  Number 13 says plaintiff was an at-will
14 employee. I heard you testify earlier that Mr. Schiele
15 had a noncompete; is that right?
16     A.  Yeah.
17     Q.  And so did you have a contract with him?
18     A.  It was in the employment packet he would've
19 signed.
20     Q.  Okay. And so --
21     A.  And it was also a nondisclosure of corporate
22 materials and copyrighted materials.
23     Q.  And so I guess my question is: How can you
24 have somebody in a noncompete if they're at-will?
25     A.  What is at-will?

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH
46..49

Page 46

1   Q. I'll let your lawyers fill you in.
2       But you don't have any understanding of what
3   at-will means; is that correct?
4   A. He was a paid employee, and he was -- handled
5   sensitive documents, financials, and the like, and as a
6   standard procedure and it happens in numerous
7   management-type things that you have a noncompete in a
8   geographical sensitive area just to keep your corporate
9   secrets still secret from your competition.
10  Q. Number 14 asks for legal conclusions I'm not
11  going to ask you about.
12      Number 15, it says plaintiff unreasonably
13  failed to avail himself of defendants' preventative and
14  corrective measures.
15  A. No.
16  Q. Do you know anything about that?
17  A. Nope. Never had any problems.
18  Q. Now, some places have like an affirmative
19  action plan or an open-door policy with regard to
20  discrimination or, you know --
21  A. He had --
22  Q. There's usually a written policy. Was there
23  anything like that in place when Mr. Schiele was --
24  A. Yes. And then there's also a phone number to
25  call Convergence if you have any concerns, the payroll

Page 47

1   leasing company.
2   Q. So there's a Convergence handbook? Is that
3   what you're saying?
4   A. Convergence is part of his signed application,
5   and there was a phone number there if there was ever a
6   problem with pay. If there was ever a problem with
7   discrimination, there was also a phone number right
8   there they could call.
9   Q. I don't have any more with that. Real quick
10  here. And these answers are literally the same every
11  time. So I'm only going to ask you about one.
12      I'm going to hand you what we've marked as
13  Plaintiff's Exhibit 12.
14      (Plaintiff's Exhibit Number 12 was marked for
15      identification.)
16  BY MR. HILL:
17  Q. And I just want to make sure I'm clear, and if
18  you would, just turn to page 2 and read the question and
19  the answer. And before you do, let me make sure that's
20  your signature on the back page here, page 19. You
21  signed off on these?
22  A. I've got the printed part.
23  Q. Did you sign that? Is that your signature on
24  page 18?
25  A. Well, you said 19.

Page 48

1   Q. Sorry.
2   A. Yeah.
3   Q. All right.
4       MR. HILL: Look, if y'all don't mind, would
5   you get us the verified version before we close
6   discovery out? He's got to get it -- you can send
7   me a declaration --
8       MS. ROJAS: Yeah, the verified section.
9       MR. HILL: -- or you can have somebody
10  notarize it, whatever you'd prefer. Just make sure
11  he verifies them.
12  BY MR. HILL:
13  Q. And so -- yeah, just took a look at the
14  interrogatory number 2 and read through the question and
15  answer, and then I'll ask you a few more questions, and
16  we'll finish up.
17  A. Okay.
18  Q. And so in interrogatory number 2 we basic --
19  plaintiff asks, you know, the reasons for his
20  termination, and the answer we get back is, you know,
21  the plaintiff didn't work for South East Show Clubs,
22  LLC, and you've kind of been through that with us. At
23  the time you answered these back in -- when was it?
24  There's another date -- April of 2017, I don't think
25  Emperor's Tampa II was an active corporation, was it?

Page 49

1   A. I don't know.
2   Q. Let's see. In fact, Emperor's Tampa II, Inc.,
3   had been dissolved in September of 2014, I think, right?
4   A. I don't remember.
5   Q. And then you reactivated it after the lawsuit
6   was filed; is that correct?
7   A. I don't remember.
8   Q. And does Emperor's Tampa II, Inc., do any
9   business anymore?
10  A. No.
11  Q. Does it have any employees?
12  A. No.
13  Q. Nobody works for it?
14  A. No.
15  Q. But you think plaintiff worked for it?
16  A. He did work for it when it was active at the
17  time when he was running that bar. It owned a liquor
18  license, it had a business license, it had a sales tax
19  number, and it filed corporate tax returns.
20  Q. When did it stop doing that?
21  A. I don't remember the exact time frame, but
22  then I closed the place down for a remodel and relaunch
23  and it reemerged with a new name.
24  Q. What's the new name?
25  A. EMTB.



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

50..53

Page 50

1  Q. EMTB?
2  A. Yeah. It was closed about like four months.
3  None of the same employees were hired back or anything
4  like that. Remodeled, a new start, new corporation, new
5  everything.
6  Q. And is that EMTB part of the South East Show
7  Clubs umbrella of companies, so to speak?
8  A. No.
9  Q. It falls outside of it? Outside of South
10 East?
11 A. There is no umbrella with South East.
12 Q. Okay. So what does South East Show Clubs do?
13 A. Nothing.
14 Q. It just sits there, and there's no money that
15 goes through it --
16 A. That's correct.
17 Q. -- no employees, nothing?
18 A. That's correct.
19 Q. And you're the registered agent for both
20 Emperor's and South East, correct?
21 A. Yes, I think so.
22 Q. So why start EMBT --
23 A. EMTB.
24 Q. -- EMTB if Emperor's is active -- Emperor's II
25 is active?

Page 51

1  A. Closed down, new start, new name, new look
2  inside, new corporation.
3  Q. Does it have anything to do with the lawsuits
4  that have been filed against --
5  A. No.
6  Q. -- the company?
7  A. No.
8  Q. I don't think I have any additional
9  questions.
10     MR. HILL: Give me two seconds. Let me talk
11     with Mr. Schiele, and we'll --
12     MR. LIROT: Okay.
13     MR. HILL: -- wrap it up.
14     (Brief recess was taken from 12:31 p.m. to
15     12:43 p.m.)
16 BY MR. HILL:
17 Q. So, Mr. Tomkovich, we're back on the record.
18 And just to kind of wrap things up -- this is a -- I've
19 handed you what was a VIP club card from Mr. Schiele's
20 wallet, and it says VIP 2013 South East Show Clubs, and
21 it's a, you know, www.seshowclubs.com website. Did you
22 operate that website?
23     (Plaintiff's Exhibit Number 13 was marked for
24     identification.)
25 A. Yes. There was a website.

Page 52

1  BY MR. HILL:
2  Q. All right. And did the website include all
3  the clubs that you had in Florida?
4  A. Yes. It was a portal to go as a master to go
5  each club, and then there was a disclaimer under it that
6  said each club is owned and operated individually.
7  Q. That's on the website, you mean?
8  A. On the website.
9  Q. Is the website still up?
10 A. No. There's just a like a holding page, I
11 believe.
12 Q. Do you know when it came down?
13 A. When I ceased doing business with
14 Shawn Hopper.
15 Q. When was that? Do you know?
16 A. I don't know. When he got me into a bunch of
17 federal lawsuits.
18 Q. How'd that -- what do you mean by that?
19 A. He's copyrighted images, and did not pay the
20 licensing fees. And now he's essentially filed
21 Chapter 13. So he has a record using illegal images and
22 doing things on his own.
23 Q. Okay.
24 A. And I'm not the only one he's gotten into
25 major lawsuits right now across the state of Florida.

Page 53

1  Q. Now, did you authorize this card?
2  A. I don't remember.
3  Q. So you don't deny authorizing it, right?
4  A. I don't deny it, but I don't remember it.
5     MR. HILL: Do you have the card itself?
6  BY MR. HILL:
7  Q. And it looks, I mean, you know, in looking at
8  it --
9     MR. SCHIELE: I think I stuck it back in my
10    pocket.
11 BY MR. HILL:
12 Q. -- fairly professional -- is it -- what would
13 this -- and for the record, I'm holding the VIP card.
14 It's the size of a credit card, it's colored -- well,
15 colored on the front, and I guess colored on the back a
16 little bit. This even worked up and -- so worked it --
17 this VIP club card got you into Jacksonville Gold Club
18 II, the Officers Gold -- what is that, the Officers
19 Club?
20 A. The Officers Club, yeah.
21 Q. Emperor's Jacksonville, Flash Dancers
22 Jacksonville, Tampa Bay Gold Club, Emperor's I and then
23 it says Nude, Emperor's II, Bliss Cabaret, Emperor's
24 Pasco, West Palm Beach, and Savannah Uncle Harry's.
25    What's the difference between Emperor's I and



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

54..57

Page 54

1 Emperor's II? One of them was a nude bar --
2   A. One was a nude club and one was the alcohol
3 club.
4   Q. And which one did plaintiff work at?
5   A. Emperor's II, the alcohol club.
6   Q. Okay. And what did this VIP card do? Do you
7 know?
8   A. It says it got you in the door for free. Not
9 for special events. It can be revoked at any time.
10   Q. So this must be something that you approved.
11 You wouldn't let these float around, would you, if these
12 weren't approved by you?
13   A. I don't know if I approved that design, but I
14 had different cards for different clubs on them.
15   Q. Okay. And so if South East Show Clubs
16 isn't -- and you know I'm going to ask this question.
17 If South East Show Clubs isn't related to any of these
18 clubs, why is it on the front of your VIP cards?
19   A. It was -- in this instance, it was a portal to
20 go to the websites instead of listing all websites
21 individually, which you could not read, you'd be able to
22 go to one website. And there were other clubs on there
23 that I didn't own that were also under the website of
24 South East Show Clubs.
25   Q. I understand. I know what you mean by the

Page 55

1 website, but I'm just talking about just in general.
2 You use this card. This is South East Show Clubs. It
3 doesn't say Emperor's. It doesn't say Gold Club.
4   A. Sure it does on the back.
5   Q. Well, my question's: On the front of this
6 card, it says South East Show Clubs, right?
7   A. Right.
8   Q. And then on the back, it's got a list of all
9 these other clubs, right?
10   A. That's correct.
11   Q. So what's the relationship between South East
12 Show Clubs and all the clubs on the back?
13   A. In this instance, it was as a website so you
14 could get to all those websites without -- and not have
15 to type them all. It didn't have enough room to print
16 everything on there.
17   Q. Well, it's more than that. I mean, it allows
18 you to get into all your clubs. It's not just a
19 website. It's a VIP card, right?
20   A. Yeah.
21   Q. I mean, you get in for free to 1, 2, 3, 4, 5,
22 6, 7, 8, 9, 10, 11 strip clubs, right?
23   A. Yes.
24   Q. And the front of it says South East Show
25 Clubs, right?

Page 56

1   A. Yes.
2   Q. So there's got to be some kind of relationship
3 between South East Show Clubs and those 11 clubs,
4 wouldn't you say?
5   A. No.
6   Q. You still deny it?
7   A. That's correct.
8   Q. Okay. Why didn't the individual clubs just
9 have their own VIP cards?
10   A. They also had that too.
11   Q. Then why make one for South East?
12   A. More marketing because I had a website that it
13 was a portal to go to the other clubs and other clubs
14 that I didn't own.
15   Q. At the time in 2013, did South East have
16 assets?
17   A. No.
18   Q. Was it was a marking entity?
19   A. It was nothing. It was a figment of my
20 imagination, and that's how it ended up that way.
21   Q. Okay. I think I'm done.
22     Did you have anything to do with the -- well,
23 strike that.
24     Do you know how many organizations that you're
25 a registered agent to?

Page 57

1   A. No.
2   Q. It's a lot of them, right?
3   A. It's more than one. Less than a hundred, but
4 more than one.
5   Q. Fair enough.
6     MR. HILL: Unless y'all produce any other
7 documents or witnesses, subject to that, I don't
8 have any additional questions for Mr. Tomkovich.
9     MR. LIROT: Fair enough. And just for the
10 record, because of the difficulty we've had because
11 of some transitions, I'm going to ask Mr. Tomkovich
12 a couple of questions. But we will certainly
13 extend any deadlines that prove to be problematic
14 due to any late production.
15     So that being said, I'm going to ask you a few
16 questions.
17         CROSS-EXAMINATION
18 BY MR. LIROT:
19   Q. Now, obviously, you're familiar with the first
20 amendment complaint in this action, and I think
21 you've been asked many times or at least responded to a
22 lot of questions about South East Show Clubs, LLC. Does
23 South East Show Clubs, LLC, quote, operate a chain of
24 adult entertainment clubs in Tampa in Hillsborough
25 County, Florida?

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

58..61

Page 58

1   A. No.
2   Q. Emperor's Tampa II, Inc., operates an adult
3   entertainment club in Tampa. Yes?
4   A. It used to, yes.
5   Q. All right. And you're the sole owner and
6   operator of the many clubs that are identified, for
7   instance, on what was in existence on Exhibit Number 13?
8   A. Yes.
9   Q. Did South East Show Clubs have any control
10  over any employees at any adult entertainment clubs in
11  this alleged chain?
12  A. No.
13  Q. Did you execute any decisions through South
14  East Show Clubs, LLC, on any of the individual
15  gentlemen's clubs on the back of the card in Exhibit 13?
16  A. No.
17  Q. Did South East Show Clubs have any managers
18  that would oversee operations of any of the clubs within
19  the regions of Florida and Georgia?
20  A. Not in the South East Show Clubs capacity.
21  Q. Was South East Show Clubs a single integrated
22  enterprise and/or single employer with Emperor's
23  Tampa II, for any particular reason?
24  A. No. It doesn't employ anyone.
25  Q. Were managers transferred between the clubs

Page 59

1   identified on Exhibit No. 13?
2   A. If there was a manager that moved, there was a
3   complete separation from one club, then a new payroll
4   package reenergized at the new place, because each
5   entity is separate.
6   Q. And did South East Show Clubs have any
7   specific written policies that govern the day-to-day
8   operations of any of the clubs that are identified on
9   the back of that card, Exhibit 13?
10  A. Not South East Show Clubs.
11  Q. South East Show Clubs manage any kind of
12  payroll for any of those clubs?
13  A. No.
14  Q. Did any of the clubs on Exhibit No. 13 receive
15  any cash payout, profit, or anything at all from South
16  East Show Clubs, LLC?
17  A. No.
18  Q. Did South East Show Clubs, LLC, purchase any
19  liquor or any other inventory that would be used at any
20  of the other clubs?
21  A. No.
22  Q. So do you have any reason to dispute whether
23  Mr. Schiele worked from March 21st, 2013, to
24  December 27th, 2013, as a general manager at the
25  Emperor's with alcohol?

Page 60

1   A. As a manager, yes.
2   Q. Okay. Do you have any information or were you
3   ever told by anyone that he was informed by Mr. Rice to,
4   quote, begin thinning the heard, meaning he wanted the
5   plaintiff, which would be Mr. Schiele, to terminate any
6   black employees?
7   A. No.
8   Q. Okay. Did Mr. Schiele ever communicate with
9   you that he had any problems with any kind of
10  discriminatory employment practices?
11  A. No.
12  Q. Did he ever communicate with you that he
13  wanted to hire a black female to work the front door and
14  had some issues with that?
15  A. No.
16  Q. Okay. Did you ever say to him after you
17  became aware a black female was hired -- did you ever
18  comment, quote, fantastic. Now, I have an N-word door
19  girl?
20      MR. HILL: Objection to form.
21  A. No.
22  BY MR. LIROT:
23  Q. What, if any, information did you get that
24  Mr. Schiele refused to participate in any kind of
25  alleged discriminatory practice?

Page 61

1   A. I didn't hear about any discriminatory
2   practices.
3   Q. All right. Do you know if Mr. Schiele ever
4   complained to you about any issue with discriminatory
5   practices?
6   A. No.
7   Q. Did Mr. Rice ever tell you that he was
8   terminating Mr. Schiele because of any kind of concern
9   over his resistance or opposition to discriminatory
10  practices?
11  A. No.
12  Q. What reasons did he give you?
13  A. He gave drinking, use of pot on the premises,
14  and letting people use pot on the premises.
15  Q. How many conversations do you think you had
16  with Mr. Rice about those issues?
17  A. Not very many. I hired Mr. Rice to put in
18  some new policies and straighten things up so we could
19  get back to profitability.
20  Q. Okay. And I think you already testified to
21  it, but what is your overall management participation in
22  the day-to-day operations of any of these particular
23  businesses?
24      MR. HILL: Objection to form.
25  A. Limited access to day-to-day operations.

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

62..65

Page 62

1  BY MR. LIROT:
2      Q.  So who is it that does the hiring and firing
3  at the individual clubs?
4      A.  Each manager has the ability to hire and fire
5  their own people.
6      Q.  Who has the final word?
7      A.  The manager of that shift that they're working
8  at, you know. Some places have a general manager that
9  oversees both shifts of night and day, but most of them
10 are responsible for their daytime or their nighttime
11 personnel.
12     Q.  All right. How was it -- and I think you
13 already testified you had some input into the ultimate
14 issues regarding Mr. Schiele. How did that come to be?
15     A.  Rob called me and said I'm letting him go, and
16 I said you need a DJ, and he's a really good DJ, and
17 he'd have supervision then. Ask him if he'd take the DJ
18 job. He'd make more money.
19     Q.  And what was the next thing that you heard in
20 relation to that issue?
21     A.  He said that was like a slap going backwards
22 or something of that nature.
23     Q.  You indicated that DJs make more than
24 managers. How do you explain that?
25     A.  The girls tip out, and then they also get

Page 63

1  paid. So there's nights when you have 30 girls, and
2  they're all tipping out $5 a piece or $10 a piece.
3  That's $300, and the manager's making about $125 a
4  shift.
5      Q.  So as far as the allegations in this
6  complaint, did you ever give any direction to terminate
7  Mr. Schiele based on any resistance or opposition that
8  he would've gotten for any kind of unlawful
9  discrimination and/or harassment?
10         MR. HILL: Objection to form.
11     A.  No.
12 BY MR. LIROT:
13     Q.  And Mr. Schiele never complained directly to
14 you about any issue of the operation of the club?
15     A.  No.
16     Q.  I don't have any more questions.
17         REDIRECT EXAMINATION
18 BY MR. HILL:
19     Q.  You said that you -- well, how many people did
20 you fire?
21     A.  How many did I fire?
22     Q.  Yeah.
23     A.  When?
24     Q.  You fired Mr. Franke, right?
25     A.  I let Mr. Franke go.

Page 64

1      Q.  Okay. Who else did you fire?
2      A.  I don't know. There's been a long list of
3  upper management people, but when it comes to bartenders
4  and waitresses and things like that, I didn't fire no
5  one.
6      Q.  There's so many people that you fired, you
7  can't even remember, can you?
8      A.  Since 1991, absolutely.
9      Q.  No. Since Mr. Schiele worked there.
10     A.  Well, there's been a lot of people gone since
11 Mr. Schiele worked there.
12     Q.  Well, there's so many you've fired that you
13 can't remember their names, can you?
14     A.  I don't remember their names now even when
15 they're working there.
16     Q.  Where did the money come from to fund South
17 East Show Clubs?
18     A.  To do what?
19     Q.  Well, there's a website, there's cards being
20 made. Where's all the money coming from?
21     A.  South East Show Clubs didn't have any money.
22     Q.  Did Shawn -- did your graphics designer work
23 for free?
24     A.  I don't know what entity paid for that card.
25     Q.  One of your entities paid for it, right?

Page 65

1      A.  Someone paid for it. I don't know who.
2      Q.  Okay. So the money from South East Show Clubs
3  came from your clubs, correct?
4      A.  There's no money that goes into South East
5  Show Clubs.
6      Q.  Well, again, it's not -- websites aren't free,
7  right? Did you get this website for free?
8      A.  I don't know.
9      Q.  Did you get these cards made for free?
10     A.  I don't know where it was billed to.
11     Q.  Okay.
12     A.  But he never sent any South East Show Club
13 bills, because it doesn't have a bank account.
14     Q.  Okay. Which means that the money must've come
15 from somewhere, right?
16     A.  I don't know where.
17     Q.  Don't you own all these places, all these
18 clubs?
19     A.  Yeah.
20     Q.  And you can't explain to us the money?
21     A.  I have lots of people that work for me, and I
22 can't explain it all now.
23     Q.  So you don't know whether South East Show
24 Clubs is receiving money from Emperor's Tampa II, Inc.,
25 or not, do you?

ORANGELEGAL

Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

66..69

**Page 66**

1  A. How would it get it?
2  Q. You tell me. They're your clubs.
3  A. Well, I don't know.
4  Q. So you don't know the answer to the question
5  you just answered. You don't know how South East Show
6  Clubs works, do you?
7  A. There is no working, because it doesn't own or
8  operate anything.
9  Q. Okay. But it receives money from somewhere,
10 right?
11 A. No, it does not get money from somewhere.
12 Q. Well, how do these cards appear then? Just
13 out of thin air?
14 A. Back in '13, I don't know where it came from.
15 Q. Okay. How was it paid for?
16 A. I don't know.
17 Q. So you don't know how South East was funded at
18 all, do you?
19 A. It wasn't funded.
20 Q. A minute ago you just said you didn't know
21 which entity paid for it, and now you're saying it
22 wasn't funded. So which is it?
23 A. I'm going to give you I don't know, and we'll
24 leave it at that.
25 Q. Okay. Now, you said South East doesn't employ

**Page 67**

1  anybody. Rob Rice testified that he was employed by
2  South East. He was the operations manager. That's --
3  A. His paycheck came from Gold Club Tampa, Inc.
4  Q. Okay. Not from South East?
5  A. Not from South East.
6  Q. Does South East have -- well, who does your
7  accounting?
8  A. A guy named Devry Dewan.
9  Q. Does he do them for all your businesses?
10 A. He files the federal tax returns.
11 Q. Okay. He files them for South East, right?
12 A. There is no tax return for South East.
13 Q. South East has never filed a tax return?
14 A. I don't think so, no.
15 Q. All right. So when Mr. Schiele was employed,
16 you said he worked for Tampa II, Inc., but then I also
17 heard Rob Rice say that he was employed by Convergence.
18 A. Convergence is the leasing company --
19 Q. Okay.
20 A. -- that we paid money to. They filed under
21 their own FIN number --
22 Q. Okay.
23 A. -- for ease of workmen's comp, insurance, and
24 the like.
25 Q. Okay.

**Page 68**

1  A. That's a common practice --
2  Q. Right.
3  A. -- to hire leasing companies to do your
4  administrative payroll.
5  Q. Right.
6  MR. HILL: I don't have any additional
7  questions subject to keeping it open as we
8  discussed.
9  MR. LIROT: Sure.
10 MR. HILL: Thank you for your time,
11 Mr. Tomkovich.
12 MR. LIROT: If this gets transcribed, you'll
13 have the right to read it.
14 THE WITNESS: I want it transcribed.
15 MR. LIROT: There you go.
16 THE COURT REPORTER: Meaning read?
17 THE WITNESS: Yes. I want the paper so we can
18 read it.
19 (Deposition concluded at 1:03 p.m.)

**Page 69**

1  CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
    COUNTY OF HILLSBOROUGH
4
5     I, KELLEY KING, Shorthand Reporter and
6  Notary Public, State of Florida, certify that
7  MICHAEL TOMKOVICH personally appeared before me and was
8  duly sworn.
9     WITNESS my hand and official seal this 20th day
10 of September, 2017.

*Kelley King*

KELLEY KING
Notary Public, State of Florida
My Commission No.: GG019363
Expires: August 8, 2020

ORANGELEGAL

**Orange Legal**
**800-275-7991**

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL TOMKOVICH

70..72

Page 70

```
 1              CERTIFICATE OF REPORTER
 2
       STATE OF FLORIDA
 3
       COUNTY OF HILLSBOROUGH
 4
 5          I, KELLEY KING, Shorthand Reporter and
 6   Notary Public, State of Florida, certify that I was
 7   authorized to and did stenographically report the
 8   deposition of MICHAEL TOMKOVICH; that a review of the
 9   transcript was requested; and that the foregoing
10   transcript, pages 5 through 67, is a true and accurate
11   record of my stenographic notes.
12          I FURTHER CERTIFY that I am not a relative,
13   employee, attorney, or counsel of any of the parties,
14   nor am I a relative or employee of any of the parties'
15   attorneys or counsel connected with the action, nor am I
16   financially interested in the action.
17          Dated this 20th day of September, 2017.
18
19
20                    _Kelley King_____
                      KELLEY KING, Notary Public
21                    State of Florida
22
23
24
25
```

Page 71

```
 1              ERRATA SHEET
 2       DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE
 3   IN RE:    MICHAEL S. SCHIELE VS. SOUTH EAST SHOW
              CLUBS, EMPEROR'S TAMPA II, INC., AND
 4            MICHAEL TOMKOVICH
     CASE NO:  8:16-CV-2308-JSM-MAP
 5   DATE:     AUGUST 9, 2017
     DEPONENT: MICHAEL TOMKOVICH
 6
 7   PAGE NO. LINE NO.  CORRECTION & REASON
 8   _____  _____   _____
 9   _____  _____   _____
10   _____  _____   _____
11   _____  _____   _____
12   _____  _____   _____
13   _____  _____   _____
14   _____  _____   _____
15   _____  _____   _____
16   _____  _____   _____
17   _____  _____   _____
18   _____  _____   _____
19   _____  _____   _____
20   _____  _____   _____
21   _____  _____   _____
22   _____  _____   _____
23   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
24   are true.
25   _____     _____
     DATE                        MICHAEL TOMKOVICH
```

Page 72

```
 1
     SEPTEMBER 20, 2017
 2
 3   MICHAEL TOMKOVICH
     C/O LUKE CHARLES LIROT, ESQUIRE
 4   2240 BELLEAIR ROAD
     SUITE 190
 5   CLEARWATER, FLORIDA 33764
 6   Re:  August 9, 2017, Deposition of MICHAEL TOMKOVICH
 7   Dear MICHAEL TOMKOVICH:
 8       This letter is to advise that the transcript for the
     above-referenced deposition has been completed and is
 9   available for review.  Please contact our office at
     (800)275-7991 to make arrangements for read and sign or
10   sign below to waive review of this transcript.
11       It is suggested that the review of this transcript be
     completed within 30 days of your receipt of this letter,
12   as considered reasonable under Federal Rules*; however,
     there is no Florida Statute to this regard.
13
         The original of this transcript has been forwarded to
14   the ordering party and your errata, once received, will
     be forwarded to all ordering parties for inclusion in
15   the transcript.
16                               Sincerely,
17
                                 Kelley King
18                               Orange Legal, Inc.
19   cc:  BRANDON J. HILL, Esquire
          LUKE CHARLES LIROT, Esquire
20        CANDICE A. ROJAS, Esquire
21   Waiver:
22   I,_____, hereby waive the reading and signing
     of my deposition transcript.
23
24   _____    _____
     Deponent Signature      Date
25   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e)
```



**Orange Legal**
800-275-7991