Michael S. Schiele vs South East Show Clubs, et al.
ROBERT RICE

```
 1                   UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                           TAMPA DIVISION

 3
                                 CASE NO.:  8:16-CV-2308-JSM-MAP
 4
     MICHAEL S. SCHIELE,
 5
            Plaintiff,
 6
     vs.
 7
     SOUTH EAST SHOW CLUBS,
 8   EMPEROR'S TAMPA II, INC.,
     and MICHAEL TOMKOVICH,
 9
            Defendants.
10
     _____/
11

12   DEPOSITION OF:        ROBERT RICE

13   DATE:                 WEDNESDAY, AUGUST 9, 2017

14   TIME:                 10:17 A.M. - 11:01 A.M.

15   PLACE:                ORANGE LEGAL
                           1000 WEST KENNEDY BOULEVARD
16                         SUITE 200
                           TAMPA, FLORIDA 33606
17
     REPORTED BY:          KELLEY KING, NOTARY PUBLIC
18                         STATE OF FLORIDA

19

20

21

22

23

24

25
```



Orange Legal
800-275-7991

Exhibit "A"

Case 8:16-cv-02308-JSM-MAP   Document 55-1   Filed 10/30/17   Page 2 of 10 PageID 479
Case 8:16-cv-02308-JSM-MAP   Document 37-1   Filed 09/22/17   Page 2 of 10 PageID 226

Michael S. Schiele vs South East Show Clubs, et al.
ROBERT RICE                                                                2..5

Page 2

```
 1    A P P E A R A N C E S:
 2    BRANDON J. HILL, ESQUIRE
      OF:  WENZEL FENTON CABASSA, P.A.
 3         1110 NORTH FLORIDA AVENUE
           SUITE 300
 4         TAMPA, FLORIDA 33602
           (813)224-0431, FAX (813)229-8712
 5         Bhill@wfclaw.com
              APPEARING ON BEHALF OF THE PLAINTIFF
 6
      LUKE CHARLES LIROT, ESQUIRE
 7    OF:  LAW OFFICES OF LUKE LIROT, P.A.
           2240 BELLEAIRE ROAD
 8         SUITE 190
           CLEARWATER, FLORIDA 33764
 9         (727)536-2100, FAX (727)536-2100
           Luke2@lirotlaw.com
10            APPEARING ON BEHALF OF THE DEFENDANTS
11    CANDICE A. ROJAS, ESQUIRE
      OF:  LAW OFFICES OF LUKE LIROT, P.A.
12         2240 BELLEAIR ROAD
           SUITE 190
13         CLEARWATER, FLORIDA 33764
           (727)536-2100, FAX (727)536-2100
14         Candice@lirotlaw.com
              APPEARING ON BEHALF OF THE DEFENDANTS
15
16    ALSO PRESENT:
           MICHAEL S. SCHIELE
17         MICHAEL TOMKOVICH
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2    TESTIMONY OF ROBERT RICE
 3       DIRECT EXAMINATION BY MR. HILL.................4
 4    CERTIFICATE OF OATH................................34
 5    CERTIFICATE OF REPORTER............................35
 6    ERRATA SHEET.......................................36
 7    NOTIFICATION LETTER................................37
 8
 9                 INDEX OF EXHIBITS
10    PLAINTIFF'S EXHIBITS
11    EXHIBIT 1...TEXT MESSAGES..........................13
12    EXHIBIT 2...BUSINESS CARD..........................21
13    EXHIBIT 3...SHAWN HOPPER E-MAIL....................26
14    EXHIBIT 4...DECLARATION OF PATRICK FRANKE..........29
15    EXHIBIT 5...SOUTH EAST SHOW CLUBS' LETTERHEAD......32
16
                   S T I P U L A T I O N S
17
18       It is hereby stipulated and agreed by and between
19    the counsel for the respective parties and the deponent
20    that the reading and signing of the deposition
21    transcript be reserved.
22
23
24
25
```

Page 4

PROCEEDINGS

THE COURT REPORTER: Would you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you're about to give in this cause is the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes.

ROBERT RICE

Was called as a witness and, having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HILL:

Q. Mr. Rice, good morning. My name is Brandon Hill. I'm one of the lawyers for Michael Schiele. He's brought a lawsuit against South East Show Clubs, Emperor's Tampa II, Inc., and Michael Tomkovich. We're here this morning to take your deposition. Your name's new to me. I mean, I heard your name kind of throughout the litigation, but we made some adjustments to get you here this morning. I know you've got somewhere to be, so I'll try to be as efficient as possible.

I'm not here to argue with you. I take a very relaxed deposition. Just here to hear your side of things. If you need a break, let me know. If you don't

Page 5

understand something, let me know. I just ask that you answer any pending questions. That's it.

A. Let's do it.

Q. All right. So can you go ahead and state your full name for the record?

A. Robert Rice.

Q. And where do you live, Mr. Rice? What's your address?

A. 

Q. And that's a street?

A. Do I have to give my information? This guy's threatened me millions of times. I don't want him by my home.

Q. Okay. It's not --

MS. ROJAS: He doesn't have to give it.

MR. HILL: He can give it to me.

MS. ROJAS: Yeah.

MR. LIROT: We'll accept any subpoenas on his behalf or waive subpoenas if you need to get ahold of him.

MR. HILL: Okay. That's fine.

MR. LIROT: Okay. I'll make sure I have --

MR. HILL: I'm not trying to make it that kind of morning. I'm just trying to get the truth.

THE WITNESS: Because it will get really



Page 6

1 nasty. I've been threatened a bunch by him.
2 BY MR. HILL:
3    Q. All right. Well, let's don't start off
4 that way. Let's just relax.
5    A. I don't want to give him my home address.
6    Q. Okay.
7    A. I have a wife and a family.
8    Q. And I said that's fine.
9    A. Okay.
10    Q. All right. Let's --
11    A. Let's go.
12    Q. -- just take it easy. All right. So when did
13 you first -- well, let's start this way. When did you
14 first meet Mr. Tomkovich?
15    A. I'm not exactly sure.
16    Q. All right. When did you first start working
17 for him?
18    A. Probably ten years ago maybe.
19    Q. Okay. In what capacity?
20    A. As a manager.
21    Q. All right. What club?
22    A. The Tampa Gold Club.
23    Q. Tampa Gold Club. And is that a d/b/a for
24 something?
25    A. I don't know.

Page 7

1    Q. Okay. Do you have any knowledge as to how the
2 structure of Mr. Tomkovich's clubs works?
3    A. I don't understand.
4    Q. Well, you said you were the manager of Tampa
5 Gold Club, Inc.; right?
6    A. Uh-huh.
7    Q. All right. So that's a corporation; right?
8 And you're the manager; correct?
9    A. Yes.
10    Q. All right. And so did the Tampa Gold Club,
11 Inc., pay you?
12    A. Yes. Actually, it was Convergence or one of
13 the payroll companies. I'm not sure who they used at
14 the time.
15    Q. Okay. And so employees at the Tampa Gold
16 Club --
17    A. Were employed by a payroll company.
18    Q. Hold on. Let me finish.
19    A. Okay.
20    Q. And so the employees that worked at Tampa Gold
21 Club, payroll ran through Convergence; correct?
22    A. We were actually employed by the payroll
23 company too.
24    Q. All right. Let's talk about that for a
25 minute. So when you say employed, who set the

Page 8

1 employees' hours?
2    A. I did.
3    Q. Okay. And who set the rates of pay?
4    A. Mike did.
5    Q. And is that -- did that remain true while you
6 worked for him those ten years?
7    A. Yes.
8    Q. So, for example, Mr. Tomkovich set
9 Mr. Schiele's rate of pay; correct?
10    A. Yes.
11    Q. And who created club policies?
12    A. They were in place when I got there. Tony
13 Hernandez was the general manager, and we followed off
14 of that.
15    Q. At Gold Club?
16    A. Yes.
17    Q. And do you know who put them in place before
18 Tony Hernandez got there?
19    A. I do not.
20    Q. So you don't know if it was Mr. Tomkovich or
21 not; correct?
22    A. I don't.
23    Q. Okay. To save time, let's fast-forward to --
24 well, first, what did you do to prepare for today's
25 deposition, if anything?

Page 9

1      Well, they don't represent you, so what did
2 you do?
3    A. Nothing. I took a shower and came down.
4    Q. Okay. And have you talked to Mr. Tomkovich
5 about today's deposition?
6    A. No.
7    Q. All right. And I'm going to be honest with
8 you. There's going to be some -- probably some
9 uncomfortable moments this morning.
10    A. Not going to add to it.
11      MR. LIROT: That's in the nature of all
12   litigation, so we'll deal with it.
13 BY MR. HILL:
14    Q. I'm just telling you. I'm not doing it
15 to irritate you or anything like that. I'm just
16 doing my job. Okay?
17      And so you were the manager at Tampa Gold
18 Club, you said, about ten years? Is that right?
19    A. No. You asked me when I was hired, and I said
20 about ten years ago.
21    Q. Okay. And so can you kind of lead me along
22 your hierarchy or how you rose through the ranks of
23 Mr. Tomkovich's organizations?
24    A. By performance.
25    Q. Okay.



Michael S. Schiele vs South East Show Clubs, et al.
ROBERT RICE

10..13

Page 10

1  A. My sales exceeded everybody. My girl count
2  exceeded everybody. Obviously, I knew what I was doing,
3  and he saw that.
4  Q. All right. Tampa Gold Club is different than
5  some of the other clubs Mr. Tomkovich owns around town,
6  I assume; correct?
7  A. There're all different. Some are in different
8  counties, so, of course, the laws are different.
9  Q. What were the other clubs that you managed?
10  A. Gold Club was the only one I managed.
11  Q. All right. And how long were you the manager?
12  A. I'm not sure. You'd have to go to the records
13  on that.
14  Q. Just -- just ballpark it for me if you can.
15  A. Seven years, maybe.
16  Q. Okay. So --
17  A. Five years.
18  Q. So that would put us at 2010, what, 2012 you
19  took a different position?
20  A. I don't know.
21  Q. All right. What was the last position you
22  held with Mr. Tomkovich?
23  A. I was the operations manager.
24  Q. For what club?
25  A. For the Tampa Gold Club, Tampa Emperor's,

Page 11

1  Pasco Emperor's, and Pinellas County Executive.
2  Q. One more time. Tampa Emperor's, Tampa Gold
3  Club.
4  A. Pasco Emperor's.
5  Q. Pasco Emperor's.
6  A. Pinellas Executive.
7  Q. Pinellas Execu- -- is that -- Pinellas
8  Executive a gentlemen's club?
9  A. Yes.
10  Q. And so were you around when the EOC came
11  around?
12  A. No, but I heard about it.
13  Q. Okay.
14  A. Everybody heard about it there. I believe
15  they were trying to rally people up to -- I had no
16  interest in that.
17  Q. The EOC was?
18  A. No. An attorney. I believe it was you.
19  Q. Okay. Well, I can assure you it wasn't me.
20  I'm not the EOC.
21     But in terms of your last position, you said
22  you were an operations manager. What year did you
23  leave?
24  A. I don't know. I can find out if I walked into
25  the lobby.

Page 12

1  Q. You don't have any idea when you left, 'cause
2  here's a --
3  A. No, I don't.
4  Q. Do you have any tattoos?
5  A. Yes, I do.
6  Q. Do you have -- what tattoo's on your back?
7  A. Zero.
8  Q. Zero. Have you ever had your tattoos changed
9  or altered in any way?
10  A. One.
11  Q. Have you ever had any white supremacy tattoos?
12  A. No. It's all Polynesian.
13  Q. I'm just curious. I don't need to see them.
14  Do you ever refer to black people or African Americans
15  as Canadians?
16  A. No.
17  Q. Have you ever told any of the folks who worked
18  underneath you, including Mr. Schiele, to thin the herd,
19  meaning get rid of African American employees?
20  A. No. I've used "thin the herd" throughout my
21  life, never based on race or anything like that. It's
22  underperformance.
23  Q. Okay. So I'm going to show you a text. I
24  think you've probably already seen it and hopefully
25  maybe you can help explain it.

Page 13

1  A. Okay. What is the tattoo about?
2  Q. Just a question. So I want to hand you what
3  we'll mark as Exhibit 1. It's a group of text messages,
4  and yours is on top.
5     MR. LIROT: Thank you, sir.
6     (Plaintiff's Exhibit Number 1 was marked for
7     identification.)
8  BY MR. HILL:
9  Q. Is your phone number 727-647-6300?
10  A. Yes.
11  Q. And your name's obviously Mr. Rice; correct?
12  A. Yes.
13  Q. I'll let you -- give you a minute to read the
14  text.
15     And just for the record, I'm going to just ask
16  you about the second one. I'll read it aloud and then
17  I'll ask you some questions.
18     You sent this text message to Mr. Schiele, and
19  Mr. Schiele has produced it. You say, quote, let's
20  start thinning the herd. Make sure you collect house up
21  front from the Canadians. What does that mean?
22  A. Canadians are generally people that don't tip.
23  It's common knowledge. It's the most -- I've heard it
24  my whole life.
25  Q. Say that again.



Orange Legal
800-275-7991

Case 8:16-cv-02308-JSM-MAP   Document 55-1   Filed 10/30/17   Page 5 of 10 PageID 492
Case 8:16-cv-02308-JSM-MAP   Document 37-1   Filed 09/22/17   Page 5 of 10 PageID 231

Michael S. Schiele vs South East Show Clubs, et al.
ROBERT RICE
14..17

Page 14

1  A. Canadians usually don't tip in the hospitality
2  industry. That's what it's meant by, the girls that
3  don't tip out. Make sure we're collecting their house
4  up front, because they're never going to tip out. We
5  refer to house as a tip-out.
6  Q. So who's the herd?
7  A. That would be any employees or independent
8  contractors.
9  Q. So when you say let's start thinning the herd,
10 you didn't mean anything racial by that at all. Is that
11 what you're saying?
12 A. No.
13 Q. That's your testimony?
14 A. Yes.
15 Q. And that's what you'll tell the jury if we get
16 there?
17 A. Yeah.
18 Q. And then you're going to tell the jury that
19 Canadians means what again?
20 A. People that primarily don't tip. In Canada
21 it's the tradition they don't tip.
22 Q. Have you been to Canada?
23 A. No, sir, I have not.
24 Q. How would you know that?
25 A. I read, I have the Internet, and I know many

Page 15

1  people that have been.
2  Q. What did you read -- where did you read that
3  Canadians don't tip?
4  A. If you go on any hospitality forum especially
5  in Central Florida, you'll see waitresses, everybody
6  complaining about the Canadians not tipping.
7  Q. What are some of the those forums called?
8  A. Offhand, I don't know. You'd have to do your
9  own research on that.
10 Q. Okay. You weren't referring to African
11 Americans as Canadians here?
12 A. This will be the third time I've told you no.
13 Q. Mr. Tomkovich ever tell you to get rid of any
14 of the African American door girls?
15 A. I didn't even know they have an African
16 American door girl.
17 Q. Did Mr. Tomkovich ever tell you --
18 A. No.
19 Q. Can I finish my question, please?
20    MR. LIROT: Can we take a break?
21    (Off-the-record discussion.)
22 BY MR. HILL:
23 Q. So you were the operations manager.
24 You're not sure when your tenure ended; is that
25 correct?

Page 16

1  A. That's correct.
2  Q. Were you still the operations manager when
3  Mr. Schiele was fired?
4  A. Yes.
5  Q. Who fired him?
6  A. He was offered a different position, and he
7  chose not to take it.
8  Q. Okay.
9  A. So he left.
10 Q. It is your testimony that he quit?
11 A. He said he didn't want the position that was
12 offered to him. He couldn't be a manager anymore.
13 Q. He was demoted; right?
14 A. Yes.
15 Q. Who demoted him?
16 A. That would be me.
17 Q. You made the decision to demote Mr. Schiele?
18 That's your testimony?
19 A. I wanted to fire him. Mike said to demote
20 him. He said offer him another position in the company.
21 Q. So Mr. Tomkovich made the decision to demote
22 him; is that correct?
23 A. Yes.
24 Q. Okay. And so you needed to go to
25 Mr. Tomkovich before you fired somebody; right?

Page 17

1  A. No, but I did talk to him. He was the owner.
2  I always spoke to him about decisions I was going to
3  make and moves I was going to make. He's been doing
4  this a long time, so I bounced things off of him.
5  Q. Sure. He's your boss; right?
6  A. Yes.
7  Q. And so, ultimately, the decision was up to
8  Mr. Tomkovich whether or not to terminate the plaintiff;
9  correct?
10 A. He felt it would be a better decision.
11 Ultimately, it was left up to me.
12 Q. Okay.
13 A. That would be like you going to your father
14 saying, hey, Dad, I want to do this; and he said, well,
15 I would probably do it this way. You could either say,
16 oh, you know, that makes sense, or you could just do it
17 your own way. It's the same situation. Understand?
18 Q. It's not a day where you get to ask me
19 questions, Mr. Rice.
20 A. Okay.
21    MR. LIROT: Not a conversation, unfortunately.
22    THE WITNESS: Gotcha.
23 BY MR. HILL:
24 Q. And what was the issue that you had with
25 Mr. Schiele?

Case 8:16-cv-02308-JSM-MAP Document 55-1 Filed 10/30/17 Page 6 of 10 PageID 483
Case 8:16-cv-02308-JSM-MAP Document 37-1 Filed 09/22/17 Page 6 of 10 PageID 252

Michael S. Schiele vs South East Show Clubs, et al.
ROBERT RICE
18..21

Page 18

1  A. His performance. His paperwork was never
2 correct; the money was never correct. He drank on the
3 job. He stole liquor from the club. He used his power
4 of authority to threaten girls if they didn't party with
5 him or meet him afterwards.
6  Q. Okay. You gave me three reasons. It's stole,
7 drank, and threatened girls. Can you provide me with
8 the specifics on when Mr. Schiele allegedly stole
9 something from the company?
10  A. The dates, I don't even know the dates --
11 remember the dates that I worked there; so, no.
12  Q. Do you know what he allegedly stole?
13  A. It was Jameson.
14  Q. Okay. And I've seen write-ups. Mr. Schiele
15 had one write-up; is that right?
16  A. I saw the write-up from the corporate office.
17  Q. Right.
18  A. He had other write-ups as well, but their
19 paperwork is terrible. Their organization is a mess.
20  Q. Whose? Mr. Tomkovich's?
21  A. Yes.
22  Q. What do you mean by that?
23  A. That they can't find employee files, and I
24 know he's been sued several times, and they've dug
25 through and they can't find other paperwork.

Page 19

1  Q. Okay. We'll come back to that in a minute.
2    So let's keep going with Mr. Schiele. So you
3 say Mr. Schiele stole Jameson. Do you mean he had
4 drinks on the job? Is that what you're talking about?
5  A. He always did that, but he actually physically
6 took bottles out. We reviewed it on the video.
7  Q. And so why didn't you fire him then?
8  A. Because I wanted to talk to Mike and see what
9 he thought. And in this industry you don't always deal
10 with the best quality people, and you kind of --
11 especially in the Bay area, they recycle a lot of the --
12 the managers.
13  Q. Do you still have the tape? I mean, do you
14 know if Mr. Tomkovich has those tapes?
15  A. I do not know. You'd have to ask him.
16  Q. Were they videotapes or CDs?
17  A. It's all on the hard drive. That's -- I don't
18 think anybody uses videotapes in the last decade.
19  Q. You said he drank on the job. When did you
20 catch him drinking on the job?
21  A. He was always drinking on the job.
22  Q. Okay. Are other people -- do other people
23 drink on the job, other --
24  A. The bartenders do, but the manager, the floor
25 host, anybody that handles money, other than the

Page 20

1 bartenders, aren't supposed to drink.
2  Q. You said he had threatened girls. When did
3 Mr. Schiele allegedly threaten girls?
4  A. I would get texts and e-mails all the time
5 from girls, and they'd send his text messages to me.
6  Q. Saying what?
7  A. I don't know the dates. That they would lose
8 their job if they didn't come back to his place with him
9 after work.
10  Q. Do you have any of those text messages still?
11  A. No. I've had the same phone number forever,
12 so I'm sure you guys could pull those.
13  Q. But you don't have any of them?
14  A. Not on hand, no, sir.
15  Q. All right. And you haven't give them to --
16  A. I got out of the industry.
17  Q. I understand.
18  A. I just -- I had no desire to -- I didn't think
19 I would be in court, especially for this.
20  Q. Okay.
21  A. Or not court, but a deposition.
22  Q. And so let's talk about the EOC for a minute.
23 You said you were the operations manager. Would you
24 have been the operations manager of -- well, let me back
25 up.

Page 21

1    South East Show Clubs, what is it?
2  A. That was a term that we used to encompass the
3 Bay area clubs.
4  Q. Okay. So it's kind of like the mother ship?
5 Is that a good way to describe it?
6  A. You can describe it however you want. Rather
7 than saying Pinellas Executive, Pasco Emperor's, Tampa
8 Emperor's, I would just say South East Show Clubs.
9  Q. So were you involved in the hiring of
10 Mr. Schiele, or who did that?
11  A. No. He was there before I got there.
12  Q. Okay.
13  A. I had left. The numbers plummeted, and Mike
14 asked me to come back.
15  Q. I'll hand you Exhibit 2.
16    (Plaintiff's Exhibit Number 2 was marked for
17    identification.)
18 BY MR. HILL:
19  Q. This is a business card Mr. Schiele's
20 produced. It shows him as the manager of South East
21 Show Clubs.
22  A. So are you saying he over -- he saw all those
23 clubs? Or where is South East Show Clubs?
24  Q. Right there on the front page. It says "SES,
25 South East Show Clubs."

Case 8:16-cv-02308-JSM-MAP   Document 55-1   Filed 10/30/17   Page 7 of 10 PageID 484
Case 8:16-cv-02308-JSM-MAP   Document 37-1   Filed 09/22/17   Page 7 of 10 PageID 233

Michael S. Schiele vs South East Show Clubs, et al.
ROBERT RICE
22..25

Page 22

1  A. So he didn't work at Emperor's; he worked
2  at --
3  Q. Well, I'm going to ask you some questions.
4  A. Okay.
5  Q. We'll get there. First of all, have you ever
6  seen a document like this?
7  A. Yes.
8  Q. Okay. So who besides Mr. Schiele was a
9  manager for South East Show Clubs?
10  A. Nobody that I'm aware of, other than myself.
11  Q. Okay.
12  A. Because --
13  Q. How long were you a manager for South East
14  Show Clubs? Do you know?
15  A. I don't know. You'd have to ask Mike.
16  Q. Were you a manager in 2015?
17  A. I don't think so.
18  Q. When did you get out of the business?
19  A. Six months ago.
20  Q. Up until then were you working for
21  Mr. Tomkovich?
22  A. No.
23  Q. When did you stop working for Mr. Tomkovich?
24  A. I don't know. I can step into the lobby and
25  find out for you. I just --

Page 23

1  Q. That's all right. I mean, just, do you know
2  the year?
3  A. I don't.
4  MR. LIROT: We can get it to you on a break.
5  THE WITNESS: Okay.
6  MR. HILL: Okay.
7  BY MR. HILL:
8  Q. And so going back to Exhibit 2, South
9  East Show Clubs, and then you turn to the back.
10  This is the back of the business card.
11  A. Yeah. I wasn't aware that he had one of
12  these.
13  Q. These are the -- these are the Tampa area
14  clubs. Is that what you were talking about?
15  A. The Bay area; correct.
16  Q. So we've got Tampa Emperor's, then you've got
17  Tampa Gold Club. What's the one in the middle? Bliss?
18  A. Bliss. That was the Executive.
19  Q. The Executive. And then the next one was
20  Pasco Emperor's, and that's what you named before;
21  right?
22  A. Yeah.
23  Q. Okay. And you were operations manager over
24  all of these; correct?
25  A. Yes. I thought I was the only one who had

Page 24

1  this.
2  Q. So who set the rates of pay for management for
3  South East Show Clubs' employees?
4  A. Mike set the rate of pay. You keep referring
5  to the South East Show Clubs' employees. There was no
6  employees of South East Show Clubs other than myself,
7  but it was paid out of the Gold club.
8  Q. How did that work? What do you mean?
9  A. Because there was never -- like, you couldn't
10  go to South East Show Club. It wasn't a club. That
11  just encompassed everything. Rather than me saying I'm
12  operations manager of Tampa Emperor's, Tampa Gold Club,
13  Bliss, Pasco Emperor's, I would just say the South East
14  Show Clubs. I was paid out of the Tampa Gold Club.
15  Q. Was there a -- like a handbook, an employee
16  handbook or anything?
17  A. Yes, there was.
18  Q. Do you know who wrote it?
19  A. I don't know.
20  Q. Was there a progressive disciplinary policy in
21  place in place when Mr. Schiele was employed?
22  A. When he was first employed, I'm not aware of.
23  You'd have to ask Tony Hernandez.
24  Q. Did you ever hear Mr. Tomkovich use racial
25  slurs?

Page 25

1  A. Not in the club, no.
2  Q. Did you ever hear him use it outside the club?
3  A. Not to my knowledge, no.
4  Q. Never heard Mr. Tomkovich refer to African
5  Americans using the N word?
6  A. No. We didn't hang out. You know, it wasn't
7  like that type of relationship.
8  Q. And did employees move from club to club?
9  A. Employees sometimes, if they needed a position
10  filled because somebody didn't show up or whatever, they
11  could call an employee from another club and use them.
12  But the independent contractors, yes, they floated from
13  club to club.
14  Q. And the independent contractors, are those the
15  dancers?
16  A. Yes.
17  Q. All right. I gotcha.
18  I'm going to hand you Exhibit 3. It just kind
19  of reiterates what I was saying. Just take a look at it
20  real quick and let me let me know when you're ready.
21  A. So Mike Schiele stated that he moved around
22  from club to club. I wasn't aware of that, no.
23  Q. Okay. And so while you were operations
24  manager did Mike Schiele, the plaintiff in this case,
25  work at different clubs?



Case 8:16-cv-02308-JSM-MAP   Document 55-1   Filed 10/30/17   Page 8 of 10 PageID 425
Case 8:16-cv-02308-JSM-MAP   Document 37-1   Filed 09/22/17   Page 8 of 10 PageID 234

Michael S. Schiele vs South East Show Clubs, et al.
ROBERT RICE
26..29

Page 26

1   A. No.
2   Q. Which club did he work at?
3   A. Emperor's Tampa.
4   Q. Emperor's. Which fell under the umbrella of
5   South East Show Clubs because it was a Tampa Bay area
6   club; correct?
7   A. Yes.
8   Q. All right. And the managers -- strike that.
9      Have it marked as 3.
10     (Plaintiff's Exhibit Number 3 was marked for
11     identification.)
12  BY MR. HILL:
13  Q. Going back to Exhibit 1, these text
14  messages, you don't deny sending these, do you, to
15  Mr. Schiele, the first three pages or so?
16  A. Can I read through them?
17  Q. Sure. I think the back half's from
18  Matt Cooper, but the first three are from your phone
19  number; is that right?
20  A. Yeah, the first three are from me.
21  Q. Okay. And you said Mr. Schiele was fired in
22  part because he had poor performance? Is that what you
23  said?
24  A. Yeah, performance.
25  Q. And how do y'all rate managers' performance?

Page 27

1   A. By sales.
2   Q. By sales. Is there some kind of chart or
3   something that you would look at to determine whether he
4   was -- anybody was, a manager like Mr. Schiele was doing
5   well or not?
6   A. I would compare it against previous numbers of
7   the clubs.
8   Q. And what do those look like? Do you know?
9   Are they Excel spreadsheets, or what are they?
10  A. Yeah, it was an Excel spreadsheet.
11  Q. I've got some of those. I'm going to ask --
12  A. And if that's copy that Mike stole from the
13  club, I mean, those can be filled in. His paperwork was
14  always wrong. That was one of the reasons he was
15  written up.
16  Q. I haven't even asked you a question yet.
17  A. I'm sorry.
18  Q. Just give me a minute. In fact, let's take a
19  couple of minutes' break.
20     (Brief recess was taken from 10:43 a.m. to
21     10:50 a.m.)
22  BY MR. HILL:
23  Q. Mr. Rice, were you able during the break
24  to figure out when you stopped working for
25  Mr. Tomkovich's organizations?

Page 28

1   A. These are the dates, approximately.
2   Q. Thank you. Okay. So from May 2008 to May
3   2012 you worked for Mr. Tomkovich in some capacity, and
4   that was as a manager of the Gold Club; is that correct?
5   A. Yes, sir.
6   Q. And then from 2013 through 2015 you were the
7   operations manager of which organizations?
8   A. Tampa Gold Club, Emperor's Tampa, Pasco
9   Emperor's, and Pinellas Executive.
10  Q. Gotcha. And that collectively is South East
11  Show Clubs; correct?
12  A. Yes.
13  Q. Okay. And so going back just real quick, were
14  you around Quativa Hardin [ph] brought her lawsuit
15  against one of the clubs? Are you familiar with her?
16  A. I don't know who that is.
17  Q. Okay. Are you familiar -- I'm sorry?
18  A. That was probably prior to me.
19  Q. Are you familiar with a gentleman named
20  Patrick Franke?
21  A. Yes.
22  Q. All right.
23  A. A phenomenal bartender.
24  Q. Did you like him?
25  A. Yeah, I liked him a lot.

Page 29

1   Q. Good guy?
2   A. Yeah.
3   Q. Honest?
4   A. Yeah. I mean, he had a good heart. He had
5   been in the industry forever. He was a great bartender.
6   He was a flair bartender. I've known him since he
7   bartended at several of the clubs 20 years ago. And
8   always a good guy. He had a substance problem, but a
9   good-hearted guy.
10  Q. I'm going hand you a declaration from
11  Mr. Franke. It's marked as Exhibit 4. Would you take a
12  read through that and let me know when you're done,
13  please?
14     MS. ROJAS: Do you have a copy, Counsel?
15     MR. HILL: Yeah. I'm sorry.
16     MS. ROJAS: Exhibit 4?
17     MR. HILL: Yes.
18     (Plaintiff's Exhibit Number 4 was marked for
19     identification.)
20     MR. TOMKOVICH: Sorry for the delay.
21  A. Okay.
22  BY MR. HILL:
23  Q. So you've read the declaration of
24  Mr. Franke that he provided to the EOC; correct?
25  A. Yes.

Case 8:16-cv-02308-JSM-MAP   Document 55-1   Filed 10/30/17   Page 9 of 10 PageID 486
Case 8:16-cv-02308-JSM-MAP   Document 37-1   Filed 09/22/17   Page 9 of 10 PageID 235

Michael S. Schiele vs South East Show Clubs, et al.
ROBERT RICE
30..33

Page 30

1 Q. And a minute ago you said you considered him
2 an honest person; is that correct?
3 A. Yes.
4 Q. And so are you familiar with the events that
5 he described in this affidavit?
6 A. Yes.
7 Q. Okay. Did they occur the way he said they
8 occurred?
9 A. Not to my knowledge. I wasn't part of that.
10 Q. Were you the operations manager at the time?
11 A. No. It states in here Tony Hernandez was.
12 Q. Okay. So you were gone at this point?
13 A. Yeah. I was at Scores.
14 Q. Okay. And give me just one minute.
15 A. Take your time.
16 Q. And so the maintenance requests for the clubs,
17 did they all -- for the Tampa clubs, Bay clubs, did they
18 all say South East Show Clubs? Is that accurate?
19 A. I have never seen this before. So I don't
20 know.
21 Q. You've never seen it before?
22 A. No.
23 Q. Do you know Bruce Stoelzel?
24 A. I'm not familiar with him.
25 Q. S-t-o-e-l-z-e-l.

Page 31

1 A. No.
2 Q. And so going back to Mr. Tomkovich's role, how
3 often did Mr. Tomkovich come to the clubs you were at?
4 A. I didn't see him very often.
5 Q. Which club did you mainly reside at?
6 A. Gold Club.
7 Q. And who set the rates of pay for management at
8 Gold Club?
9 A. Mike.
10 Q. Mr. Tomkovich? I'm -- just so the record's
11 clear.
12 A. Yes.
13 Q. And who determined the hours for management at
14 the clubs you ran?
15 A. That would be me.
16 Q. And when decisions were made to terminate
17 employees -- let's start over.
18 With Mr. Schiele, can you walk me through his
19 termination, how exactly it occurred?
20 A. On several occasions he had been spoken to
21 verbally. He had multiple write-ups for different
22 things, and like I said before, in this industry we
23 don't really deal with the best, and it's hard to find
24 people that are willing to take this kind of job or
25 position. So we tried working with him. I had never --

Page 32

1 he was there in place when I got there with the company.
2 So rather than just coming in and swinging an
3 ax, I gave him a chance to tighten up and perform. It
4 never happened. So, ultimately I spoke with Mike. Mike
5 said offer him a lesser position within the company. He
6 had no interest in that.
7 Q. Well, wasn't he terminated and then a couple
8 of weeks later you offered him the DJ position out in
9 Pasco?
10 A. I don't think so. I don't know for sure, but
11 I wanted to fire him ultimately, but then after talking
12 to Mike it made sense, because he deals with this kind
13 of stuff on a regular basis.
14 Q. Making management-level decisions --
15 A. Yeah.
16 Q. -- as to whether fire employees or not?
17 A. Yeah.
18 MR. HILL: Okay. Subject to counsel that
19 you're going to accept subpoenas on Mr. Rice's
20 behalf, should be good.
21 MR. LIROT: Yes. You're good with that,
22 aren't you?
23 MR. RICE: Yeah, that's fine.
24 MR. HILL: I don't have any other questions.
25 Thank you for your time, sir.

Page 33

1 THE WITNESS: You're welcome.
2 MR. LIROT: Thank you.
3 (Plaintiff's Exhibit Number 5 was marked for
4 identification off the record.)
5 (Deposition concluded at 11:01 a.m.)

Michael S. Schiele vs South East Show Clubs, et al.
ROBERT RICE

34..37

Page 34

1  CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
   COUNTY OF HILLSBOROUGH
4
5      I, KELLEY KING, Shorthand Reporter and
6  Notary Public, State of Florida, certify that
7  ROBERT RICE personally appeared before me and was duly
8  sworn.
9      WITNESS my hand and official seal this 20th day
10 of September, 2017.
11
12
13
14                    *Kelley King*
15  _____
    KELLEY KING
16  Notary Public, State of Florida
    My Commission No.: GG019363
17  Expires: August 8, 2020
18
19
20
21
22
23
24
25

Page 35

1  CERTIFICATE OF REPORTER
2
   STATE OF FLORIDA
3
   COUNTY OF HILLSBOROUGH
4
5      I, KELLEY KING, Shorthand Reporter and
6  Notary Public, State of Florida, certify that I was
7  authorized to and did stenographically report the
8  deposition of ROBERT RICE; that a review of the
9  transcript was requested; and that the foregoing
10 transcript, pages 4 through 33, is a true and accurate
11 record of my stenographic notes.
12     I FURTHER CERTIFY that I am not a relative,
13 employee, attorney, or counsel of any of the parties,
14 nor am I a relative or employee of any of the parties'
15 attorneys or counsel connected with the action, nor am I
16 financially interested in the action.
17     Dated this 20th day of September, 2017.
18
19                    *Kelley King*
20  _____
    KELLEY KING, Notary Public
21  State of Florida
22
23
24
25

Page 36

1  ERRATA SHEET
2  DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE
3  IN RE:    MICHAEL S. SCHIELE VS. SOUTH EAST SHOW
             CLUBS, EMPEROR'S TAMPA II, INC., AND
4            MICHAEL TOMKOVICH
   CASE NO:  8:16-CV-2308-JSM-MAP
5  DATE:     AUGUST 9, 2017
   DEPONENT: ROBERT RICE
6
7  PAGE NO.  LINE NO.   CORRECTION & REASON
8  _____   _____    _____
9  _____   _____    _____
10 _____   _____    _____
11 _____   _____    _____
12 _____   _____    _____
13 _____   _____    _____
14 _____   _____    _____
15 _____   _____    _____
16 _____   _____    _____
17 _____   _____    _____
18 _____   _____    _____
19 _____   _____    _____
20 _____   _____    _____
21 _____   _____    _____
22 _____   _____    _____
23 Under penalties of perjury, I declare that I have read
   the foregoing document and that the facts stated in it
24 are true.
25 _____
   DATE                                      ROBERT RICE

Page 37

1
2  SEPTEMBER 20, 2017
3  ROBERT RICE
   C/O LUKE CHARLES LIROT, ESQUIRE
4  2240 BELLEAIR ROAD
   SUITE 190
5  CLEARWATER, FLORIDA 33764
6  Re: August 9, 2017, Deposition of ROBERT RICE
7  Dear ROBERT RICE:
8      This letter is to advise that the transcript for the
   above-referenced deposition has been completed and is
9  available for review. Please contact our office at
   (800)275-7991 to make arrangements for read and sign or
10 sign below to waive review of this transcript.
11     It is suggested that the review of this transcript be
   completed within 30 days of your receipt of this letter,
12 as considered reasonable under Federal Rules*; however,
   there is no Florida Statute to this regard.
13
       The original of this transcript has been forwarded to
14 the ordering party and your errata, once received, will
   be forwarded to all ordering parties for inclusion in
15 the transcript.
16                              Sincerely,
17
                                Kelley King
18                              Orange Legal, Inc.
19 cc: BRANDON J. HILL, Esquire
       LUKE CHARLES LIROT, Esquire
20     CANDICE A. ROJAS, Esquire
21 Waiver:
22 I,_____, hereby waive the reading and signing
   of my deposition transcript.
23
   _____   _____
24 Deponent Signature         Date
25 *Federal Civil Procedure Rule 30(e)/Florida Civil
   Procedure Rule 1.310(e).



Orange Legal
800-275-7991