# EXHIBIT B

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2                          TAMPA DIVISION

3
                              CASE NO.:   8:16-CV-2308-JSM-MAP
4
    MICHAEL S. SCHIELE,
5
          Plaintiff,
6
    vs.
7
    SOUTH EAST SHOW CLUBS,
8   EMPERAROR'S TAMPA II, INC.,
    and MICHAEL TOMKOVICH,
9
          Defendants.
10
    _____/
11

12  DEPOSITION OF:      MICHAEL S. SCHIELE

13  DATE:               WEDNESDAY, AUGUST 9, 2017

14  TIME:               1:37 P.M. - 3:27 P.M.

15  PLACE:              ORANGE LEGAL
                        1000 WEST KENNEDY BOULEVARD
16                      SUITE 200
                        TAMPA, FLORIDA 33606
17
    REPORTED BY:        KELLEY KING, NOTARY PUBLIC
18                      STATE OF FLORIDA

19

20

21

22

23

24

25



                        Orange Legal
                        800-275-7991              Exhibit "A"

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

2..5

**Page 2**

1   A P P E A R A N C E S :
2   BRANDON J. HILL, ESQUIRE
     OF:   WENZEL FENTON CABASSA, P.A.
3          1110 NORTH FLORIDA AVENUE
           SUITE 300
4          TAMPA, FLORIDA 33602
           (813)224-0431, FAX(813)229-8712
5          Bhill@wfclaw.com
                APPEARING ON BEHALF OF THE PLAINTIFF
6
     LUKE CHARLES LIROT, ESQUIRE
7     OF:  LAW OFFICES OF LUKE LIROT, P.A.
           2240 BELLEAIRE ROAD
8          SUITE 190
           CLEARWATER, FLORIDA 33764
9          (727)536-2100, FAX(727)536-2100
           Luke2@lirotlaw.com
10             APPEARING ON BEHALF OF THE DEFENDANTS
11   CANDICE A. ROJAS, ESQUIRE
      OF:  LAW OFFICES OF LUKE LIROT, P.A.
12         2240 BELLEAIRE ROAD
           SUITE 190
13         CLEARWATER, FLORIDA 33764
           (727)536-2100, FAX(727)536-2100
14         Candice@lirotlaw.com
               APPEARING ON BEHALF OF THE DEFENDANTS
15
16   ALSO PRESENT:
           MICHAEL TOMKOVICH
17
18
19
20
21
22
23
24
25

**Page 3**

1                   I N D E X
2   TESTIMONY OF MICHAEL S. SCHIELE
3      DIRECT EXAMINATION BY MR. LIROT..................4
4      CROSS-EXAMINATION BY MR. HILL...................85
5   CERTIFICATE OF OATH.............................90
6   CERTIFICATE OF REPORTER........................91
7   ERRATA SHEET...................................92
8   NOTIFICATION LETTER............................93
9
10             INDEX OF EXHIBITS
11   DEFENDANTS' EXHIBITS
12
       EXHIBIT 14...DISCIPLINE DOCUMENT..................40
13
       EXHIBIT 15...CONVERGENCE EMPLOYEE LEASING
14         APPLICATION..............................47
15   EXHIBIT 16...TEXT MESSAGES......................81
16
17            S T I P U L A T I O N S
18        It is hereby stipulated and agreed by and between
19   the counsel for the respective parties and the deponent
20   that the reading and signing of the deposition
21   transcript is reserved.
22
23
24
25

**Page 4**

1            P R O C E E D I N G S
2        THE COURT REPORTER:  Would you raise your
3   right hand, please?
4        Do you solemnly swear or affirm that the
5   testimony you're about to give in this cause is the
6   truth, the whole truth and nothing but the truth?
7        THE WITNESS:  I do.
8            MICHAEL S. SCHIELE
9   was called as a witness and, having first been duly
10  sworn, testified as follows:
11           DIRECT EXAMINATION
12  BY MR. LIROT:
13       Q.  Can you go ahead and state your name and spell
14  your last name for the record?
15       A.  It's Michael Steven Schiele, S-c-h-i-e-l-e.
16       Q.  Okay.  Mr. Schiele, as I think's obvious, I
17  represent the defendants in this case that you have
18  filed, and I don't know if you met Ms. Rojas, but she's
19  my associate.  And, obviously, for the record, we're
20  joined here by Mr. Tomkovich and your counsel.
21       And I'll start off by asking if you've ever
22  had your deposition taken before?
23       A.  No.
24       Q.  Okay.  You saw the ones that we did before?
25       A.  Uh-huh.

**Page 5**

1        Q.  Obviously, we're going to ask you a series of
2   questions that are the equivalent of asking you in
3   court.  It's sworn testimony.  So it's the same thing as
4   testifying in court.
5        If I ask you any questions that are unclear
6   for any reason, I'd be happy to rephrase them.
7   Otherwise, we'll assume that you understood them and
8   able to give a true answer to those questions.
9        And I'm going to ask you a couple of
10  preliminary questions.  You were kind enough not to
11  shake my hand because you said you had a cold, which I
12  thought was --
13       A.  I'm sorry.  I'm not trying to -- I'm not
14  trying contaminate everybody.
15       Q.  No, a display of great courtesy I wish
16  everybody would follow, but are you on any kind of
17  medication or any kind of maladies that would interfere
18  with you being able to listen to my questions and give
19  the answers?
20       A.  No, sir.  Just a little bit of a lack of sleep
21  because I work nights, but we'll be all right.
22       Q.  All right.  A couple of other pointers.  I
23  think you might have seen me politely correct
24  Mr. Tomkovich when he said uh-huh to the yes.  It's
25  always important you give a verbal response rather than



Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

6..9

**Page 6**

1   an uh-huh or uh-uh.  And again, human nature
2   being conversational --
3       A.  I'll probably slip up here and there.  So just
4   reign me back in.
5       Q.  All right.  We'll fix it.
6           COURT REPORTER:  And please, one at a time.
7       Thank you.
8   BY MR. LIROT:
9       Q.  Right.  That's what I'm going to get to.  You
10  know, everybody kind of anticipates, and that's just the
11  nature of human conversation.  Please wait for me to
12  finish my question, and then you can give your answer.
13  And I'll try to wait for you to finish your answer
14  before I ask you another question so that the court
15  reporter doesn't get too unhappy with me.
16          And then the standard question that I ask
17  everybody and everybody does not like for one reason or
18  another, have you ever been convicted of a felony?
19      A.  No.
20      Q.  Okay.  Well, with that being said, let me ask
21  you a little bit about your background.  Where were you
22  born?
23      A.  New York.
24      Q.  Okay.  Where in New York?
25      A.  Brookhaven, New York, Long Island.

**Page 7**

1       Q.  Okay.  And is that where you went to high
2   school?
3       A.  Yes.  William Floyd High School in Mastic
4   Beach, New York.
5       Q.  Okay.  What was your additional education
6   after that?
7       A.  None really.  Just high school education.
8       Q.  Okay.  When did you come down to Florida?
9       A.  I first came down Florida, it was actually
10  Miami.  I moved down there in, I want to say, around
11  2009.  I lived there for about two years.
12          That's when I actually got my toes wet as far
13  as management goes.  I was a DJ mostly, but that's where
14  I started getting a little bit of management experience
15  under my belt.
16          So I first moved to Miami, and I've lived in
17  Miami, Orlando, Tampa.  I've lived all over Florida.
18      Q.  The only thing I left out of my introduction
19  is I've got a lot of notes on my computer.  So if I
20  don't give you the courtesy of my eyes, it'll help me
21  review my questions so that I can ask them and we can be
22  efficient.  So forgive me for that.
23      A.  It's quite all right.
24      Q.  What club in Miami?
25      A.  It's called The Playhouse.  It's on -- in

**Page 8**

1   Hallandale Beach.
2       Q.  And who owned that?
3       A.  It's a guy named Andrew.  It was an Andrew and
4   a guy by the name of Greg.  Forgive me.  It's been a
5   long time.  I can't remember their last names.
6       Q.  I understand.
7       A.  I think it was Greg Berger [ph] and Andrew
8   something or other.
9       Q.  And was -- how far would you say that was the
10  Cheetah Hallandale, which I think was down there at the
11  time?
12      A.  Right down the street literally.  It was
13  almost a stone's throw.
14      Q.  And then what did you do after that?
15      A.  When I left Playhouse, I ended up moving.  I
16  went to -- well, it was North Carolina.  Then I went to
17  Miami.
18          I actually ended up returning home to New York
19  for two to three years, and I got a job up there working
20  at a club called Blush on Long Island, which was
21  another -- more of a -- more of a full rounded
22  management gig.
23      Q.  Okay.  And what town was Blush in?
24      A.  Commack.
25      Q.  Are you familiar with the Crystal Cafe and

**Page 9**

1   Babylon?
2       A.  Yeah.  It's a -- they were actually, at one
3   point, I think the same owners.
4       Q.  Okay.  And other than experience, did you ever
5   have any kind of formal training in management or any
6   kind of business education or things like that?
7       A.  Not really, no.  I mean, I learned under some
8   good people, but yeah, as far as it was just sort of
9   a -- you know, an organic moving upwards kind of a
10  thing.  It was never really -- you know, I never really
11  went to business school or anything like that.
12      Q.  And after Blush, where did you go?
13      A.  After Blush was when I moved down here.  Well,
14  I actually moved to Orlando to start a company, which
15  didn't really take off, an entertainment company with a
16  friend of mine that ended up not really paying the
17  bills.  It was a very rewarding experience, but as far
18  as making any money, I ended up very quickly getting
19  back into the good old strip club business.
20      Q.  So you had an erstwhile partner that didn't
21  carry his load?
22      A.  No, I wouldn't put it on him.  We all -- you
23  know, we tried something.  It didn't work.  There's no
24  ill will there.  We're actually still very good friends.
25      A.  -- but it definitely was not going to be paying any



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

10..13

Page 10

1  bills.
2     Q.  What was the project?
3     A.  It was an Internet radio station where we sort
4  of a had a loose knit confederation of shows on a
5  network that we could provide.  Basically, just
6  providing a platform for a lot of unknowns to, you know,
7  reach a new audience.  Obviously, we failed to monetize
8  that.
9     Q.  What did you do next?
10    A.  That's when I ended up picking up a couple of
11 shifts at the Dollhouse of Orlando, which was where I
12 met the gentleman that I came to work at South East Show
13 Clubs with, Jason Patterson and James -- James --
14    Q.  Who was running the Dollhouse at that time?
15    A.  Well, it was owned by the Uratics [ph], but
16 Dean Reardon was running it at the time.
17    Q.  And what was -- what period of time, since
18 we're getting closer to the issues in your Complaint?
19    A.  Certainly.  I'm going to say probably the
20 first -- the first three months of 2013.  Probably most
21 of the time of 2013 right leading up to before I went
22 out to Tampa.
23    Q.  Okay.
24    A.  So I'd say January, February probably of 2013.
25    Q.  So who would you say hired you to start

Page 11

1  working in Tampa?
2     A.  That was Jim -- James Ross.  He was -- he was
3  my manager at the Dollhouse in Orlando.  He and another
4  gentleman, Jason Patterson, reached out to me.
5        I had actually quit working for them because
6  the Uratics stopped paying shift pays to daytime DJs.
7  So given that we were working for tips only and you have
8  about five girls on a day shift, it really just didn't
9  interest me to stay there, but we stayed in touch.
10       When Jason got this gig at Gold Club, he
11 reached out to me.  They needed a third guy.  They
12 needed a, you know, relief guy, just somebody to pick up
13 shifts when somebody got the flu and stuff like that,
14 and they knew I was a pretty trustworthy guy, so they
15 offered me the relief manager gig at that time.
16    Q.  So what -- your first position when you came
17 to the Gold Club was what?
18    A.  Swing shift manager, relief manager.
19    Q.  Okay.  Were you ever the DJ there?
20    A.  No.
21    Q.  Never once?
22    A.  Never -- there is one time that I had to
23 fill -- it was actually my very last night working for
24 the company, December 31st, New Year's Eve 2013.  I had
25 a DJ who had a gig.  He called out that day.  Seeing as

Page 12

1  how I have a background in DJ'ing and I didn't have --
2  you know, it's New Year's Eve, not going to find
3  somebody.  That was the single only time I ever DJ'd,
4  and it was during a shift I was managing, too.
5     Q.  When you first started with the Gold Club,
6  what were your job responsibilities?
7     A.  Just basically, as a -- since I worked
8  basically Sunday doubles, Monday night, Saturday day
9  shift, they're not exactly the most lucrative or sought
10 after shifts in any strip club.  So my job -- my job
11 descriptions were, as once John Desmond [ph] very
12 charmingly put it, just come in, turn the key, count the
13 money and make sure the building doesn't burn down.
14 That's how unimportant my shifts were at that time.
15    Q.  And how long did you work there?
16    A.  I was there until July of 2013.
17    Q.  All right.  And where did you go next?
18    A.  Stayed there -- I didn't stay at Gold.  They
19 were -- at one point, they wanted me to get into
20 promotions because I had a background in radio before.
21 I'd done radio and broadcasting stuff like that.  So
22 they wanted to kind of -- they had a gentleman at the
23 time named Michael Rothman [ph] who was sort of doing a
24 lot of that stuff.
25    Q.  Rothman?

Page 13

1     A.  Yeah.  He was sort of their marketing
2  director, I guess you could call it.
3        MR. HILL:  Just go ahead.  I'm going to get
4     some water.
5     A.  And I guess they were not planning on keeping
6  him very long.  So they wanted to have somebody
7  eventually fill the role of promoting the clubs,
8  commercials, all that kind of stuff.  So we were
9  discussing the possibility of me moving to the corporate
10 office and overseeing promotions, things of that nature.
11       It wasn't really for me.  Kind of an
12 operational guy.  I like to, you know, solve problems.
13 There weren't a whole lot of problems to solve in
14 promotions.
15       So I actually officially resigned in July
16 of 2013 and I was talked back into coming back to work
17 for them.  And that's when they proposed the idea of me
18 going over to Emperor's because at that time, it was in
19 very bad shape, and the manager that had it at that time
20 was pretty much one of the worst managers they ever had.
21 So they wanted me to get in there and see what I could
22 do with it.
23 BY MR. LIROT:
24    Q.  Now, who was your direct supervisor at the
25 Gold Club?



Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

14..17

Page 14

1    A.  I mean, it was -- most of the stuff was done
2  like -- like our orders came from the corporate office,
3  which would be behind Emperor's, which was mostly
4  John Desmond or a woman named Cathy [ph].  They kind of
5  ran stuff out of there, and usually, at least once a
6  month, Mr. Tomkovich would come by and, you know, tweak
7  things, make sure that there was uniformity in the --
8  you know, in the family of clubs, things like that,
9  things were up to his standards.  So it was a lot of
10  spot checks and stuff like that.
11    Q.  Okay.  So would you agree that Mr. Tomkovich
12  was accurate when he said he didn't really have any
13  day-to-day operational supervision over the clubs that
14  you worked at?
15    A.  I don't agree with that at all.  Everything
16  is -- everything we do is to his standards.  He's the
17  owner.  Everything comes from him.
18      He's the guy.  This is -- you know what I
19  mean?
20      If this was a dictatorship, he's our dictator.
21  You know what I mean?
22      It's not -- it's not some other guy.  I mean,
23  it's -- yeah, he has district managers that will pass
24  the messages along, but, I mean, we -- we all work for
25  Mike.

Page 15

1    Q.  But I'm talking about day-to-day
2  responsibilities?
3    A.  Well, I mean, we have to text him the numbers
4  every night directly to his cell phone number.  We have
5  to e-mail the numbers every night to him directly.
6  Update the spreadsheets, send them off to him directly.
7  So a lot of it was reporting to him directly.
8    Q.  But that would indicate to me he wasn't
9  present at the location?
10    A.  I saw him at least once or twice a month to
11  directly go over things that could be improved in my
12  club.
13    Q.  So day-to-day means you're there every day, in
14  my parlance.  You don't agree with that interpretation?
15    A.  Well, I mean, to an extent, but if I'm running
16  a club and my owner shows up and tells me why don't I
17  have two waitresses on a Friday, I should have two
18  waitresses, not one waitress, I don't exactly tell him
19  to go screw.  You know what I mean?
20      I would, obviously, do what my owner would
21  like me to do.  So anything that was asked of me by
22  Mr. Tomkovich, I would -- I would do.
23    Q.  So try to give me some better detail.  You're
24  at the Gold Club, which is a different facility but also
25  an Adamo Road or Adamo Drive, as I understand?

Page 16

1    A.  Well, I only -- yeah, there was a time for
2  about two weeks where I was transitioning out of Gold
3  Club transitioning over to Emperor's, and I was still
4  sort overseeing that transition.  So I was kind of doing
5  both, but I was -- at that time, we were between John
6  Desmond.  We were between John Desmond and Rob Rice.  We
7  didn't have a director of operations, so I reported
8  directly to Mr. Tomkovich.
9    Q.  Okay.  When you were working at the Gold Club,
10  where did you get your paycheck from?
11    A.  We had a leasing company Convergence that
12  would cut checks.  We got -- my Gold Club checks did
13  come from Gold Club.  My Emperor's checks did come from
14  Emperor's.
15      When I was running both and transitioning, I
16  was working Doubles down the street, for one or two pay
17  periods, I was actually getting a check from both.
18  So --
19    Q.  So Convergence is an employee leasing company
20  that just takes care of all the minutia of doing the
21  paychecks and doing the deductions and things like that?
22    A.  Correct.
23    Q.  So now, you said you had resigned from the
24  Gold Club.  What brought that about?
25    A.  Well, it was after I left Gold Club.  I was

Page 17

1  discussing the idea of doing promotions with them, that
2  I would be doing marketing promotions, trying to just --
3  for the clubs in Tampa, just trying to get, you know,
4  the best value for that.  That was when I just didn't --
5  I didn't take to that job and I didn't last very long.
6  It was not even a week, and I just was, like, my heart's
7  not in this.
8      I'm not an office guy.  It's just not my
9  thing.  So we -- I sent them a resignation letter, but I
10  never really officially resigned because they called me
11  back immediately and asked me to take on the Emperor's
12  project.
13    Q.  And who -- I think you said it was the worst
14  manager you'd ever seen was working at Emperor's at the
15  time?
16    A.  Yeah.  They -- I mean, if the testimony is
17  that I wasn't a good manager, then the guy before me
18  certainly was -- was no -- was no picnic either.
19    Q.  All right.  Who was he?
20    A.  Thomas McArthur [ph].
21    Q.  Thomas?
22    A.  McArthur.
23    Q.  Okay.  Who was else was working at Emperor's
24  at that point in time?
25    A.  When I got over there, it was Thomas and it

Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

18..21

Page 18
1   was Chris Langston [ph]. Chris didn't last very long.
2        Tom was the GM at the time, and before that,
3   it was a gentleman by the name of Joey De La Sandro
4   [ph], but I didn't really have any experience dealing
5   with Joey. I was over at Gold Club when he was there.
6        Q.  Were there the two different facilities at
7   that one location, the nude operation and the alcohol
8   operation?
9        A.  Yes, yes. And pretty much as far as, you
10  know, the way it was done, it -- you know, they'll say
11  that I worked at the liquor club, but I also, you know,
12  had say in who managed the back club and who did things
13  back there. So there was, you know, a bit of influence
14  that would reach the back club from my front club.
15       Q.  Different entities operating the two
16  businesses, if you recall?
17       A.  Well, I mean, they definitely fed one another
18  and benefitted from one another. Two completely
19  different types of entertainment, you know, venues. So
20  when you have them right next to each other, obviously,
21  they're going to feed each other.
22       Q.  As manager, did you have any familiarity with
23  the City of Tampa adult licenses?
24       A.  I mean, not really. I was more of a -- like,
25  the corporate office would also do the licensing, the

Page 19
1   game machine licensing and the taxes and stuff like
2   that. It was more our responsibility to just make sure
3   that we forwarded any, you know, pertinent data, bills
4   that we got, things like that, but that would all be
5   handled through corporate.
6        Q.  Okay. But did you have any awareness as
7   manager that they different -- one had a liquor license,
8   one did not?
9        A.  Oh, of course. Yeah, yeah, yeah. We -- you
10  know, you'd never -- you'd never see liquor in the nude
11  side or anything like that. Yeah, we knew -- I knew how
12  to, you know, enforce the rules and the laws.
13       Q.  But on the wall, different certifies of
14  occupancy and --
15       A.  Yeah, two separate -- they are two separate
16  entities. Oh, yeah.
17       Q.  Business tax license I think is what the City
18  of Tampa calls it?
19       A.  I believe so.
20       Q.  Okay. You're at Emperor's, you've replaced
21  Mr. McArthur, who apparently was not a real impressive
22  manager, and what were your responsibilities there?
23       A.  Try to just wrangling the hemorrhaging of
24  products, try to get the sales up, try to restaff. I
25  was originally sent in to just kind of watch Tom for two

Page 20
1   weeks, but we all kind of knew where that was headed.
2   But Tom was on his way out. So I worked in tandem with
3   Tom but very briefly, and then we got him out. I
4   started officially running the entire place on
5   July 26th, which was a Friday.
6        Q.  So went on March 21st, 2013 to -- and when I
7   say Emperor's, you understand I'm talking about
8   Emperor's Tampa II, Incorporated, the alcoholic beverage
9   facility?
10       A.  Okay.
11       Q.  As opposed to Emperor's, the nude club, which
12  is confusing, but I think for the purposes of this
13  record, I'll just call it Emperor's, and we're agree
14  that we're talking about the alcoholic beverage
15  facility.
16       A.  Okay.
17       Q.  So you go there. March 21st, 2013 was your
18  first day there?
19       A.  Thereabouts.
20       Q.  And then after a couple of months, you
21  transitioned into being the manager replacing
22  Mr. McArthur?
23       A.  Well, I originally transitioned into being the
24  main manager of Gold Club. Jason and Jimmy had a
25  complete meltdown. They didn't last very long.

Page 21
1        Coming over here with them, I sort of knew
2   they weren't going to last very long. My hopes that,
3   you know, I would survive the fallout, and I did.
4        Jason wasn't suited for management at all. So
5   he sort of had his meltdown. He kind of dug his own
6   grave and he was out the door.
7        Jimmy Ross remained on with us, and at that
8   time, John Desmond saw fit to make me the general
9   manager over James Ross.
10       Q.  At the Gold Club or at Emperor's?
11       A.  Gold Club.
12       Q.  At the Gold Club?
13       A.  Yes. And then he was immediately fired after
14  that pretty much, like three days later, and then there
15  was a week of nobody knowing what was knowing on. And
16  then after that, I reported directly to Mr. Tomkovich
17  until about the time that Rob Rice came in to start
18  acting as a buffer again.
19       Q.  And that was at the Gold Club?
20       A.  That was, yes, at Gold Club.
21       Q.  So in your Complaint, the date of March 21st,
22  2013 would be when you first started to work at the Gold
23  Club?
24       A.  Probably when I started with them. Yeah, when
25  I came over Jason and Jimmy.



Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

22..25

**Page 22**

1    Q.  And help me clarify at what point you go over
2  to the Emperor's club.
3    A.  Yeah. There's a -- about a -- maybe a ten-day
4  period there where I did the little promotions gig.
5  That didn't really work out.
6        Then I -- I resigned. I took like three days
7  off and I just went home and I played with my dogs, just
8  didn't take any phone calls. And then they started
9  calling me, and within -- within ten days, I was back
10  over working at Emperor's.
11    Q.  So how long were you at the Gold Club before
12  you transitioned into this marketing position that you
13  didn't really care for?
14    A.  Four-and-a-half months roughly. Probably the
15  beginning of July would be when that happened. The
16  first week of July, I'd say.
17    Q.  All right.
18    A.  Give or take. Again, it could be the last
19  week of June, you know.
20    Q.  Quite all right. So at some point in July of
21  2013 you find yourself working at Emperor's?
22    A.  Correct.
23    Q.  And when did Mr. Rice come on the scene?
24    A.  Not until October --
25    Q.  Okay.

**Page 23**

1    A.  -- of 2013. So you're talking about probably
2  three months without him, four months without him.
3    Q.  When you were at Emperor's for those -- from,
4  I'll say, July to October of 2013, were there any
5  African American dancers or bartenders or employees at
6  all?
7    A.  Yes. When I transitioned into Emperor's, it
8  was -- Tom had been the GM, he hadn't been the GM long.
9  Before him, it was Joey De La Sandro.
10        Joey De La Sandro is known as a guy who does
11  urban clubs. That's kind of his thing, you know. Hip
12  hop, you know, late night, after hours things. So yes,
13  that influence was certainly felt when I got there
14  originally, yeah. There was -- there was a couple of
15  dancers and stuff. Not so much staff, but dancers, yes.
16    Q.  Okay. So urban as a certain African American
17  connotation to it, yes?
18    A.  Yeah. I currently work at what's considered a
19  urban club. So it's, you know -- it's -- it is the
20  proper nomenclature.
21    Q.  Where is that located?
22    A.  I work in Skin Tampa currently.
23    Q.  Which is also on Adamo?
24    A.  You could throw a rock from Emperor's and hit
25  it.

**Page 24**

1    Q.  Okay. Mr. Terrell [ph] and Mr. Finagan [ph]
2  operate that club?
3    A.  Yes.
4    Q.  Okay.
5    A.  Joel, yep. Yes.
6    Q.  And let's just go back to the Emperor's
7  situation. So Mr. Rice comes along, and when did this
8  whole concept of the allegation in your Complaint about,
9  quote, thinning the herd come about?
10    A.  It -- right -- pretty much right before I was
11  fired. Rob came on in about October, but I was told
12  specifically when we brought on Rob, because I knew at
13  the time that Rob was known for sort of cleaning house,
14  bringing in his own guys, that sort of thing. He had
15  his own way of doing stuff, but I had assurances from
16  Mike and Matt Cooper both that I wasn't to worry about
17  Rob Rice. That if Rob Rice started sniffing around in
18  my affairs, that I was doing such a great job at
19  Emperor's getting the -- getting the revenue up 42
20  percent, getting the shrinkage down 40 percent, that Rob
21  Rice couldn't do a damn thing to get me out of that
22  door. So I felt that I certain -- a certain line in
23  with Mike at that point.
24    Q.  And when you say Mike, we're talking about
25  Mr. Tomkovich?

**Page 25**

1    A.  Correct.
2    Q.  So Mr. Rice comes in --
3    A.  They told me basically, don't worry about --
4  I'm sorry.
5    Q.  What did they tell you?
6    A.  Just not to worry about Rob, and that if -- if
7  push ever came to shove, that they'd have my back
8  because I'd done such a good job for them up to that
9  point.
10    Q.  Did you ever work with Mr. Rice before?
11    A.  No, sir.
12    Q.  Did you know of him? I got the impression --
13    A.  I knew him by reputation, yes. He's -- his
14  reputation proceeds him. You don't -- you know --
15  you're not in the strip club business in Florida and
16  don't know the name Rob Rice.
17    Q.  Why is that?
18    A.  He's a good salesman. He's good at marketing
19  himself. That's pretty much it. He's just -- he's very
20  good at branding himself as sort of -- as sort of the
21  guru of strip clubs.
22    Q.  Bear with me for just a second.
23    A.  That's fine. I've had a lot of water. Can I
24  just --
25    Q.  Please.



Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

26..29

Page 26

```
1        (Brief recess was taken from 2:01 p.m. to
2     2:07 p.m.)
3        MR. LIROT:  We'll go back on the record.
4  BY MR. LIROT:
5     Q.  Counsel gave us Exhibit 1, which appears to be
6  texts from Mr. Rice.  Why don't you go ahead and
7  describe for me what you understand that document to be.
8     A.  Just all of it in general or you want to look
9  at --
10    Q.  Well, sure.
11    A.  Itemized.
12    Q.  Sure.  It's a composite exhibit, so there are
13  a lot of pages.
14    A.  Yeah.
15    Q.  I'd like you to go through it so I understand
16  it.
17    A.  All right.  Well, the first page here is
18  pretty self-explanatory.  This is from Rob Rice.  I want
19  to say around, let's say, November -- November,
20  probably, where we were instructed -- this was a mass
21  text that actually went out to, I believe, all
22  management.
23       Like, I think that I got this, Mark Glover got
24  this, Ben -- pretty much anybody who was a manager at
25  SES, Rob sent out one mass text, and I received this
```

Page 27

```
1  text where I was basically instructed to start thinning
2  the herd, make sure I collect house fees up front from
3  the Canadians, reviews on the hour.
4       Reviews are show time dance specials that you
5  do to try to, you know, push the product on the guys.
6  Two drinks purchased at the door for people that don't
7  pay a cover at the back club, meaning the full nude
8  side.  So they'd have to buy something, sodas.  It
9  didn't matter.  You basically couldn't just be a dead
10  piece of weight in the back club.  If you were back
11  there, you had to buy something.  But that was basically
12  the instructions on how he wanted more stuff to happen.
13       Thinning the herd was pretty self-explanatory.
14  If I have it here -- sorry.
15    Q.  Is that I'll call it a compendium or a summary
16  of all the texts between you and Mr. Rice?
17    A.  Actually could probably be more.  I'm in the
18  process right now -- I know we're getting close to the
19  deadline here, but I did find the original phone.  Right
20  now, I'm just in the process of getting a battery for an
21  S3, which isn't exactly something anybody has laying
22  around right now because it's ancient technology, but
23  that is in the mail.
24    Q.  Is that a cell phone?
25    A.  Yes.
```

Page 28

```
1     Q.  Samsung?
2     A.  Yeah, an S3.  So it's a little old school,
3  it's a little beat up, but once I get a batter in it,
4  I'll be able to fire it up and access pretty much all
5  this information.
6     Q.  And it'll have dates?
7     A.  Yeah, it will be -- I mean, it's just like if
8  you received a text message on a cell phone, it's saved
9  in the actual -- I've locked the messages into the
10  inbox.  So they'll be in there.
11       I'm trying to find --
12    Q.  So I'm sure your attorney will cooperate with
13  us, since he's given us this, to get us the actually
14  texts off the phone once you get it up and cranked up?
15    A.  Yeah, yeah.  Which I'm -- trust me, I'm
16  working to do this as quickly as possible.
17       Is this the only ones we have?
18       MR. HILL:  Yeah.
19       THE WITNESS:  All right.
20    A.  But, yeah, I mean, it was essentially Rob had
21  issues with my -- basically, the whole company had
22  issues with our quality of clientele.
23       They didn't want -- the exact quote I believe,
24  if I remember correctly, was ghetto hood rats in my
25  club, and that was pretty much a companywide thing.
```

Page 29

```
1  Everybody kind of knows -- it's a known thing
2  at SES.  You know, you're playing with fire if you --
3  you know, if you start recruiting people that are a
4  little bit too -- too on one side of the color chart.
5  BY MR. LIROT:
6     Q.  All right.  Well, obviously, we need to get
7  into that.  So when you say thinning the herd, what does
8  that mean to you?  It seems to be something that's open
9  to some interpretation.
10    A.  Certainly.  Well, thinning the herd, he's
11  referencing the entertainers.
12       Now, I don't know of a single strip club that
13  I've ever worked at where they want less dancers, unless
14  it's a single -- you know, unless it's a specific group
15  of dancers or a certain demo -- but you don't just
16  say -- no strip club in the history of the world has
17  said, We've got too many girls.  Get some of these girls
18  out of here.  That's just not a thing that happens.
19    Q.  And I understand the dancers are not
20  employees.  As a manger, you have a pretty good
21  understanding of the business model?
22    A.  They are independent contractors, correct.
23    Q.  Why don't you describe that business model
24  just so we can make that clear for the record.
25    A.  Well, the entertainers pay a fee to work at
```

Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

30..33

**Page 30**

1  the club. So it's sort of like reverse employment, you
2  know. They pay a less fee for use of basically the
3  facilities.
4      You know, we -- SES uses their promotional
5  power, their brand, their VIP cards, all that stuff and
6  they bring in people in exchange for that, and they have
7  a bar and they have, you know, an ambiance and security
8  and safety. And in exchange for that, the girls pay for
9  the right to work there.
10     **Q. Temporary space lessee or a term like that?**
11     A. Essentially, yeah, something to that effect.
12     **Q. And they get to keep --**
13     A. Honestly, the wording changes every time
14  there's a major lawsuit in this -- every time Déjà Vu
15  gets sues, it's -- the contracts say something new on
16  them.
17     **Q. Okay. But, I mean, for the most part, the**
18  **dancers get to keep a significant portion of the dance**
19  **fees that they get from the customers?**
20     A. Yes. If they were to do a dance, like a
21  private dance, the house keeps $5, they keep 20, but
22  they also have to pay simply to work there. So --
23     **Q. So doing the math, are you aware of any**
24  **performer ever who didn't make of at least the**
25  **equivalent of minimum wage under the business model**

**Page 31**

1  you've just described?
2      MR. HILL: Objection to form. You can answer.
3      A. I mean, I'm sure they exist, but it's pretty
4  few and far between. It's usually kind of pretty
5  pathetic if they can't at least, you know --
6  BY MR. LIROT:
7      **Q. What, if any, specific information do you have**
8  **that Mr. Tomkovich knew about this text about thinning**
9  **the herd being sent to you or any other manager?**
10     A. Well, I mean, just pretty much working for him
11  and reporting to him for as long as I have, knowing as
12  many upper management that has worked -- has come and
13  gone from this company, most don't like when you hire
14  black people. That's just the bottom line. He's --
15     **Q. How do you know that?**
16     A. Because I basically was yelled at once when I
17  worked at Gold Club. I wasn't -- it was -- I wasn't
18  really yelled at, but it was -- directly from him while
19  we were out to dinner one night. He did make a
20  reference to one of his infamous backhanded compliments.
21     Like, Mike would never actually compliment you
22  unless it was followed up. It was always a compliment
23  sandwich, and it was something to the effect of, you
24  know, hey, yeah, you seem to have half a brain, but, you
25  know, when you hire a nigger at my flagship club to work

**Page 32**

1  at the door, that's a problem.
2      **Q. And where did this conversation take place?**
3      A. It was at the Hard Rock. We were having
4  dinner one night. It was myself, him and Mack Cooper.
5      **Q. And who got hired?**
6      A. Her name was Tiana Jefferson [ph]. I want to
7  say Tiana Jefferson. You got to forgive me. It's been
8  a long time. And I think she only lasted about two or
9  three weeks at Gold Club. So she was sort of a -- you
10  know, it's a very distant memory. It's a very brief
11  memory.
12     She was only there for maybe two weekends.
13  She worked like Saturday, Sunday day shift at the door.
14     **Q. And who terminated her?**
15     A. I sort -- I sort of passed the buck on that
16  one. I was transitioning out of Gold Club anyway. I
17  sort of left that in the hands of the guy who took over
18  Gold Club. His name was Roy Sansbury [ph].
19     I don't believe she was terminated, though. I
20  believe she ended up just quitting. She had some
21  other -- the shifts she was working were not that
22  lucrative. So it's not like she was missing out on
23  much.
24     **Q. How does a door girl get paid?**
25     A. Tips and hourly. It's not a bad gig for

**Page 33**

1  sitting around. I mean, it's really not.
2      **Q. Okay. So when did that occur; so, obviously,**
3  **you're still at the Gold Club when that conversation**
4  **took place?**
5      A. Yeah. Probably right at the tail end of June,
6  first week of July. I just -- I needed a swing shift
7  door girl, and they're not -- those shifts are not --
8  trust me, people are not work banging your door down to
9  work Saturday day shift at the door. You know what I
10  mean?
11     Even at a great club like Gold Club, it's --
12  it is what it is, but people do it because they want to
13  get in at a big company. You know what I mean?
14     They want to be part of a brand, and that's
15  part of why we all work there. You know what I mean?
16     We wanted that -- we wanted to move up.
17     **Q. So then you go to Emperor's and you get this**
18  **text from Mr. Rice, and there's reference in there to**
19  **Canadians. What does that mean?**
20     A. I understood it to mean African Americans
21  because it's sort of -- it's a crappy thing, but in the
22  service industry, that's -- that's what it means.
23     **Q. And that's some sort of double talk or some**
24  **code word?**
25     A. Yes.

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

34..37

Page 34

1    Q.  And when did you first --
2    A.  It wasn't -- Rob Rice and SES, this was not
3  the first time I'd heard this term in my lifetime.  So
4  it's not a -- he didn't invent this word.  You know what
5  I mean?
6    Q.  I'm not familiar with it, candidly, but when's
7  the first time you heard it -- the word Canadians used
8  as some kind of code word?
9    A.  Honestly, anybody who's ever waited tables has
10  heard it in some connotation in the past.  You know what
11  I mean?
12       It's not something I've ever used, but I've
13  heard it.  I know -- I know the etymology.  I know what
14  it means.  You know what I mean?
15       It's kind of an unspoken thing.
16    Q.  You ever heard Rob Rice us that term before
17  this text?
18    A.  Well, I heard him use it verbally during a
19  meeting one time, too, but he didn't -- he never
20  actually said this is what this means.  He was careful
21  enough to cover his tracks, but we all kind of knew what
22  Canadians meant.
23    Q.  What was the context --
24    A.  It certainly didn't mean Canadians.
25    Q.  What was the context that you understood it to

Page 35

1  mean?
2    A.  The black entertainers.
3    Q.  And when did that come up at a meeting other
4  than the text that we're talking about?
5    A.  We had a meeting at the Gold Club one time for
6  the head managers from each club.  We'd have to come in
7  there one day once in a while and meet with Rob and Mike
8  and go over things, make sure that there was uniformity
9  in our brand and make sure that we were all on the same
10  page.  That's why we always got these mass texts from
11  him, to keep us kind of in the loop and keep us all
12  doing the same thing.
13    Q.  Was Mr. Tomkovich at this meeting?
14    A.  I believe so, yes.  I mean, he was -- he's at
15  a handful of them, he's not at a handful of them.  There
16  were a lot of meetings.  I can tell you that much.
17  Sometimes it was both him and Rob; sometimes it was just
18  Rob; sometimes it was just Mike.
19    Q.  Okay.  So do you have any specific
20  recollection of Mr. Tomkovich being at any meeting where
21  Mr. Rice would have used the term Canadian as some
22  euphemism for African Americans?
23    A.  Not specifically, no, but these were a lot of
24  overlapping meetings.  I mean, we were constantly
25  reporting to somebody.

Page 36

1    Q.  Bear with me for just a second.
2    A.  No problem.
3       (Brief recess was taken from 2:17 p.m. to
4  2:19 p.m.)
5       MR. LIROT:  All set.
6  BY MR. LIROT:
7    Q.  So we were talking about the texts and some
8  other connected issues.  What, if anything, did you do
9  in response to receiving the text about, quote, thinning
10  the herd, close quote?
11    A.  I mean, I acknowledged it, but I didn't -- I
12  didn't actually enact the policy.  I essentially
13  explained to my staff this is the way we want to do it,
14  but we're just going to keep doing it the way we've been
15  doing it, and we just continued to operate, you know,
16  the way we were and just kind of hope that the -- you
17  know, we'd be forgiven by the numbers, by the sales.
18    Q.  How many African American performers or
19  employees were at Emperor's at that point in time?
20    A.  Between both clubs, a good amount, you know.
21  We had a pretty diverse group.  So, you know, I'd say
22  the African American dancers probably made up at last
23  solid 30 or 40 percent of our -- of our demo.
24    Q.  And what, if anything, did Mr. Rice or anyone
25  do based on what you just testified was a refusal to

Page 37

1  implement any discriminatory policy?
2    A.  I wouldn't know because I didn't last very
3  long after not implementing the policy.  I mean, the
4  thinning the herd comment came, and within a month, I
5  was gone.  So there wasn't much in the way of any
6  remedial action.
7       I mean, honestly, the write-up that I got, the
8  one write-up that they've been able to produce was done
9  sometime between receiving this text and getting fired.
10  So it was pretty obvious they were trying to create some
11  kind of a -- you know, documentation and paper trail to
12  justify getting rid of me.
13    Q.  So you think the write-up that you got was
14  some kind of subterfuge or excuse to get rid of you?
15    A.  Seeing as how I was working until noon, until
16  three in the morning for two weeks straight while my
17  manage was out of town dealing with his daughter in his
18  hospital, I would say that yelling at me for being tardy
19  when I'm working 14-hour days is probably a bit
20  unreasonable.
21    Q.  Why don't you tell me -- explain that to me.
22  Give me little background.
23    A.  I had a manager.  His name was Joe Rea.  He
24  worked for me for a brief time towards the end.
25    Q.  R-i-a?

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

38..41

Page 38

1    A.  R-e-a.
2    Q.  R-e-a?
3    A.  Yes.  Great manager.  I was really excited to
4 bring him on.  I had had -- you know, I had -- my night
5 manager -- I worked day shift.  I handled liquor payroll
6 and all that stuff, and then I had one night shift.
7        I kept getting saddled and forced with these
8 crappy managers at night because we couldn't really find
9 any decent managers.  So Mike told me to hire Tony Lima.
10 I hired Tony Lima.  That guy turned out to be an idiot.
11      Then we hired another guy.  He turned out to
12 be an idiot.
13      By the --
14   Q.  Who was the other guy?
15   A.  What was the other night manager we had for a
16 minute?
17      Forgive me.  I'm sorry.  I'm running on two
18 hours' sleep, and I'm sick as a dog.
19   Q.  I understand.
20   A.  So I'm doing my best here.  It was some other
21 guy that really barely lasted.  He lasted about as long
22 as the door girl at Gold Club.
23      When I finally met Joe Rea, I was excited.  I
24 was thinking, wow, maybe I'll be less stressed out.
25 I'll have a guy who knows what's he's doing when I'm not

Page 39

1 around.
2        As soon as we hired Joe Rea, his daughter was
3 in a really bad car accident up in North Carolina.  He
4 needed to leave immediately with no notice.  He was
5 going to come back, but there was -- that's it.  There
6 was nobody else.  So I had to work.
7        So I was working while he was gone for at
8 least a week, possibly a week and a half, from noon
9 until three in the morning.  Then, I had to close up.
10 So probably get out about 4:00 a.m., go home, get a few
11 hours sleep, try to get back by 11:00 a.m. to open up,
12 get to the bank, get change.  So they wrote me up for
13 being tardy, which let's be honest, is --
14   Q.  Who wrote you up?
15   A.  You'd have to -- I don't have it in front of
16 me.  Whoever the corporate person was at the time.  They
17 just came to my office with a write-up for me.
18   Q.  Is it the written --
19   A.  Just told me sign it.
20   Q.  Is it the written write-up that we're talking
21 about here?
22   A.  Yeah.
23   Q.  All right.  Well, I have copies of a
24 discipline documentation form, which, I guess, since
25 we're doing these sequentially, I'll just make this

Page 40

1 Number 14.
2        (Exhibit Number 14 was marked for
3    identification.)
4    A.  All right.
5 BY MR. LIROT:
6    Q.  So is this the discipline documentation form
7 or the write-up that you talked about?
8    A.  Correct.  It's easy to remember.  It's the
9 only time I've ever been written up.
10   Q.  And --
11   A.  The handwriting leaves a little to be desired.
12      MR. HILL:  Let him ask.
13      THE WITNESS:  Okay.
14 BY MR. LIROT:
15   Q.  No problem.  You're general manager, and I
16 guess it says the date and time of incident is 12/18/13,
17 location, Emperor's Tampa.  Description, Mike has been
18 repeatedly verbally warned about his tardiness.  Mike
19 needs to clock in for work at 12 daily.  I can't -- I'm
20 sure that's a.m., yes?  12:00 a.m. daily or 12 o'clock?
21   A.  P.m. because it would be the noon.  It would
22 be the opening.
23   Q.  Okay.  This gives him one hour to go to bank
24 and open club accordingly at one.  Staff should be there
25 by 12:30, and I guess the witnesses are Tiffany Nivens

Page 41

1 [ph] and Alan Foxworth [ph].
2    Q.  Who's Tiffany Nivens?
3    A.  She worked in the corporate office.
4 Paperwork, payroll, finances, stuff like that, making
5 sure all the clubs were working, you know, in
6 conjunction with one another.
7    Q.  And Alan Foxworth?
8    A.  That -- he's just one of the -- he's the
9 maintenance guy, and I guess he handles some of Mike's
10 affairs here in Tampa.
11   Q.  And I take it you signed this and printed your
12 name?
13   A.  Yes.
14   Q.  If you disagreed with this, why would you sign
15 it?
16   A.  Because what choice do I have?  Get fired, get
17 suspended?
18      You know, you sign the paperwork, you move on.
19 I mean, at the end of the day, I was still doing a good
20 enough job.  I didn't think I was going to get fired for
21 one tardy write-up.  So it wasn't really a concern at
22 the time.
23   Q.  Do you recognize the signature of person
24 preparing report?
25   A.  Yes.



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

42..45

Page 42

1    Q.  Who is that?
2    A.  It's Bob Benjamin Cook [ph].
3    Q.  All right.  I admire your interpretive
4  abilities to get that.
5    A.  Oh, you meant the signature.  I'm sorry.
6    Q.  Yes.  Signature of person --
7    A.  I'm sorry.  I was looking at the printed name
8  under the signature.
9    Q.  The printed name --
10    A.  Sorry.  I cheated.  I apologize.
11    Q.  The printed name, I can certainly connect with
12  Benjamin Cook.  The other looks like hieroglyphics to
13  me.
14    A.  Could be sand script.
15    Q.  Maybe Foxworth?  I can't read it.
16    A.  Could be Alan.  I don't know.
17    Q.  All right.  So what, if any, knowledge do you
18  have about Mr. Tomkovich being aware of any issue
19  related to this discipline form?
20    A.  To this specific discipline form?
21    Q.  Correct.
22    A.  I mean, I couldn't tell you, but -- I mean, I
23  don't know if he's -- if he even does know about it.  I
24  mean, you'd have to ask him that.
25    Q.  So this is December 18th, and I think you told

Page 43

1  me that -- and again, we're working on getting the phone
2  records, this text that talked about thinning the herds
3  and the reference to Canadians was sometime in October.
4  So that's probably --
5    A.  November, probably.
6    Q.  So somewhere eight to ten or -- you know,
7  some -- several weeks, at least?
8    A.  It was probably very late November.  So you're
9  probably talking, yeah, two, three weeks tops.
10    Q.  Okay.  Well, when you find your phone records,
11  that'll help us --
12    A.  Absolutely.
13    Q.  -- figure out what that date was.  So what did
14  you do in response to the thin the herd issue?  Did you
15  report it to anybody; did you complain to anybody?
16    A.  No, because generally, complainers don't do
17  very well at South East Show Clubs.  Squeaky wheels do
18  not get the grease in that -- in that corporate culture.
19    So, no, I didn't complain.  I simply didn't
20  enact the policy.
21    Q.  And in response to your description of not
22  enacting the policy, what happened next?
23    A.  Spot checks, you know, Rob, Mike still popping
24  by the club, I guess, just not liking what they saw.
25    Q.  What, if anything, did they say to you,

Page 44

1  Mr. Rice or anybody else?
2    A.  I believe they said something to the effect of
3  that we could get better quality customers in there and
4  that I didn't have to have ghetto hood rats selling
5  drugs in my club, as I believe.  Something.  I'm
6  paraphrasing.  Something to that effect.
7    Q.  So I guess my question would be what, if
8  anything, was perceived about you resisting or opposing
9  unlawful discrimination and/or harassment?
10    MR. HILL:  Objection to form.  Go ahead.
11    A.  Again, I mean, not doing it.  It's still -- I
12  didn't do it.  So I mean, that in itself, would, I guess
13  be, you know, in a way, I guess, insubordination.  I
14  don't know.
15    But I just -- like I said, I didn't run and
16  tell anybody, you know.  I didn't go snitch to anybody.
17  I just didn't do it.
18    I explained to my door girl who was in charge
19  of collecting money that we got a new -- we got new
20  orders from corporate and that we were to start, you
21  know, collecting house fees up from the African American
22  dancers and that the white ones could pay later if need
23  be and make the money later, and I told them that we
24  were not going to enforce that rule and that we were
25  going to keep doing it the way we were doing that.

Page 45

1  BY MR. LIROT:
2    Q.  What benefit would one get from that rule; was
3  there some issue that would have justified any
4  differential treatment?
5    MR. HILL:  Objection to form.  Go ahead.
6    THE WITNESS:  I don't think in a case like I
7  mean, this is -- yeah, there's no logical reason,
8  but I don't believe that racism is based on logic.
9  So, I mean, of course, we're not dealing with a
10  logical train of thought here.
11  BY MR. LIROT:
12    Q.  Well, I mean -- so correct me if I'm wrong,
13  having been related to this industry for close to 30
14  years, I was under the impression that house could be
15  paid at any time during a performer's shift?
16    A.  Yes, it can, and, generally, it's paid at the
17  end.
18    Q.  Okay.
19    A.  A lot of times what they'll do is in many
20  clubs, as you sell private dances throughout the night,
21  we hang onto that money in a register, and at the end of
22  the night, you'll get paid out of all that.  So if you
23  have any outstanding house fees, whatever, we usually
24  settle at the end of the night.  It's usually easier to
25  do that.

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE                                                      46..49

Page 46

1   This -- this policy of collecting house up
2   front from the Canadians was a -- that was a method they
3   were using to thin the herd, as they said. The felt
4   that if --
5   Q.  How much --
6   A.  -- we had less African American dancers
7   working for us, we would eventually have less African
8   American customers there, and that was the stated goal.
9   Q.  Do you find any base, in fact, to support a
10  decrease in African American patrons with a decrease in
11  African American performers?
12  A.  No, I don't, but I'm not the one who has a
13  problem with black people.
14  Q.  So I'm going to hand you what we're going to
15  mark as Exhibit 15. There you go.
16  MR. LIROT:  Here's a copy for you.  Did I give
17  you the other one or did I not?
18  MR. HILL:  You sent me everything via e-mail,
19  I think.
20  MR. LIROT:  Okay.  So you have the document?
21  MR. HILL:  Yeah.
22  MR. LIROT:  Okay.
23  (Exhibit Number 15 was marked for
24  identification.)
25  BY MR. LIROT:

Page 47

1   Q.  So this appears to be the Convergence Employee
2   Leasing -- Employee Leasing application, which we've
3   been calling the application packet, and I just want to
4   go through this. This, obviously, lists you under the
5   employee information.
6   Did you fill this out or do you remember if
7   somebody else might have filled it out?  How did -- what
8   do you recall about this document?
9   A.  The employee information area, all that stuff,
10  that's my handwriting. The position part is
11  not my handwriting from what I can tell.
12  Q.  Okay.
13  A.  Yeah, this is -- this is all me except where
14  otherwise noted.
15  Q.  So you filled out page 1, and the $500 salary
16  for a manager, that's accurate?  You agreed to that, I
17  take it?
18  A.  That was the -- yeah, the on the books part of
19  it, yes.
20  Q.  Okay.
21  A.  There's lot of cash incentives, cash bonuses,
22  things of that nature in this basis.
23  Q.  Tip outs?
24  A.  It's sort of the nature of the beast, yes.
25  Q.  And then the next page, the withholding

Page 48

1   allowance certificate, that's your signature down at the
2   bottom?
3   A.  That's correct.
4   Q.  And that's December 28th, 2013?
5   A.  Yes, sir.
6   Q.  Did you fill this paperwork out as a precursor
7   to working at any of the I'll call Tomkovich related
8   clubs and --
9   A.  This was honestly like the employment packet I
10  filled out in the less than a year I worked there. I
11  filled out one for Gold Club.
12  We weren't always on Convergence. We were on
13  some other -- some other payroll company.
14  Then we switch payroll providers. I had to
15  fill out another one.
16  Then I went to Emperor's. I had to fill out
17  another one. Then I filled this one out probably four
18  days before I was fired.
19  Q.  Okay. So this is filled out. I'm just trying
20  to understand the dates because they seemed curious to
21  me. So this is employers -- excuse me -- Emperor's
22  Tampa, Inc., and this filled on December 28th, 2013.
23  A.  That's correct.
24  Q.  You filled out and dated everything else. I
25  guess we see Mr. Cook's name in here and there's a drug

Page 49

1   and alcohol testing and a picture of what appears to be
2   your driver's license and your social security card,
3   which I can assure you if this gets filed anywhere,
4   we'll black out your social security numbers but for the
5   last four digits.
6   A.  I would appreciate that.
7   Q.  What circumstances brought about the timing of
8   filling this document out?
9   A.  I could only speculate. I would assume we
10  were either making another change in payroll or -- I
11  mean, like I said, I filled out so many of these packets
12  in the one year I worked there that we were constantly
13  changing horses midstream. There was always a new
14  policy.
15  Q.  And that was because of shifts in employee
16  leasing companies?
17  MR. HILL:  Objection to form.
18  A.  It could have been possibly. I don't know.
19  Like I said, I'm not -- I'm not running the whole
20  company. I'm just -- I'm just sort of taking orders.
21  BY MR. LIROT:
22  Q.  So do you recall getting paid for a period of
23  time from ADP, another employee leasing company?
24  A.  I don't recall it, but that doesn't mean it
25  wasn't a thing. Like I said, I do remember there being



Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

50..53

**Page 50**

1  another company that wasn't Convergence. I don't --
2  **Q. You're just not sure who was it?**
3  A.  Yeah, I couldn't tell you exactly who it is.
4  **Q. And there might even have been a third?**
5  A.  I doubt it. I think it was three, you know.
6  I know that I filled out a bunch of these packets, but I
7  know most of them were Convergence packets. I think I
8  only filled out one other packet at some time that was
9  not Convergence.
10  **Q. And on this packet, I guess on the third page,**
11  **it's got a Convergence employee agreement, and I think**
12  **there's some language in there. If you --**
13  A.  Which page?
14  **Q. The third page, it says Convergence employee.**
15  **I think it's --**
16  A.  General safety rules or --
17  **Q. No.**
18  A.  Oh, no. There we go.
19  **Q. Right there.**
20  A.  I got you.
21  **Q. So as you look, there's, like, three places**
22  **with bold letters, and I'm looking underneath the third**
23  **bold letter, and I'm starting with in addition. I think**
24  **it says: I also agree that if at any time during my**
25  **employment I'm subjected to any type of discrimination,**

**Page 51**

1  including discrimination because of race, sex, age,
2  genetic information, religion, color, retaliation,
3  national origin, handicap, disability or marital status
4  or if I'm subjected to any type of harassment, including
5  sexual harassment, I will immediately contact the
6  appropriate person of the client company to which I have
7  been assigned.
8        Did you ever report any of the concerns that
9  you had with the racial issues that you've described
10  here today to anybody in the client company?
11  A.  I mean, not specifically the racial angle
12  because I knew it would have just got -- it would have
13  just gotten me canned. I did try to reach out to both
14  Mike and Mack Cooper and pretty much everybody above me
15  at one point to try and let them -- because I was
16  hearing all kinds of things.
17        By the time New Year's Eve rolled around, I
18  was working. I was hearing rumors that I quit, that I
19  put in my notice, you know, all this stuff. So I made
20  an attempt to reach out to Mr. Tomkovich at least two
21  times before I was fired to reach out and let him know
22  that I did not give my notice, that I did not have any
23  intention of quitting, and any attempts to contact him
24  were a failure.
25  **Q. This document goes on to say: Should I choose**

**Page 52**

1  not to contact the client company for any reason, I may
2  contact CEL's human resources director, and then they
3  give you the phone number.
4        Did you ever each out to anybody at CEL?
5  A.  No.
6  **Q. All right. Now, we listened to Mr. Rice this**
7  **morning indicate that the primary reason that he made**
8  **the decision to terminate you was because of things**
9  **other than racially charged issues. He mentioned**
10  **drinking. Did you dink on the job while you were at**
11  **Emperor's?**
12  A.  Yeah. I mean, honestly, it's -- look, this is
13  the strip club business, and I'm not going to sit here
14  and pretend to be a choir boy. Nobody in that company
15  was.
16        In fact, SES is an extremely toxic culture.
17  You heard Mike admit himself he's fired a lot of people.
18  He's burned through a lot of people.
19        It's not a very -- it's a very high stress,
20  very toxic environment. Everybody there is doing
21  something. Something.
22        Was I drunk on the job? No.
23        But, you know, it's an old adage in the strip
24  club business. When a customer wants to buy you a drink
25  you take that drink. You ring it in that drawer.

**Page 53**

1  **Q. How often would customers buy you drinks?**
2  A.  My customers liked me. I'm a fun guy. So I'm
3  sure they bought me -- I'm sure they bought me quite a
4  few drinks in the day.
5  **Q. So your testimony here today is that in spite**
6  **of the environment and the consumption of alcohol, you**
7  **never reached a point of impairment that would influence**
8  **the dispatch of your job responsibilities?**
9  A.  No.
10  **Q. We also heard that there was some loss of**
11  **Jameson. Is Jameson an alcoholic beverage that you**
12  **prefer?**
13  A.  Yeah. I like my Jamo. So do -- so did two of
14  my bartenders. So did one of my floor guys. You know
15  what I mean?
16        Jameson's a very popular brand of whiskey.
17  **Q. I think Matthew McConaughey's favorite, if I'm**
18  **not mistaken.**
19  A.  Kindred spirits.
20  **Q. That being said, did you ever take any Jameson**
21  **that you were not entitled to or that didn't belong to**
22  **you?**
23  A.  No. Listen, when I took over Emperor's, it
24  was at a 62 percent shrinkage rage. I got it down to
25  20.9 in one week. So I don't think that loss of product



Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

54..57

**Page 54**

1  was a problem with me.
2  **Q. Explain that to me, if you will. Who keeps**
3  **track of all that?**
4  A. That was Bevintel. You have that?
5  **Q. We'll go through that. So what did you do to**
6  **achieve that benefit?**
7  A. I fired people who were stealing. I kept
8  better records of the liquor that was going in and out.
9  It's -- running a bar is not hard. It's really not
10 hard, and I'm certainly not stupid enough to be as
11 terrible as they're making me out to be.
12        Running a bar is a simple science. You know
13 what I mean?
14        Make sure people aren't stealing, make sure
15 you've got the right pars for the right product for what
16 your customers enjoy, make sure you got pearls in there.
17 Pretty simple. You know, it's not a hard gig.
18        Tom McArthur had a 62 percent shrinkage rate
19 because he was robbing the place blind. How did I
20 improve, to answer your question?
21        I wasn't stealing. That's the short answer.
22 We immediately saw an overnight change of the numbers
23 simply because I wasn't robbing the place blind.
24 **Q. Who did you fire to achieve this benefit?**
25 A. Thomas McArthur. And actually, I didn't fire

**Page 55**

1  him. Mike Tomkovich fired him.
2  **Q. Did you ever hire anybody to work at any of**
3  **these clubs?**
4  A. Just like, you know, lower level staff, you
5  know, bartenders, floor hosts, you know, dancers, stuff
6  like that, shooter girls, waitresses. I did have some
7  input as to who the managers were, other managers in my
8  club, but I certainly didn't get the final say, you
9  know. I could definitely poo poo the idea of somebody
10 coming in if I wanted to, but I certainly wouldn't get
11 the last say.
12 **Q. Okay. Did you ever fire anybody?**
13 A. Just regular employees. Like I said,
14 bartenders, the occasional shooter girl. Not
15 management. I didn't have the authority to fire or hire
16 management.
17 **Q. But you did have the authority to hire or fire**
18 **people other than management?**
19 A. Yeah, bartenders, things of that nature.
20 **Q. Did you ever have to get Mr. Tomkovich's input**
21 **on that?**
22 A. I mean, there were certain people that were
23 untouchable in the company.
24 **Q. I'm talking about the people that you actually**
25 **hired or fired?**

**Page 56**

1  A. People that I hired and fired, no, not really,
2  but I would get assigned people whether I liked them or
3  not.
4  **Q. Okay. Bear with me for a second.**
5        Exhibit 2 is this business card that says SES
6  and then has got the -- I guess we got the e-mail from
7  Mr. Hopper. What communications do you remember having
8  with Mr. Hopper about the creation of this business
9  card?
10 A. Well, I've known Shawn since I was over at
11 Gold Club. He was always doing our stuff. I mean, he
12 was around there as long as -- longer than I was. I
13 already had a good rapport with Shawn.
14 **Q. I'm referring to Exhibits 2 and 3.**
15 A. Of course. Yes, of course.
16 **Q. There's the e-mail.**
17 A. Sorry. But -- yeah, I mean, this is exactly
18 what it looks like. As I got moved over, my Gold Club
19 cards were, obviously, completely irrelevant. So we
20 needed to replace them.
21        We -- seeing as how I had already went from
22 Gold Club over to this promotional gig, over to
23 Emperor's, they were already talking about if -- if I
24 did well at Emperor's, they were going to stick me over
25 at Bliss to try to fix that place up. It was -- it was

**Page 57**

1  kind of a known thing that people like myself, people
2  like Ben, people -- people would get moved around to
3  watch other clubs to make sure there was uniformity in
4  our brand. That's they always wanted, uniformity in our
5  brand.
6        So in keeping with the spirit of uniformity in
7  our brand, I wanted to be able to say, look, let's have
8  an overarching card where I can promote our other clubs,
9  which they are. We've all admitted it. SES was the --
10 you know, whatever.
11        So Shawn and I discussed instead of wasting,
12 because I've already been through two sets of cards,
13 Gold Club, they almost made me promotional guy cards,
14 which would have been a total waste. I'm like just make
15 an SES card. We'll make an SES card. They bounce me
16 all over anyway. You know what I mean?
17        We're -- it is what it is. So we ended up
18 going that route because it just made more sense. It
19 made more sense to promote our brand and not just my
20 club.
21 **Q. So that's conversations you had with**
22 **Mr. Hopper?**
23 A. Yeah, but I mean, look, I didn't pay for
24 these. SES paid to get these made. So there's no
25 way -- I'm not stupid, man. I would not have spent that

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

58..61

Page 58

1  man's money on something that he would not -- you know
2  what I mean?
3       If this was such an offense, then when these
4  cards were printed up back in July, I would have been
5  fired as soon as he saw them.
6     Q.  Well, I'm not suggesting it's an offense, but
7  did you ever get a paycheck from SES?
8     A.  No, but just -- he draws club -- you know,
9  money from the clubs.  It's -- the clubs are what make
10 money, but SES is still the brand.
11    Q.  Being the brand doesn't automatically mean
12 that that's a real business entity though, does it?
13    A.  Well, it does when the implication is always
14 that we have the power of South East Show Clubs behind
15 us.  You know what I mean?
16      You can't just go picking on a manager over at
17 Bliss because you know the entire, you know, might of
18 SES will come down on you, you know.  That's just the
19 way it is.  I mean, Pat Franke's still working at a KFC
20 because of the power SES has, the influence that that
21 company has.  It's massive.
22    Q.  Well, do you know anyone that ever has
23 received a check from a SES bank account?
24    A.  I mean, no, but I'm not a banker.
25    Q.  Okay.  And you never got --

Page 59

1     A.  I don't have access to their bank records.
2     Q.  You never got a paycheck from SES?
3     A.  Not directly from SES, but we -- all the clubs
4  paid towards, you know, the top.  We had our little drop
5  envelopes that we had to leave.  Those are -- you know,
6  those are a known thing.  Those -- that money just
7  evaporated and went into a special little extra safe off
8  to the side for Mike.
9     Q.  And other than that, you're really not -- you
10 don't have information today to identify SES as a
11 specific business entity?
12       MR. HILL:  Objection to form.
13    A.  I mean, I think I've provided more than enough
14 evidence that SES does operate as its brand, as a giant
15 conglomerate brand of a collection of show clubs in the
16 southeast.  I didn't pull this out of the sky.
17 BY MR. LIROT:
18    Q.  I'm not suggesting that you did.  Just trying
19 to verify what, if any, actual business entity you think
20 SES really is?
21    A.  It's -- it was our corporate parent.
22 Everything was done -- you couldn't just go rogue on
23 SES.  Corporate would find out immediately.
24      If you so much as made a typo on the
25 paperwork, the corporate office was calling you the next

Page 60

1  day going, Well, what's this, what is this, why is this
2  one not carried?
3       There was constant accountability.  We were
4  constantly being -- we had -- we all to report upwards,
5  and once you're a general manager of a club, there's
6  nowhere to report upward but to the parent company.
7     Q.  And you're talking about reporting to human
8  beings, though, are you not?
9     A.  My superiors.
10    Q.  And how do you connect that with an entity
11 known as SES?
12    A.  Because that's what we were branded as.
13 That's what we were told we were branded.  I did not
14 move all the way to Tampa to work at Emperor's, okay?
15      I moved all the way to Tampa to work for South
16 East Show Clubs, the brand, that we all heard about.
17    Q.  Well, I think in your previous testimony you
18 said that even when you went from one club to the other
19 or worked at two different clubs, you still got separate
20 paychecks from those two different clubs?
21    A.  Yeah, but it was still South East Show Clubs.
22 You wouldn't be moving from club to club unless some
23 corporation parent was instructing you to do so, right?
24    Q.  Well, what's --
25    A.  If I work at a Wendy's I can't have a guy from

Page 61

1  Taco Bell tell me I have to report to another Wendy's,
2  but a guy from Wendy's corporate can tell me I have to
3  go to another Wendy's store.
4     Q.  I appreciate your advocacy, but I'm looking
5  for something specific that you can tell me that
6  identifies SES as a living, breathing business entity?
7       MR. HILL:  Objection to form.  Asked and
8  answered, repeated.
9  BY MR. LIROT:
10    Q.  Well, I tell you what.  We'll agree to
11 disagree on that.  We'll move on.
12      Now, you got terminated in December of 2013,
13 correct?
14    A.  January.
15    Q.  January of 2013?
16    A.  '14.  2014.
17    Q.  2014?
18    A.  Yeah, it was January 3rd or 4th.
19    Q.  Okay.  And your counsel shared with us this
20 declaration of Mr. Franke from apparently August 4th of
21 2015.  I'm going to show you that.
22      So that -- that declaration would have been
23 quite some time after your alleged termination?
24    A.  Yes.
25    Q.  Okay.  Did you know Mr. Franke?

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

62..65

**Page 62**

1    A.  I -- honestly, the first I ever heard about
2  Franke was when I read an article about his case, which
3  was, obviously, long after I was already in the EEOC
4  process.
5        I was already -- I think I had already gotten
6  my letter of cause, whatever, my determination from them
7  by the time I even knew who Pat Franke was.  Obviously,
8  since then, we've bonded a bit.  We have some -- we have
9  some, you know, common things that we have in common
10  that most other people don't, but I never knew him until
11  I read about him in the paper.
12    Q.  Well, what would you have in common with
13  Mr. Franke?
14    A.  Well, just knowing that he's going through
15  something similar.  Like I said, I've only had a handful
16  of conversations with him and they were very casual and
17  they were just more like, Hey, how's your thing going,
18  pretty much.
19    Q.  So when you say going through the same kind of
20  thing, cases against Mr. Tomkovich type of entity,
21  discrimination being an issue?
22    A.  Yeah.  Like I said, I had no idea who
23  Pat Franke was.  I had no idea about this entire
24  situation, but when I read his -- when I read the
25  article with him in it, I was like, geez, this is me.

**Page 63**

1  This dude's me.  You know what I mean?
2        So, obviously, out of curiosity, I looked him
3  up on Facebook, but we haven't had really much in the
4  way of many conversations.
5    Q.  Same counsel?
6    A.  No, I don't believe so.
7    Q.  Different attorneys?
8        MR. HILL:  EEOC.
9        THE WITNESS:  Yeah.
10  BY MR. LIROT:
11    Q.  All right.  I understand you had predecessor
12  counsel or counsel before my fine colleague who's with
13  us here today.
14    A.  I did.
15    Q.  Who was that?
16    A.  I -- I was -- I didn't know really what my
17  rights were at the time, and I fell for one of those
18  scams online where they just take a deposit and write a
19  letter, and if the letter doesn't work, then they
20  just -- they bail on you.  It really wasn't
21  representation.
22    Q.  Okay.  I --
23    A.  Obviously, in the legal sense, it was
24  representation, but it wasn't really a -- they didn't
25  really take any time to learn about my case or what was

**Page 64**

1  going on.  They just -- I kind of went to them.  I said,
2  you know, this is what I feel has been going on, and
3  they -- it turned out to be one of them Google ad scams,
4  basically.
5    Q.  Was it a real attorney?
6    A.  I'm sure it was.  I mean, I paid them.  They
7  seemed to be.  I signed a contract and everything, but I
8  paid them and then we ended our relationship pretty much
9  immediately.
10    Q.  Do you remember the attorney or the firm?
11    A.  It's been so long.  It was so brief.
12    Q.  Do you know Mr. Hernandez?
13    A.  Yeah.  I've worked for him before.  Not under
14  Mike, but I've worked for him elsewhere.
15    Q.  Did you ever work with Mr. Hernandez at any
16  point during your tenure with a Tomkovich related
17  entity?
18    A.  No, sir.
19    Q.  Okay.  Where did you meet him?
20    A.  I met Tony Hernandez about a year,
21  year-and-a-half ago, but a friend of mine actually got a
22  job working as a manager there at his club now, Hush,
23  and they needed a DJ.  Came in and met with Tony and
24  went to work for them for a while.
25    Q.  How long after -- and I'm going to clear this

**Page 65**

1  up while I'm thinking about it.
2        Now, your position is that you were demoted or
3  retaliated against.  Were you indeed offered a job as a
4  DJ?
5    A.  Yes, but let me clarify that.  I was first
6  terminated.  I was informed that I was no longer with
7  company.  I was fired.  Then --
8    Q.  By Mr. Rice?
9    A.  Well, I actually found out from one of my
10  subordinates.  I didn't even know I was fired.  I got a
11  call one day from my floor host telling me, Hey, man,
12  sorry about how things worked out.
13        And I was on the couch with my girlfriend,
14  like, what are you talking about?
15        And that's when he said, Yeah, they're
16  cleaning house right now.  They fired everybody.  They
17  told me you're fired, too.
18        That's when I attempted to reach out.  Knowing
19  that there was already a bit of -- already having two
20  attempts to try to contact Mr. Tomkovich that were
21  unsuccessful, Matt Cooper not getting back to me, Rob
22  Rice and I having a certain amount of, you know, animus
23  towards each other, I reached out to Ben Cook and I
24  asked him what the deal was, and that's when Ben
25  informed me that, yes, I was, in fact, to be terminated,

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

66..69

Page 66

1 that they were going to come get my keys the minute I
2 walked in the door.
3         I told him he could just come to my house and
4 get the keys.  I wouldn't coming back anymore if I was
5 fired.
6         About two or three weeks went by, and that's
7 when Rob Rice reached out to me, offered me the head DJ
8 job in Pasco.
9       Q.   You never talked to Mr. Tomkovich in the
10 interim?
11      A.   He pretty much dropped off the face of the
12 earth once this started going on.
13      Q.   And so someplace --
14      A.   We went from having, like, weekly -- I'm
15 sorry.  Go ahead.
16      Q.   Someplace, somehow you're contacted again and
17 offered an alternative position?
18      A.   Uh-huh.
19      Q.   Now, it's my understanding that DJs, the whole
20 way that they make a living is pretty lucrative?
21      A.   Pretty decent.
22      Q.   Why would you turn down that alternative
23 position?
24      A.   I wasn't interested in working for people that
25 treated me the way they treated me.  That's exactly how

Page 67

1 I explained it to them when I wrote back to them.  I
2 said, I have no interest in working for you after the
3 way the last thing was handled.  You know, why would I
4 want to come back to that?
5       Q.   When you say the way the last thing was
6 handled, what do you mean?
7       A.   My firing.
8       Q.   So I'm still trying to tie together all of
9 these issues that you've articulated in your Complaint,
10 and your position today is that any of these alternative
11 explanations for the way you were treated, as you
12 phrased it, had nothing to do with any of the other
13 information we've gotten from Mr. Rice or Mr. Tomkovich?
14      A.   I mean, if -- if their issue is apparently
15 that I was this drunk drug addict, I'm sitting here
16 looking at a contract right now that states that I agree
17 to be drug tested any time.  Why didn't we do that?
18      Q.   Were there any drug tests on anybody?
19      A.   Oh, yeah.  I fired two guys that way.  It's
20 the easiest way to go in the strip club business.  You
21 don't want a guy around anymore, all these dudes are
22 going to piss for something.  They all at least smoke
23 pot.  I mean, most of them.  So it's an easy bet when
24 you want to get rid of some guys, just go, do me a
25 favor, head down to LabCorp for me, pee in a cup.

Page 68

1 Half the time, they don't show up.  The other
2 half of the time, sometimes they fail, and then in that
3 one, maybe 10 percent chance, sometimes you're stuck
4 with them.  It happens.
5       Q.   Well, I think you'd agree with me that there's
6 been some testimony today that you might have used drugs
7 while you were on the job; is that true?
8       A.   Other than smoking a little pot, but not -- I
9 mean, on the job, no.  On my breaks and stuff, yeah, I
10 smoke a little weed, but not on the premises.
11      Q.   Where would you smoke it?
12      A.   In my car, down the street, whatever, go for a
13 ride.  You're working 12, 14 hour days, you're entitled
14 to go have a little lunch break.  So what I do in the
15 parking lot of a Wendy's is kind of my business.
16      Q.   Would it ever occur on the premises of the
17 business?
18      A.   Not outside of my car.
19      Q.   Okay.  So how long from the time you turned
20 down the alternative DJ position was it before you found
21 alternative employment?
22      A.   I pretty much had an offer at Vu -- Déjà Vu
23 almost right away.  I went down to talk to Hal, and I
24 had already known Mark and a couple of the guys down
25 there.

Page 69

1       Q.   King?
2       A.   Yeah, yeah.  Good ole Hal.  Hal hired me over
3 at Déjà Vu.
4         The money kind of sucked at Vu, the hours
5 really sucked.  They were really great people, but I
6 didn't -- I didn't really -- I was always looking for
7 something to match the level that I had at South East
8 Show Clubs.  So I was always looking for something a
9 little bit better.
10        I was at Vu for a little while.  Then I went
11 out to Orlando.
12      Q.   What did you do there?
13      A.   I managed a club until a former employee
14 from -- that I knew through Gold Club and Emperor's
15 actually came out from SES and went back, had a chat
16 with my boss one night, and two days later, I was let
17 go.  I was there a week.  I didn't even have a chance to
18 get a set of keys made.
19      Q.   Who would that have been?
20      A.   A guy by the name CJ.  Forgive me.  I wish I
21 could give you a last name, but he didn't work directly
22 for me.  So I never saw his employment stuff.  CJ
23 something or other.  He was on Facebook.  His name was,
24 like, CJ Mellow or something.  He's some muscle head.  He
25 was on VIP for us at Gold Club at one point.

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

70..73

Page 70

1    Q.  So you're telling me that you got a -- you
2  left Déjà Vu, you got a job in Orlando, and somebody
3  from a Tomkovich-related club happened to be in
4  Orlando --
5    A.  Well, he saw a post I made on social media
6  that I was promoting this new club, Diamond Club in
7  Orlando.  So he came out --
8    Q.  Who was running that?
9    A.  I was at that time, but who's running it, I
10  believe that was when the Vigels [ph] were back around
11  for a little bit.  I don't think they're running those
12  clubs anymore, but at the time, I was working for the
13  Vigels, and this guy had some kind of prior relationship
14  with the Vigels.
15        He had a chat with them.  I was let go very
16  unceremoniously, and the reason was never even really
17  given.  So it was at that point that I started
18  connecting the dots and I decided to, you know -- I
19  needed to stand up for myself, and that's how I got into
20  this.
21        I've had a smear campaign against me since the
22  day I left.
23    Q.  So you leave Orlando.  What did you do next?
24    A.  Well, that's -- I was unemployed for some
25  time.

Page 71

1    Q.  What efforts were you taking to find
2  employment?
3    A.  I was applying at every club I could.
4  Actually, I was applying at clubs, restaurant.  I had a
5  ServSafe certificate.  So I was trying restaurants,
6  sports bars.  I really didn't care at that point, you
7  know, anything that would take me.  I was even willing
8  to go back to waiting tables at that point.
9        I was so burned out on the strip club business
10  at that point.  I thought maybe a change of pace would
11  be good, but I ended up getting lucky and finding a home
12  at Skin and, you know, Mr. Terrell's been really good to
13  me.  So --
14    Q.  So that was your next position was with Skin?
15    A.  Yeah, and I've pretty much been with them
16  since.
17    Q.  Did you ever work at the other location on
18  Hillsborough?
19    A.  Secrets, I have worked there a couple times,
20  helped them out just a handful of times.  Like if they
21  really are in a jam, I really don't like working at
22  Secrets.  It's just way all the way in Town and Country.
23  It's just really not my cup of tea, but when they've
24  need me, obviously, I don't really say no.
25    Q.  Let me go through some of these other exhibits

Page 72

1  and then I'm going to try to wrap this up relatively
2  quickly.
3        Exhibit 5 are these maintenance requests.
4  Where did that document come from?
5        Obviously, this was presented because it's got
6  the SES logo up at the top.
7    A.  Yes.  Right around the time after three months
8  or so of no -- nobody really running Tampa except for
9  Mike directly, he finally got Rob involved, and this was
10  Alan Foxworth.  He was the -- he took over for their --
11  he kind of took over all the maintenance and the
12  overseeing the properties himself, just making sure that
13  they were all uniform and up to our standards.
14    Q.  Okay.
15    A.  So any time we had something break, ice maker,
16  you know, or the neon lighting or any of that stuff goes
17  out, we would fill one of these out, submit it through
18  the corporate office in the back, and Alan or Farner
19  [ph] or one of these guys would come out and take a
20  look.
21    Q.  What knowledge do you have that Mr. Tomkovich
22  either knew of that document or approved of that
23  document?
24    A.  I mean, I don't have any direct knowledge, but
25  I mean, I know that South East Show Clubs is his

Page 73

1  trademark.  I don't know why anybody else would be using
2  it.  It's certainly not to enrich any of them.
3    Q.  Let me show you Exhibit Number 6, and again,
4  this is the final judgment in the EEOC versus HA 3860
5  and South East Show Clubs.
6        Go ahead, and if you would, just take a look
7  at the top paragraph.  I just want to ask you a couple
8  of questions about that.
9    A.  Certainly.
10    Q.  Do you see the word default in there?
11    A.  Uh-huh.
12    Q.  Do you know what the legal implications of the
13  use of that term are?
14    A.  Default judgment I would assume due to either
15  a lack of -- I guess the other person just didn't show
16  or missed some things or it was not a -- yeah.
17    Q.  I think that's accurate.
18    A.  Yeah.  I guess just --
19    Q.  And then the date on that is August 2015.  If
20  you look at the very last page or actually at the top,
21  there's a little -- there's a line that gives you both
22  federal docket information on the very top.
23    A.  Yeah, August 14th.
24    Q.  All right.  So that would have been long after
25  your discontinuation of any association with


ORANGE LEGAL

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

74..77

Page 74

1 Mr. Tomkovich or any club that he has any relationship
2 with?
3     A. Yeah, that's correct.
4     Q. And then Mr. Hill gave us these. July 2000 --
5     A. I'm sorry. I'm getting --
6     Q. Do you want to take a break?
7     A. I'm getting weird a charley horse. You're
8 fine. I just have to stand.
9      MR. LIROT: No, no. Let's take a break.
10      (Brief recess was taken from 3:03 p.m. to
11    3:05 p.m.)
12      MR. LIROT: I'm trying to get you out of here.
13 BY MR. LIROT:
14     Q. For this Exhibit Number 7, Alexander Barranco
15 of Bevintel. What can you tell me about him and that
16 document?
17     A. Well, this is actually, as a correction,
18 Alex Barranco was brought on, again by SES, to get all
19 of the bars up to a certain standard. Alex had flare
20 bartending experience, inventory control, stuff like
21 that. So he would -- he was kind of like a bar
22 consultant. Like, he didn't really about the
23 entertainment or the girl side of it, he just worried
24 about the bar.
25      He did not work for Bevintel, he actually

Page 75

1 worked for SES. He worked for -- you know, he went
2 around from club to club, but the Bevintel information
3 would -- like basically, he hired Bevintel to do all of
4 his clubs. Come in, do all the inventory and stuff.
5      Then, all the reports would get sent to him
6 and then they would trickle down. So Alex would
7 eventually get them and then they would come to us, and
8 then like a report card, they would tell you good job,
9 bad job, whatever.
10     Q. So I take it that lists missing liquor for
11 lack of a better description?
12     A. Correct.
13     Q. And what period of time does that cover?
14     A. This one is July 23rd, and it says Bev info
15 for 7/15. So I'm going to assume that this is the week
16 of 7/15 going into 7/22.
17     Q. So Bev info would come in --
18     A. And I received it on the 23rd, which would
19 make sense.
20     Q. So they'd come in once a week?
21     A. Once a week. They would take all of our
22 liquor invoices, weigh our bottles, match it to the
23 micro sales and come up with a -- come up with a number.
24     Q. And your testimony is that none of the missing
25 liquor is explained by your conduct?

Page 76

1     A. Well, this first page here, the 63 percent,
2 that was Thomas McArthur's last week at Emperor's
3 Gentlemen's Club. So --
4     Q. Explain the percentage to me. So you're
5 telling me if there -- if I've got an inventory of 100
6 percent, 63 percent of that disappears?
7     A. Correct. And then at the bottom, your
8 Bevintel rating is sort of like a report card. So 52.5
9 percent is like out of a hundred. You know what I mean?
10      It's basically, like, if you were -- if you
11 were to get a test in college with a 52 percent, you'd
12 be panicking. So the 63 percent reflects overall
13 shrinkage. That means not just liquor, that means Red
14 Bulls, which are expensive, just all that stuff, all
15 product.
16     Q. Any inventory?
17     A. Yes. Then your liquor pour cost and all that
18 stuff. So the 63 percent point 2, that's was the --
19 that was the last straw for Tom week, and that was when
20 Mike actually told me go get Tom, send him to the back
21 office, and they fired him on the 26th. They fired him
22 in the middle of his shift. I just took over.
23     Q. I'm going to jump to Exhibit Number 13, which
24 was the card you presented us with today. We made a
25 copy of.

Page 77

1      Now, you heard Mr. Tomkovich testify that SES
2 was really more of a just an umbrella marketing arm for
3 all of the clubs. Where did you get that card?
4     A. We had boxes of them at all the clubs. Every
5 club had at least a couple boxes of these and we were
6 instructed to actually sell these for cash. You were
7 supposed to get about 2, 250 bucks each for these, but
8 they weren't to be rung into the drawer. They were to
9 be put into a special envelope that went into the top
10 part of the safe for Mr. Tomkovich.
11     Q. Okay. And what do you think the significance
12 of that card is as far as SES?
13     A. Well I mean, it's a skeleton key. It's a
14 golden ticket. You know what I mean?
15      If you have that card, you go into any club,
16 they're going to hook you up. They're going to let you
17 in for free. It would be -- I mean, I would guess
18 essentially it would work as -- you know, the same way
19 as a McDonald's gift card. It works at any McDonald's,
20 you know.
21     Q. Okay. Bear with me for just a second. I'm
22 going to try to wrap this up quickly.
23      Now, we looked at the written reprimand. Did
24 you get any other kind of write-ups from Mr. Rice?
25     A. Nope.



Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE                                                          78..81

Page 78

1    Q.  Any write-ups about drinking or inappropriate
2  behavior?
3    A.  If I did, I didn't sign them or I never saw
4  them.
5    Q.  All right.
6    A.  I got one write-up.  Tardiness, that was it.
7    Q.  All right.  When you say you didn't sign them,
8  were you presented with some write-ups that you didn't
9  sign?
10    A.  Nope.  Because like I said, honestly, I
11  thought the one that I got was retarded.  I thought the
12  tardiness one was stupid, but I stilled signed it
13  because I didn't want to lose my job.
14      So if I seen any other ones, I mean, if they
15  had started getting really ridiculous, I might have
16  refused to sign them, but I was never presented -- I
17  mean, what's the date on that?
18      Sorry.
19    Q.  That's all right.
20    A.  Sorry.  I can be very verbose sometimes.
21    Q.  That's okay.  That's a good DJ, right?
22      And just for the record, you have a very good
23  DJ voice.  I'm sure that our transcript doesn't capture
24  that, but you have that deep FM -- I'm trying to think
25  of the word -- stentorian?

Page 79

1    A.  Well, if I ever try to get Beasley
2  Broadcasting to hire me back, I'll try to get a letter
3  of reference from you.
4    Q.  Okay.
5    A.  And I'm always willing to do your commercials
6  as well.
7    Q.  Fair enough.  All right.  I'm going to end on
8  this note here and talk to my folks just for a second,
9  see if there's anything that I've missed, but Mr. Rice
10  testified that there's a lot of text messages or some
11  other concern floating around about you trying to take
12  advantage of your position to get sexual favors from
13  females associated with the business.  What's your
14  response to that?
15    A.  That's preposterous.  And unlike my text
16  messages, which I actually produced, I don't see any of
17  those.  But I don't believe that to be the case.
18      Am I going to sit here and pretend like I'm --
19  I've never hooked up with somebody in the business?
20      I'm not -- come on.  I'm not a saint, but have
21  I ever coerced or forced anybody?
22      I think I've proven and established today that
23  I can be a pretty affable and charming guy.  I don't
24  need to coerce people into sleeping with me.
25    Q.  Well, I don't think that was the testimony

Page 80

1  that he gave.
2    A.  He pretty --
3    Q.  I think he indicated that he had some concern
4  and was actually contacted by some people that felt you
5  were taking advantage of your position to try to get
6  them to provide you with sexual favors.
7    A.  My answer to that would be, who are these
8  people?  I would be curious to know who these people
9  are, but I certainly don't -- I've never had an issue
10  with that, and I mean, anybody who's worked with me
11  since at any other club will attest to the fact that
12  that's just not my style.
13    Q.  So you're telling that there's no merit to
14  that position or testimony taken by Mr. Rice?
15    A.  No, absolutely not.
16      MR. LIROT:  All right.  Let us go outside for
17    just a moment, and we'll see how quickly we can
18    finish this up today.
19      (Brief recess was taken from 3:12 p.m. to
20    3:17 p.m.)
21      MR. LIROT:  Back on the record.
22  BY MR. LIROT:
23    Q.  Your attorney gave us some other texts that
24  haven't been marked yet.
25      MR. LIROT:  I guess I'll go ahead and mark

Page 81

1    those as Number 16.
2      (Exhibit Number 16 was marked for
3    identification.)
4  BY MR. LIROT:
5    Q.  Because this is front and back or it looks
6  like some of its front and back, I can't tell, but
7  we'll make sure that we have a complete one-sided set of
8  this.  But can you tell me what those texts are?
9    A.  Yes.  This was a conversation I had with a
10  friend of mine, former employee of mine, Bruce Stoval
11  [ph].  Bruce, he was part of my crew that kind of got
12  wiped out when I got wiped out.
13      Somebody slipped through the cracks.  He
14  reapplied, he got a job back there immediately, and he
15  honestly felt for my situation at the time.  So, you
16  know, saying in touch with people that are still in the
17  industry, he was kind of keeping me privy to the fact
18  that all of the policies that I refused to carry out on
19  the orders of SES were being carried out now, basically.
20      So that's when he was basically -- I was -- I
21  reached out to him because at the time, I was putting a
22  case together, and I asked him if he knew anything, and
23  he told me basically, yeah, this is all of the stuff
24  that's going, and, you know, I screen capped it for, you
25  know, just in case.

Orange Legal
800-275-7991

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

82..85

**Page 82**

1    Q.   Is this on the same phone you're looking for
2  the batter for?
3    A.   No, I believe this was Facebook. I believe
4  this was a Facebook conversation.
5    Q.   Are you able to recreate that with any dates?
6    A.   Probably, yeah. I could probably do that
7  within -- I mean I could. I can't promise. I don't
8  know Facebook's -- you know, but I'll try. I can
9  certainly attempt to.
10   Q.   Fair enough. And then your counsel also gave
11  us what appear to be Emperor's II sales records, and I'm
12  not going to go -- I'm not going to make that part of
13  the exhibits here, but what is that and where did you
14  get it?
15   A.   Well, that's -- I got it from my outbox in my
16  own personal e-mail. We're instructed to send that out
17  every day. Every day, we fill out the new information
18  for that day.
19       Like, so let's stay you're starting at the
20  beginning of the month. This whole thing will be blank
21  and you finish, let's say, 12/1. You'll fill out all of
22  12/1 and you'll send it in with the rest of it blank
23  just that first day, and then every day as we do, you
24  know, new days, you update it and send it to corporate.
25       The thing is we were -- we had our own

**Page 83**

1  personal e-mail addresses to do this with. It wasn't
2  like I didn't -- I didn't carry boxes of documents out
3  of the building or anything, it was I just went into my
4  outbox of my e-mail when I found that this information
5  would be relevant and when I'd have to prove my -- my
6  numbers.
7    Q.   Okay.
8    A.   I mean, if we're worrying about the
9  confidentiality of these documents, then we probably
10  should have had some kind of internal e-mail server, but
11  we didn't have that. We were instructed to just e-mail
12  our stuff in using our own personal e-mails. So it's
13  not like -- you know what I mean?
14       It's just something I could access at any time
15  because I sent those e-mails.
16   Q.   From what device? From your -- was it a phone
17  or --
18   A.   Sometimes from --
19   Q.   -- a laptop?
20   A.   Sometimes from the -- a computer in the
21  office, sometimes from your phone, sometimes whatever
22  device you had in front of you because I'd have to text
23  the numbers to Mike as well every night. So we were --
24  they were very hands on with getting, you know, up to
25  the minute reports.

**Page 84**

1    Q.   Okay. So do you have -- I mean, what body of
2  materials of this nature do you have?
3    A.   Just those. Just those. Honestly, anything
4  that I've ever submitted to corporate via e-mail is
5  probably sitting in my outbox still. That's just the
6  power of gmail. It's always going to be there.
7    Q.   Do you recall signing a confidentiality
8  agreement?
9        MR. HILL:  He hasn't broken any
10  confidentiality. We're producing it in this lawsuit
11  to you guys.
12       MR. LIROT:  I wasn't -- I didn't say that he
13  had. I just --
14       MR. HILL:  You guys should have it, too. You
15  should have given it to us.
16  BY MR. LIROT:
17   Q.   Well, obviously, we would request that you
18  keep all the records confidential that you have in your
19  possession and --
20   A.   The only person who's ever --
21   Q.   And if you could give us -- I don't know how
22  voluminous it would be, but if you could give us
23  everything related to your association with Emperor's
24  for us to take a look at, that would be much
25  appreciated?

**Page 85**

1        MR. HILL:  And in turn, we'd also like some
2  documents from you guys.
3        MR. LIROT:  We will certainly -- that was a
4  conversation we had --
5        MR. HILL:  Sure.
6        MR. LIROT:  -- in much more serious context --
7        MR. HILL:  Sure.
8        MR. LIROT:  -- both with and in your absence.
9  All right.
10       MR. HILL:  Okay. Just a couple questions real
11  quick.
12           CROSS-EXAMINATION
13  BY MR. HILL:
14   Q.   Picking up --
15       MR. HILLS:  Are you done? I didn't mean to
16  interrupt you.
17       MR. LIROT:  No, I'm done. Thank you.
18       MR. HILL:  Back on the record.
19  BY MR. HILL:
20   Q.   Just real quick, Mr. Schiele. Mr. Lirot
21  handed you Exhibit 14, which is a write-up. Can you
22  tell me what you see at the top of that write-up?
23   A.   The South East Show Clubs logo.
24   Q.   So you actually received a disciplinary
25  documentation form from South East Show Clubs; is that

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

86..89

Page 86

1  right?
2      A.  That's correct.
3      Q.  And you didn't make this document, did you?
4      A.  No.
5      Q.  Okay.  And is this the type of documentation
6  you saw other people get whenever they would get
7  disciplined?
8      A.  Yes.  I would -- I had to actually issue a few
9  of these in my day.
10     Q.  And it came from South East Show Clubs?
11     A.  And they were identical to these.  You'd just
12 get a blank one of these, and normally, the process
13 would be if I wanted to write up an employee, I would
14 have to write them up, and then, I would have to find
15 somebody who worked for the parent company to back it
16 up.
17         So if you see here, there's usually two
18 different managers or two different witnesses.  They
19 would always get somebody from the parent company to be
20 around for that.
21     Q.  And by the parent company, what do you mean?
22     A.  South East Show Clubs.
23     Q.  And who set your rate of pay?
24     A.  Mike Tomkovich.
25     Q.  Who set your hours?

Page 87

1      A.  Mike Tomkovich, South East Show Clubs.  Mike
2  Tomkovich.
3      Q.  Who told you what your job duties were?
4      A.  The company, the parent company, Mike
5  Tomkovich, directly from him.
6      Q.  Who set the company policies that you
7  enforced?
8      A.  The owner, Mike Tomkovich.
9         MR. HILL:  All right.  I believe that's all.
10 That's it.
11         And which -- what number is the Convergence?
12        THE WITNESS:  15.
13        MR. HILL:  15.
14 BY MR. HILL:
15     Q.  And so picking up 15, Document 15, it says
16 client company employee leasing application.  Do you see
17 that?
18     A.  Uh-huh.
19     Q.  It says Emperor's Tampa, Inc.  Do you see
20 that?
21     A.  Uh-huh, yes.
22     Q.  It doesn't say Emperor's Tampa II, Inc., does
23 it?
24     A.  No, it does not.
25     Q.  And so there was an Emperor's Tampa II, Inc.

Page 88

1  and an Emperor's Tampa, Inc., right?
2      A.  Correct.
3      Q.  But somehow, you were asked to apply for
4  Emperor's Tampa, Inc. through Convergence; is that
5  right?
6      A.  That's according to this, yes.
7      Q.  Who asked you to fill this out, do you know?
8      A.  It came from above.  I know that much.
9      Q.  What is above?
10     A.  Somebody from corporate.  So it was either
11 Mike or it was somebody.  Somebody above me.  Could have
12 Ben, it could have been -- more than likely, it was --
13 it was either Mike or Rob.
14     Q.  And the corporate offices, you kept talking
15 about corporate offices, where is the corporate office
16 located?
17     A.  The same -- the same address as Emperor's,
18 5718 Adamo Drive.  We have a front club, we have a back
19 club, they have a giant parking garage, and then within
20 that parking garage is a small, you know, two -- like,
21 two little room office.
22     Q.  And where is corporate for South East Show
23 Clubs?
24     A.  Jacksonville, I believe.
25     Q.  And is that the parent corporate office?

Page 89

1      A.  Correct, yes.
2      Q.  I didn't --
3      A.  Yeah.  Jacksonville is considered HQ.  So --
4      Q.  Meaning?
5      A.  Like this -- Jacksonville's the center of
6  the -- you know, the whole thing.  That's the tippy top.
7         MR. LIROT:  Nothing more.
8         MR. HILL:  He'll read.  We'll be in touch.
9         (Deposition concluded at 3:27 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Michael S. Schiele vs South East Show Clubs, et al.
MICHAEL S. SCHIELE

90..93

**Page 90**

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA
     COUNTY OF HILLSBOROUGH

 4

 5        I, KELLEY KING, Shorthand Reporter and

 6   Notary Public, State of Florida, certify that

 7   MICHAEL S. SCHIELE personally appeared before me and was

 8   duly sworn.

 9        WITNESS my hand and official seal this 20th day

10   of September, 2017.

11

12

13

14               Kelley King

15               _____
                 KELLEY KING

16               Notary Public, State of Florida
                 My Commission No.: GG019363

17               Expires: August 8, 2020

18

19

20

21

22

23

24

25
```

**Page 91**

```
 1                  CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA

     COUNTY OF HILLSBOROUGH

 4

 5        I, KELLEY KING, Shorthand Reporter and

 6   Notary Public, State of Florida, certify that I was

 7   authorized to and did stenographically report the

 8   deposition of MICHAEL S. SCHIELE; that a review of the

 9   transcript was requested; and that the foregoing

10   transcript, pages 4 through 89, is a true and accurate

11   record of my stenographic notes.

12        I FURTHER CERTIFY that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17        Dated this 20th day of September, 2017.

18

19              Kelley King

20              _____
                KELLEY KING, Notary Public

21              State of Florida

22

23

24

25
```

**Page 92**

```
 1                     ERRATA SHEET

 2          DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE

 3   IN RE:    MICHAEL S. SCHIELE VS. SOUTH EAST SHOW
               CLUBS, EMPEROR'S TAMPA II, INC., AND
 4             MICHAEL TOMKOVICH

     CASE NO:  8:16-CV-2308-JSM-MAP

 5   DATE:     AUGUST 9, 2017
     DEPONENT: MICHAEL S. SCHIELE

 6

 7   PAGE NO. LINE NO.   CORRECTION & REASON

 8   ____    _____    _____

 9   ____    _____    _____

10   ____    _____    _____

11   ____    _____    _____

12   ____    _____    _____

13   ____    _____    _____

14   ____    _____    _____

15   ____    _____    _____

16   ____    _____    _____

17   ____    _____    _____

18   ____    _____    _____

19   ____    _____    _____

20   ____    _____    _____

21   ____    _____    _____

22   Under penalties of perjury. I declare that I have read

     the foregoing document and that the facts stated in it

23   are true.

24

25   _____         _____
     DATE                         MICHAEL S. SCHIELE
```

**Page 93**

```
 1

     SEPTEMBER 20, 2017

 2

 3   MICHAEL S. SCHIELE
     C/O BRANDON J. HILL, ESQUIRE
 4   WENZEL FENTON CABASSA, PA
     1110 NORTH FLORIDA AVENUE, SUITE 300
 5   TAMPA, FLORIDA 33602
     Re: August 9, 2017, Deposition of MICHAEL S. SCHIELE
 6   Dear MICHAEL S. SCHIELE:
 7        This letter is to advise that the transcript for the
     above-referenced deposition has been completed and is
 8   available for review.  Please contact our office at
     (800)275-7991 to make arrangements for read and sign or
 9   sign below to waive review of this transcript.
10        It is suggested that the review of this transcript be
     completed within 30 days of your receipt of this letter,
11   as considered reasonable under Federal Rules*; however,
     there is no Florida Statute to this regard.
12
          The original of this transcript has been forwarded to
13   the ordering party and your errata, once received, will
     be forwarded to all ordering parties for inclusion in
14   the transcript.
15                                  Sincerely,
16
17                                  Kelley King
                                    Orange Legal, Inc.
18
19   cc:  BRANDON J. HILL, Esquire
          LUKE CHARLES LIROT, Esquire
20        CANDICE A. ROJAS, Esquire
21   Waiver:
22   I, _____, hereby waive the reading and signing
     of my deposition transcript.
23
24   _____         _____
     Deponent Signature           Date
25   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e)
```



**Orange Legal**
**800-275-7991**